327 F.3d 56
 UNITED STATES of America, Appellee,
v.
Ramzi Ahmed YOUSEF, Eyad Ismoil, also known as Eyad Ismail, and Abdul Hakim Murad, also known as Saeed Ahmed, Defendants-Appellants,
Mohammed A. Salameh, Nidal Ayyad, Mahmud Abouhalima, also known as Mahmoud Abu Halima, Bilal Alkaisi, also known as Bilal Elqisi, Ahmad Mohammad Ajaj, also know as Khurram Khan, Abdul Rahman Yasin, also know as Aboud, and Wali Khan Amin Shah, also known as Grabi Ibrahim Hahsen, Defendants.
 Docket No. 98-1041L.
 Docket No. 98-1197.
 Docket No. 98-1355.
 Docket No. 99-1544.
 Docket No. 99-1554.
 United States Court of Appeals, Second Circuit.
 Argued: May 3, 2002.
 Decided: April 4, 2003.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED David N. Kelley and Michael J. Garcia, Assistant United States Attorneys (Mary Jo White, United States Attorney, on the brief, David Raskin, Adam B. Siegel, Jennifer G. Rodgers, James J. Benjamin, Jr., Baruch Weiss, Jamie L. Kogan, Christine H. Chung, Ira M. Feinberg, Assistant United States Attorneys, of counsel), United States Attorney's Office for the Southern District of New York, New York, NY, for Appellee United States of America.
 Bernard V. Kleinman and Steven Z. Legon, White Plains, NY, for Defendant-Appellant Ramzi Ahmed Yousef.
 Louis R. Aidala (Joan Palermo, on the brief), New York, NY, for Defendant-Appellant Eyad Ismoil.
 Jerry L. Tritz (Amy J. Porter, on the brief), Law Office of Jerry L. Tritz, New York, NY, for Defendant-Appellant Abdul Hakim Murad.
 Before: WALKER, Chief Judge, WINTER and CABRANES, Circuit Judges.
 JOHN M. WALKER, Jr., Chief Judge, RALPH K. WINTER and JOSÉ A. CABRANES, Circuit Judges.
 
 
 1
 TABLE OF CONTENTS

INTRODUCTION ........................................................................77

GENERAL BACKGROUND ..................................................................78

 I. World Trade Center Bombing ..............................................78
 II. Airline Bombing .........................................................79

AIRLINE BOMBING CASE ................................................................80

 BACKGROUND ........................................................................80

 I. Preparation for Airline Bombing Conspiracy ..............................80
 II. Discovery of Airline Bombing Plot .......................................81
 III. Arrests of Shah, Yousef, and Murad ......................................82

 DISCUSSION ........................................................................85

 I. Assertion of Extraterritorial Jurisdiction Over Defendants Yousef
 and Murad .............................................................85
 A. Jurisdiction to Prosecute Defendants' Extraterritorial Conduct
 Under Federal Law .................................................86
 1. Applicable Law ..................................................86
 2. Counts Thirteen and Fourteen ....................................86
 3. Count Twelve ....................................................87
 4. Count Nineteen ..................................................88
 B. Exercise of United States Extraterritorial Jurisdiction and
 Customary International Law .......................................90
 
 
 2
 1. Bases of Jurisdiction over the Counts Charged ...................92
 a. Relationship between Domestic and International Law
 in Yousef's Prosecution ...................................92
 b. Treaty-Based Jurisdiction: The Hague and Montreal
 Conventions ...............................................94
 2. Jurisdiction over Counts Twelve through Eighteen ................96
 3. Jurisdiction over Count Nineteen ................................97
 a. The District Court's Holding and Yousef's Challenges
 on Appeal .................................................97
 i. The District Court's Opinion ..........................98
 ii. The Use of Authority in Determining Customary
 International Law ...................................99
 iii. The Universality Principle Provides for Jurisdiction
 over Only a Limited Set of Acts Violating
 the Law of Nations .................................103
 b. Jurisdiction Is Proper Under United States Laws
 Giving Effect to Its Obligations Under the Montreal
 Convention ...............................................108
 c. In Any Event, Jurisdiction Over Count Nineteen Is
 Proper under the Protective Principle of Customary
 International Law ........................................110
 C. Due Process Claims .................................................111
 1. Due Process Nexus ..............................................111
 2. Due Process in Conduct of Trial ................................112
 D. Venue in Southern District of New York .............................114
 E. Doctrine of Specialty ..............................................115
 II. Conviction of Yousef Under 18 U.S.C. § 2332 .......................116
 A. Prosecutorial Discretion Under Section 2332(d) .....................116
 B. Failure to Charge Jury on Intent to Retaliate ......................117
 III. District Court Failure to Sua Sponte Voir Dire the Jury Mid-Trial
 Regarding the Pope and the Roman Catholic Church .....................118
 IV. Liberation Army Letter .................................................120
 A. Admission of Liberation Army Letter ................................121
 B. Failure to Redact Liberation Army Letter ...........................122
 V. District Court Denial of Murad's Motion to Suppress His Post-Arrest
 Statement ............................................................122
 A. District Court Decision ............................................123
 B. Standard of Review .................................................124
 C. Murad's Alleged Request for a Lawyer ...............................124
 D. Voluntariness of Confession ........................................125
 1. FBI Coercion ...................................................125
 2. Hegarty's Testimony ............................................126
 3. Murad's Allegations of Torture by Philippine Officials .........126
 4. United States Government's Lack of Knowledge Regarding
 Philippine Mistreatment ......................................127
 E. Harmless Error .....................................................128
 VI. Murad's Sixth Amendment Right to Present a Defense .....................128
 A. Applicable Law .....................................................128
 B. Reports by Amnesty International and the United States
 Department of State Regarding Abusive Treatment by
 Philippine Police ................................................128
 C. Discovery from the Philippines .....................................129
 D. Jury Charge on Voluntariness .......................................130
 VII. "Bully" Charge on Circumstantial Evidence of Intent ....................131
 VIII. Sufficiency of the Evidence on Yousef's Attempt Convictions ............133

WORLD TRADE CENTER CASE ............................................................135

 BACKGROUND .......................................................................135
 
 
 3
 I. Indictment and Apprehension of Yousef and Ismoil .......................135
 II. The World Trade Center Bombing Trial ...................................135

 DISCUSSION .......................................................................137

 I. Yousef's Pre-Trial Motions .............................................137
 A. Motion to Dismiss the Indictment ...................................137
 B. Motion to Suppress .................................................139
 1. Attachment of Sixth Amendment Right to Counsel Upon
 Indictment for the World Trade Center Bombing ................140
 2. Invocation of Right to Counsel .................................141
 3. Sixth Amendment Rights Based on Assignment of Asylum
 Counsel ......................................................142
 4. Purported Due Process Requirement of Appointment of
 Counsel ......................................................143
 5. Voluntariness of Yousef's Post-Arrest Statements ...............144
 II. Ismoil's Motion to Suppress His Statement to Jordanian Authorities .....144
 III. The Daubert Hearing ....................................................147
 IV. Yousef's Motion to Sever ...............................................149
 V. The Admission of Ismoil's Redacted Statement ...........................152
 VI. Yousef's Motion for a Change of Venue ..................................155
 VII. Exclusion of Evidence of Government's Inconsistent Theories ............155
 VIII. Admission of Government's Fingerprint Evidence and Telephone
 Call Charts ..........................................................157
 IX. Jury Instructions Concerning Ismoil's Knowledge ........................158
 X. Jury Instruction on "Aiding and Abetting" ..............................160
 XI. Failure to Dismiss the Alternate Jurors ................................160
 XII. Cumulative Violation of Right to Fair Trial ............................161

SENTENCING ISSUES ..................................................................161

 I. Ex Post Facto Claim ....................................................162
 II. Length of Sentences ....................................................162
 III. Fines and Restitution ..................................................164
 IV. Special Conditions of Confinement ......................................165

POST JUDGMENT ISSUES ...............................................................166

 I. "Scarpa Materials" .....................................................166
 II. Recusal ................................................................169

CONCLUSION .........................................................................170

 I. Airline Bombing Case ...................................................170
 II. World Trade Center Case ................................................171
 III. Sentencing Issues ......................................................172
 IV. Post-Judgment Issues ...................................................173
 
 INTRODUCTION
 
 4
 Defendants-appellants Ramzi Yousef, Eyad Ismoil, and Abdul Hakim Murad appeal from judgments of conviction entered in the United States District Court for the Southern District of New York (Kevin Thomas Duffy, Judge) on April 13, June 2, and June 15, 1998, respectively. Judge Duffy presided over two separate jury trials. In the first trial, Yousef, Murad, and Wali Khan Amin Shah were tried on charges relating to a conspiracy to bomb United States commercial airliners in Southeast Asia. In the second trial, Yousef and Ismoil were tried for their involvement in the February 1993 bombing of the World Trade Center in New York City. Yousef, Ismoil, and Murad now appeal from their convictions, asserting a number of claims. Yousef and Ismoil also appeal from the District Court's denial of several of their post-judgment motions. In reviewing these claims, we view the evidence in the light most favorable to the Government, as required by Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
 
 GENERAL BACKGROUND[1]
 I. World Trade Center Bombing
 
 5
 The conspiracy to bomb the World Trade Center began in the Spring of 1992, when Yousef met Ahmad Mohammad Ajaj at a terrorist training camp on the border of Afghanistan and Pakistan. After formulating their terrorist plot, Yousef and Ajaj traveled to New York together in September 1992. In Ajaj's luggage, he carried a "terrorist kit" that included, among other things, bomb-making manuals. After Yousef and Ajaj arrived at John F. Kennedy International Airport, inspectors of the Immigration and Naturalization Service ("INS") discovered the "terrorist kit" in Ajaj's luggage and arrested him. Although Yousef was also stopped, he and Ajaj did not disclose their connection to one another, and INS officials allowed Yousef to enter the United States.[2]
 
 
 6
 Once in New York, Yousef began to put together the manpower and the supplies that he would need to carry out his plan to bomb the World Trade Center. Yousef assembled a group of co-conspirators to execute his plan, including defendants Mohammad Salameh, Nidal Ayyad, Mahmud Abouhalima, and Abdul Rahman Yasin. Next, Yousef began accumulating the necessary ingredients for the bomb. He ordered the required chemicals, and his associates rented a shed in which to store them. Yousef and Salameh established their headquarters at an apartment they rented in Jersey City, New Jersey, an urban center located across the Hudson River from Manhattan. The apartment also functioned as their bomb-making factory.
 
 
 7
 In December 1992, Yousef contacted Ismoil, who was then living in Dallas, Texas. On February 22, 1993, Ismoil joined Yousef and the others in New York to help complete the bomb preparations.
 
 
 8
 On February 26, 1993, Yousef and Ismoil drove a bomb-laden van onto the B-2 level of the parking garage below the World Trade Center. They then set the bomb's timer to detonate minutes later. At approximately 12:18 p.m. that day, the bomb exploded, killing six people, injuring more than a thousand others, and causing widespread fear and more than $500 million in property damage.
 
 
 9
 Soon after the bombing, Yousef and Ismoil fled from the United States. Yousef and Ismoil were indicted for their participation in the bombing on March 31, 1993 and August 8, 1994, respectively. Yousef was captured in Pakistan nearly two years after the bombing, and Ismoil was arrested in Jordan a little over two years after the attack. Both were returned to the United States to answer the charges in the indictment.
 
 II. Airline Bombing
 
 10
 A year and a half after the World Trade Center bombing, Yousef entered Manila, the capital of the Philippines, under an assumed name. By September 1994, Yousef had devised a plan to attack United States airliners. According to the plan, five individuals would place bombs aboard twelve United States-flag aircraft that served routes in Southeast Asia. The conspirators would board an airliner in Southeast Asia, assemble a bomb on the plane, and then exit the plane during its first layover. As the planes continued on toward their next destinations, the timebombs would detonate. Eleven of the twelve flights targeted were ultimately destined for cities in the United States.
 
 
 11
 Yousef and his co-conspirators performed several tests in preparation for the airline bombings. In December 1994, Yousef and Wali Khan Amin Shah placed one of the bombs they had constructed in a Manila movie theater. The bomb exploded, injuring several patrons of the theater. Ten days later, Yousef planted another test bomb under a passenger's seat during the first leg of a Philippine Airlines flight from Manila to Japan. Yousef disembarked from the plane during the stopover and then made his way back to Manila. During the second leg of the flight, the bomb exploded, killing one passenger, a Japanese national, and injuring others.
 
 
 12
 The plot to bomb the United States-flag airliners was uncovered in January 1995, only two weeks before the conspirators intended to carry it out. Yousef and Murad were burning chemicals in their Manila apartment and accidentally caused a fire. An apartment security guard saw the smoke coming from the apartment and called the fire department. After the firemen left, the Philippine police arrived at the apartment, where they discovered chemicals and bomb components, a laptop computer on which Yousef had set forth the aircraft bombing plans, and other incriminating evidence. Philippine authorities arrested Murad and Shah, though Shah escaped and was not recaptured until nearly a year later. Yousef fled the country, but was captured in Pakistan the next month.
 
 
 13
 * * *
 
 
 14
 On February 21, 1996, a grand jury in the Southern District of New York filed a twenty-count superseding indictment against the defendants and others. Counts One through Eleven charged Yousef and Ismoil with various offenses arising from their participation in the February 26, 1993 bombing of the World Trade Center. Counts Twelve through Nineteen charged Yousef, Murad, and Shah with various crimes relating to their conspiracy to bomb United States airliners in Southeast Asia in 1994 and 1995.[3]
 
 
 15
 The trial of Yousef, Murad, and Shah on the airline bombing charges began on May 29, 1996 and ended on September 5, 1996, when the jury found all three defendants guilty on all counts. Yousef and Ismoil's trial on charges relating to the World Trade Center bombing began on July 15, 1997 and concluded on November 12, 1997, when the jury found both defendants guilty on all counts.
 
 
 16
 Yousef was sentenced for both convictions on January 8, 1998. For the World Trade Center convictions he was sentenced principally to a total of 240 years of imprisonment: 180 years on Counts One through Eight, plus two 30-year terms on Counts Nine and Ten for violations of 18 U.S.C. § 924(c),[4] to be served consecutively to the 180-year sentence and to each other. For the airline bombing convictions, Yousef was sentenced principally to a term of life imprisonment, to be served consecutively to his 240-year sentence for the World Trade Center bombing.
 
 
 17
 On April 3, 1998, Ismoil was sentenced principally to 180 years of imprisonment on Counts One through Six, Eight, and Eleven. Additionally, Ismoil was sentenced to two 30-year terms on Counts Nine and Ten to be served consecutively to each other and to the 180-year sentence, for a total of 240 years of imprisonment.
 
 
 18
 On May 15, 1998, Murad was sentenced principally to life imprisonment on Counts Twelve through Sixteen, plus two 30-year sentences for Counts Seventeen and Eighteen, all to be served consecutively.
 
 AIRLINE BOMBING CASE
 BACKGROUND
 
 19
 I. Preparation for Airline Bombing Conspiracy
 
 
 20
 In August 1994, after the bombing of the World Trade Center, and his flight from the United States, Yousef traveled to Manila under an alias. By September, Yousef had developed an elaborate plan to bomb a dozen United States-flag aircraft and recorded that plan on his laptop computer. According to the plan, five individuals would plant bombs aboard twelve United States-flag aircraft operating on routes in Southeast Asia. Each conspirator would board an airliner in Southeast Asia, assemble a bomb on board the plane, and leave the aircraft at its first stop. The timebombs would detonate during the second leg of each of the targeted flights. Eleven of the twelve flights were ultimately destined for cities in the United States. Each of the targeted aircraft was capable of carrying up to 280 people.
 
 
 21
 After Yousef had formulated his airline bombing plan, he began to acquire the information and the ingredients necessary to carry it out. Yousef compiled detailed flight data on the twelve aircraft, including their departing times, flight numbers, flight durations and aircraft types, and transferred this information to his laptop computer. In early November 1994, Yousef placed a large order for chemicals and equipment in Manila, and, during the next two months, he and his co-conspirators performed several tests in preparation for the aircraft bombings. On December 1, 1994, Yousef and Shah conducted a test by placing a bomb under a patron's seat at the Greenbelt movie theater in Manila. At 10:30 p.m., the bomb exploded, injuring several people. Ten days later, on December 11, Yousef planted another test bomb under the seat of a passenger on a Philippine Airlines jet flying from Manila to Cebu (another city in the Philippines) and then to Japan. Yousef disembarked from the plane in Cebu. Two hours after the aircraft departed from Cebu, the bomb exploded, killing one Japanese passenger and injuring others.
 
 
 22
 In late December, Murad traveled from the Middle East to the Philippines, and Shah, who had left the Philippines immediately after the movie theater bombing, returned to Manila under an assumed name. Thus, by January 1995, the conspirators were assembled in Manila and ready to carry out their attack on twelve United States flag aircraft. But for a fire in the defendants' apartment in Manila, the plan might have succeeded.
 
 II. Discovery of Airline Bombing Plot
 
 23
 On January 6, 1995, Yousef was in the Manila apartment burning chemicals that he and Murad had obtained to construct the aircraft bombs. At approximately 10:45 p.m., an apartment security guard noticed Yousef and Murad running down the stairs carrying their shoes. After Yousef and Murad went back to their apartment, their neighbors observed smoke coming from the window of their apartment and alerted apartment security. The security guard proceeded to the apartment to investigate, finding Murad and Yousef by their front door. The defendants denied that there was a fire in their apartment and would not permit the guard inside to inspect. The guard then returned to his post to contact the police.
 
 
 24
 After trying to contact the local police to no avail, the security guard returned to the apartment to investigate further. At this point, Murad let the security guard into the apartment, while Yousef waited outside. The guard observed a salt-like substance and burn marks in the area of the sink. Murad told the guard that they had been mixing ingredients to make firecrackers for a late New Year's celebration. The guard then went back to his station and had the receptionist call the fire department. In the meantime, Yousef left the apartment complex.
 
 
 25
 After the firefighters had come and gone, police arrived at the apartment. The security guard let the police into the apartment, where they found, among other things, cartons of chemicals, Casio timers, wrist watches with wires attached, and juice bottles with unknown substances inside. The officers then waited in the lobby of the apartment complex for Murad and Yousef to return. Murad returned and, after he was approached by one of the officers, tried to flee. The police quickly apprehended him and took him into custody.
 
 
 26
 While in custody at the apartment, Murad called Yousef's cellular telephone. Almost immediately after receiving this call, Yousef made arrangements to leave the country. He purchased a plane ticket to Singapore and fled the Philippines approximately five hours after Murad's call.
 
 
 27
 While Yousef was in flight from the country, the police continued to search the Manila apartment. In addition to the bomb-related materials, police discovered photographs of Pope John Paul II, Bibles, and confession materials; the Pope was scheduled to visit Manila on January 12, 1995, just five days later. The police collected some of the items they found in the apartment and then applied for a warrant to search the apartment.[5] A Philippine judge issued a search warrant, and members of the local police explosive ordnance disposal unit ("EOD") conducted a thorough investigation of the apartment. They videotaped the contents of the apartment and seized several items, including Yousef's laptop computer, papers and books with instructions for making bombs, a chemical dictionary, and many chemicals and mechanical components which could have been used to make bombs. On Yousef's laptop computer, the police found various files including a letter claiming responsibility for future attacks against American targets by the "Fifth Division of the Liberation Army."
 
 III. Arrests of Shah, Yousef, and Murad
 
 28
 On January 11, 1995, several days after their search of the Manila apartment, Manila police arrested Shah. Police apprehended Shah after they determined that a pager called by Yousef following Murad's arrest was registered in the name of Shah's girlfriend. Shah escaped from custody one week later, only to be recaptured on December 11, 1995 in Malaysia by Malaysian police. Shah was then delivered to the custody of the United States, where he agreed to speak to Federal Bureau of Investigation ("FBI") agents after he signed a written waiver of his Miranda rights. See Miranda v. Arizona, 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
 
 
 29
 In early February 1995, the United States Embassy in Islamabad, Pakistan received a tip that Yousef was somewhere in Islamabad. On February 7, 1995, Pakistani officials, together with a special agent from the United States Department of State, arrested Yousef at a guest house in Islamabad. The next day, agents from the FBI and the United States Secret Service arrived from the United States, took Yousef into custody, and transported him back to the United States. On the plane, Yousef was informed of the charges against him pertaining to the World Trade Center bombing and advised of his rights. Without the use or need of an interpreter, he waived his Miranda rights and made an extensive confession about the World Trade Center bombing plot.[6]
 
 
 30
 Philippine authorities turned Murad over to FBI agents in Manila on April 12, 1995. During the plane ride to the United States, Murad was read his Miranda rights twice and given written copies of the waiver in both English and Arabic. Murad indicated that he understood his rights and waived them in writing. He then agreed to speak to the FBI agents on the airplane without an interpreter. Murad told the agents that his part in the aircraft bombing scheme was to board a United Airlines flight in Singapore with its first stop in Hong Kong and to plant a bomb onboard the plane. After arriving in Hong Kong, Murad was to take a different flight back to Singapore, planting a bomb aboard that plane as well. Murad told the agents that he expected the resulting explosion to tear a hole in the aircraft, causing it to crash in the Pacific Ocean. He also asserted his belief that co-conspirators would bomb other flights. Murad stated that the goal of the attacks was to "make the American people and the American government suffer for their support of Israel." Direct Testimony of Francis J. Pellegrino, Aug. 5, 1996, Airline Bombing Trial Transcript ("ATr."), at 3501.
 
 
 31
 Murad described the explosive device components of the bombs, which matched items seized at the Manila apartment he shared with Yousef. Murad stated that he had been told that the Philippine Airlines bombing of December 11, 1994 was a testrun to ensure that the chemicals and timing device worked correctly.
 
 
 32
 On February 21, 1996, a grand jury in the Southern District of New York indicted Yousef, Murad, and Shah for various crimes relating to their conspiracy to bomb United States airliners in Southeast Asia in 1994 and 1995. Counts Twelve through Twenty of the original indictment (S12 93 Cr. 180(KTD)) were renumbered from One to Nine for use in the airline bombing trial.
 
 
 33
 In Count Twelve, the defendants were indicted for violating 18 U.S.C. § 371[7] by conspiring to violate 18 U.S.C. § 32(a)(1) by destroying aircraft in the special administrative jurisdiction of the United States and civil aircraft operated in foreign air commerce; and by conspiring to violate 18 U.S.C. § 32(a)(2) by placing bombs on board such aircraft, thereby endangering the aircraft's safety.[8]
 
 
 34
 Count Thirteen charged the defendants with violating 18 U.S.C. § 32(a)(1) and (7) by attempting to destroy an aircraft within the special aircraft jurisdiction of the United States and civil aircraft operated in foreign air commerce.[9] Count Fourteen charged the defendants with violating 18 U.S.C. § 32(a)(2) and (7) by attempting to place a bomb on such aircraft and endangering the safety of such aircraft.
 
 
 35
 In Count Fifteen, the defendants were charged with violating 18 U.S.C. § 2332(b) and (d) by conspiring to kill United States nationals while they were located outside of the United States.[10] In Count Sixteen, the defendants were charged with violating 18 U.S.C. § 2332a by conspiring to use a weapon of mass destruction outside the United States against United States nationals.[11]
 
 
 36
 The defendants were charged in Counts Seventeen and Eighteen with violating 18 U.S.C. §§ 924(c) and 2 by using and carrying a destructive device during and in connection with a violent crime.[12] The violent crime underlying Count Seventeen was the conspiracy to bomb aircraft charged in Count Twelve. In Count Eighteen, the underlying violent crime was the conspiracy to kill United States nationals charged in Count Fifteen.
 
 
 37
 Yousef alone was charged in Count Nineteen with violating 18 U.S.C. §§ 32(b)(3), 34, and 2 for placing a bomb on a civil aircraft registered in a foreign country while that aircraft was in service, to wit, Yousef's bombing of the Philippine airlines flight that killed one passenger.[13]
 
 
 38
 Shah alone was charged in Count Twenty with violating 18 U.S.C. § 751(a) by attempting to escape from the Metropolitan Correctional Center in New York on February 6, 1996.[14]
 
 
 39
 Prior to trial, the defendants moved to suppress their confessions, but the District Court denied those motions.
 
 
 40
 The trial of Yousef, Murad, and Shah on the airline bombing charges began on May 29, 1996 and ended on September 5, 1996, when the jury found all three defendants guilty on all counts. The District Court sentenced Yousef principally to a term of life imprisonment on all eight counts. The District Court sentenced Murad principally to life imprisonment on Counts Twelve through Sixteen, plus two 30-year sentences for Counts Seventeen and Eighteen, all to be served consecutively.
 
 
 41
 On appeal, defendants-appellants Yousef and Murad attack their convictions and sentences, raising a number of issues.[15]
 
 DISCUSSION
 
 42
 I. Assertion of Extraterritorial Jurisdiction Over Defendants Yousef and Murad[16]
 
 
 43
 Yousef contends that the Government exceeded its authority by trying him in the United States for his conduct in the aircraft bombing case. In particular, he asserts that the charges alleged in Counts Twelve, Thirteen, Fourteen and Nineteen should be dismissed because 18 U.S.C. § 32 cannot be applied to conduct outside the United States. He further claims that he cannot be convicted of the charge set forth in Count Nineteen because he was not "found" within the United States as required by 18 U.S.C. § 32(b). Yousef also contends that his prosecution violates customary international law limiting a nation's jurisdiction to proscribe conduct outside its borders and is contrary to the Due Process Clause of the Fifth Amendment of the Constitution.[17] In addition, Yousef asserts that the District Court violated the venue provisions of the Constitution and Federal Rule of Criminal Procedure 18. Finally, Yousef argues in his reply brief that his indictment and conviction for the airline bombing conspiracy violated the extradition treaty between the United States and Pakistan. See United Kingdom Extradition, Dec. 22, 1931, U.S.-U.K., 1931 U.S.T. LEXIS 60, 12 Bevans 482.
 
 
 44
 A. Jurisdiction to Prosecute Defendants' Extraterritorial Conduct Under Federal Law
 
 1. Applicable Law
 
 45
 It is beyond doubt that, as a general proposition, Congress has the authority to "enforce its laws beyond the territorial boundaries of the United States." EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991). Although there is a presumption that Congress does not intend a statute to apply to conduct outside the territorial jurisdiction of the United States, see Foley Bros. v. Filardo, 336 U.S. 281, 285, 69 S.Ct. 575, 93 L.Ed. 680 (1949), that presumption can be overcome when Congress clearly expresses its intent to do so, id.; Sale v. Haitian Ctrs. Council, Inc., 509 U.S. 155, 188, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993); United States v. Gatlin, 216 F.3d 207, 211 (2d Cir.2000). As long as Congress has indicated its intent to reach such conduct, a United States court is "bound to follow the Congressional direction unless this would violate the due process clause of the Fifth Amendment." United States v. Pinto-Mejia, 720 F.2d 248, 259 (2d Cir.1983) (internal quotation marks omitted). Moreover, the presumption against extraterritorial application does not apply to those "criminal statutes which are, as a class, not logically dependent on their locality for the Government's jurisdiction." United States v. Bowman, 260 U.S. 94, 98, 43 S.Ct. 39, 67 L.Ed. 149 (1922).
 
 
 46
 In determining whether Congress intended a federal statute to apply to overseas conduct, "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10, 21, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963) (internal quotation marks omitted). Nonetheless, in fashioning the reach of our criminal law, "Congress is not bound by international law." Pinto-Mejia, 720 F.2d at 259. "If it chooses to do so, it may legislate with respect to conduct outside the United States, in excess of the limits posed by international law." Id.; see also United States v. Quemener, 789 F.2d 145, 156 (2d Cir.1986); United States v. Allen, 760 F.2d 447, 454 (2d Cir.1985).
 
 2. Counts Thirteen and Fourteen
 
 47
 Counts Thirteen and Fourteen charged Yousef, Murad and Shah with violating 18 U.S.C. § 32(a). Count Thirteen alleged that they attempted to damage aircraft in the special aircraft jurisdiction of the United States and civil aircraft operated in foreign air commerce, in violation of § 32(a)(1) and (7). Count Fourteen charged them with violating § 32(a)(2) and (7) by attempting to place a bomb on such aircraft in Count Fourteen.
 
 
 48
 Section 32(a)(1) prohibits damaging "any aircraft in the special aircraft jurisdiction of the United States" or "any civil aircraft used, operated, or employed in interstate, overseas, or foreign air commerce." Section 32(a)(2) makes it a crime to place a destructive device on board any such aircraft if it would be likely to endanger the aircraft's safety. Section 32(a)(7) prohibits an attempt or conspiracy to do anything forbidden under § 32(a).
 
 
 49
 The text of the applicable federal statutes makes it clear that Congress intended § 32(a) to apply extraterritorially. Under 49 U.S.C. § 46501(2)(A) the "special aircraft jurisdiction of the United States" is defined to include any "civil aircraft of the United States" while that aircraft is in flight. "Civil aircraft of the United States," in turn, is defined in 49 U.S.C. § 40102(a)(17) as "an aircraft registered under Chapter 441" of Title 49, which requires registration of any United States-flag aircraft. See 49 U.S.C. §§ 44101-44103. Accordingly, § 32(a) covers any United States-flag aircraft while in flight, wherever in the world it may be. In addition, Congress defined "foreign air commerce" to cover "the transportation of passengers or property by aircraft ... between a place in the United States and a place outside the United States." 49 U.S.C. § 40102(a)(22).[18]
 
 
 50
 The District Court was correct to hold that the twelve aircraft targeted in the instant case fell within one or another category of craft protected by United States law. The relevant aircraft were all United States-flag aircraft targeted while in flight, and were therefore in "the special aircraft jurisdiction of the United States." 18 U.S.C. § 32(a)(1). Furthermore, all but one of the aircraft targeted in the conspiracy charged in Counts Thirteen and Fourteen were civil aircraft carrying passengers destined for the United States,[19] and were therefore "civil aircraft used, operated, or employed in ... overseas, or foreign air commerce." 18 U.S.C. § 32(a)(1); see also 49 U.S.C. § 40102(a)(22) (defining "foreign air commerce" as "the transportation of passengers or property by aircraft for compensation ... between a place in the United States and a place outside the United States when any part of the transportation or operation is by aircraft"). Accordingly, it was proper for the District Court to exercise jurisdiction over the extraterritorial crimes charged in Counts Thirteen and Fourteen.
 
 3. Count Twelve
 
 51
 In Count Twelve, the defendants were charged with violating 18 U.S.C. § 371 by conspiring to place bombs on board aircraft and destroy aircraft, in violation of 18 U.S.C. § 32(a)(1) and (2). The District Court concluded that, because it had jurisdiction over the substantive crimes charged — including attempted destruction of aircraft in the special aircraft jurisdiction of the United States — it also had derivative jurisdiction over the conspiracy charges. United States v. Yousef, 927 F.Supp. 673, 682 (S.D.N.Y.1996).
 
 
 52
 We agree. Indeed, this conclusion is a simple application of the rule enunciated by the Supreme Court as long ago as 1922 in Bowman, that Congress is presumed to intend extraterritorial application of criminal statutes where the nature of the crime does not depend on the locality of the defendants' acts and where restricting the statute to United States territory would severely diminish the statute's effectiveness. See Bowman, 260 U.S. at 98, 43 S.Ct. 39; United States v. Plummer, 221 F.3d 1298, 1304-06 (11th Cir.2000) (relying on Bowman to conclude that the attempt provision of 18 U.S.C. § 545, which criminalized the smuggling of goods into the United States, applies extraterritorially); United States v. Felix-Gutierrez, 940 F.2d 1200, 1204-05 (9th Cir.1991) (relying on Bowman to apply the accessory-after-the-fact prohibition set forth in 18 U.S.C. § 3 to conduct outside the United States where there was extraterritorial jurisdiction over the underlying crime). In the instant case, if Congress intended United States courts to have jurisdiction over the substantive crime of placing bombs on board the aircraft at issue, it is reasonable to conclude that Congress also intended to vest in United States courts the requisite jurisdiction over an extraterritorial conspiracy to commit that crime. Cf. id.; United States v. Cotten, 471 F.2d 744, 750 (9th Cir.1973) ("Bowman implicitly gives extraterritorial effect to 18 U.S.C. § 371."); Brulay v. United States, 383 F.2d 345, 349-50 (9th Cir.1967) (extending smuggling statute, 18 U.S.C. § 545, to conduct outside the United States, at least with respect to citizens of the United States, and extending "18 U.S.C. § 371, the conspiracy section ... along with it"). We therefore hold that the District Court was correct to conclude that it had "extraterritorial jurisdiction" over the ancillary charges detailed in Count Twelve.
 
 4. Count Nineteen
 
 53
 In Count Nineteen, Yousef alone was charged with violating 18 U.S.C. § 32(b)(3) for placing a bomb on a civil aircraft registered in another country. Specifically, Yousef was charged with planting a bomb on board a Philippine Airlines flight traveling from the Philippines to Japan on December 11, 1994. The aircraft was a civil aircraft registered in the Philippines.
 
 
 54
 There is no dispute that Congress intended § 32(b) to apply to attacks on non-United States-flag aircraft. The statute applies expressly to placing a bomb on aircraft registered in other countries while in flight, no matter where the attack is committed, and provides for jurisdiction over such extraterritorial crimes whenever, inter alia, "an offender is afterwards found in the United States." 18 U.S.C. § 32(b).
 
 
 55
 Yousef argues that he was wrongly charged in Count Nineteen because he was brought here against his will when Pakistan transferred him to United States custody for prosecution on charges relating to the World Trade Center bombing and, therefore, he was not "found in the United States" within the meaning of § 32(b). To support his position, Yousef points out that in another statute, 18 U.S.C. § 1651, Congress differentiates between one who is forcibly brought into the country and one who is found in the United States: "Whoever, on the high seas, commits the crime of piracy as defined by the law of nations, and is afterwards brought into or found in the United States, shall be imprisoned for life." (emphasis supplied).
 
 
 56
 Yousef reasons that if being "found" in the United States merely requires a defendant's presence here, then the "afterwards brought into" language of § 1651 would be superfluous. He thus concludes that because he was brought to the United States involuntarily, he was not "found in the United States" for purposes of § 32(b).
 
 
 57
 Upon examining the persuasive interpretation by other courts of an identical jurisdictional provision in a related statute, see United States v. Rezaq, 134 F.3d 1121, 1130-32, 1143 (D.C.Cir.1998); United States v. Yunis, 924 F.2d 1086, 1092 (D.C.Cir.1991), as well as the purpose and plain language of 18 U.S.C. § 32(b), we hold that Yousef was "found in the United States" within the meaning of § 32(b).
 
 
 58
 In Yunis, the United States Court of Appeals for the District of Columbia held that jurisdiction existed in a situation similar to Yousef's. Yunis, who claimed to be a member of Lebanon's Amal Militia, was indicted for hijacking a Royal Jordanian Airlines flight from Beirut, Lebanon, and destroying it on the ground in Beirut. Yunis, 924 F.2d at 1089. Initially, Yunis was charged with conspiracy, hostage taking, and aircraft damage. Id. After Yunis was indicted, FBI agents lured Yunis to international waters off the coast of Cyprus, where they arrested him on these charges. Yunis then was brought to the United States, where, in a superseding indictment, he was charged with the additional crime of air piracy under the Antihijacking Act, 49 U.S.C.App. § 1472(n) (1988).[20] Id. at 1090. The Court held that jurisdiction properly was established under the "afterwards found in the United States" language of § 1472(n) because by the time Yunis was charged with air piracy, he was already present in the United States and under arrest on other charges.[21] Id. at 1092; see also United States v. Rezaq, 134 F.3d at 1132 (relying on Yunis to hold that "section 1472(n)'s `afterward found in the United States' language did not preclude jurisdiction even though the United States brought Rezaq into its territory against his will").
 
 
 59
 The instant case presents circumstances at least as compelling as those in Yunis for asserting criminal jurisdiction over Yousef. Yousef was already under indictment for his participation in the World Trade Center bombing before he was seized in Pakistan and returned to the United States.[22] Only after he was in the United States awaiting trial for the World Trade Center charges did a grand jury indict him on separate charges relating to the airline bombing plot.[23] By the time Yousef was charged with the crime detailed in Count Nineteen, therefore, he was already lawfully in federal custody in the United States. Accordingly, Yousef was "found in the United States," and jurisdiction is proper under 18 U.S.C. § 32(b).
 
 
 60
 Indeed, any other interpretation would contravene the purpose and strain the plain language of § 32(b), which was adopted pursuant to the United States' obligations under the Montreal Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation, ("the Montreal Convention"), Sept. 23, 1971, 24 U.S.T. 565, T.I.A.S. No. 7570; see also S. Rep. No. 98-619 at 3682 (1984), reprinted in 1984 U.S.C.C.A.N 3682.
 
 
 61
 The purpose of the Montreal Convention is to ensure that individuals who attack airlines cannot take refuge in a country because its courts lack jurisdiction over someone who committed such an act against a foreign-flag airline in another nation. See 24 U.S.T. at 565, art. 5. Accordingly, the Convention requires States parties to adopt legislation to assert jurisdiction over such an offender whenever an offender is "present in" the State and the State does not extradite the offender to another State party. Id. Although § 32 uses the words "found in" instead of "present in," we agree with the reasoning of the Yunis court that, in enacting the statute to meet its obligations under the Montreal Convention, "Congress intended the statutory term `found in the United States' to parallel the [Montreal] Convention's `present in [a contracting state's] territory,' a phrase [that] does not indicate the voluntariness limitation urged" by Yousef. Yunis, 924 F.2d at 1091-92 (applying similar reasoning to analogous statute, 49 U.S.C. § 46502, formerly 49 U.S.C.App. § 1472(n)). Moreover, were we to conclude that the term "found in the United States" did not permit a United States court to assert jurisdiction over someone present in the country involuntarily, Yousef's extradition to the United States to be prosecuted for the bombing of the World Trade Center — and his resulting detention here — would prevent his prosecution for the later-charged aircraft attacks. Congress could not have intended such an absurd result when it enacted § 32(b). Cf. United States v. Turkette, 452 U.S. 576, 580, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) ("absurd results are to be avoided"); Adams-Mitchell Co. v. Cambridge Distrib. Co., 189 F.2d 913, 923 (2d Cir.1951) ("if such [a] [statutory] interpretation led to absurd results, and thus imputed to Congress an irrational purpose, it should be spurned").
 
 
 62
 Finally, we reject Yousef's argument that the plain meaning of "found" requires that Yousef have been found in the United States "by chance." Although "come upon by chance" is one possible definition of the verb "to find," several other possible definitions of this verb do not incorporate this element of chance or happenstance. See 5 Oxford English Dictionary 922 (2d ed. 1989) (defining "find" (and its past tense, "found") to mean "[t]o discover or attain by search or effort ... [to] obtain by searching," as well as "[t]o come upon by chance or in the course of events"); see also Webster's New Third International Dictionary 851 (1976) (defining "find" as "to secure or obtain (something needed or desirable) by effort or management" (parentheses in original)). At most, the term "found" is ambiguous with respect to the issue of voluntary presence, and this ambiguity should be construed in favor of implementing the purposes of the Montreal Convention that are evident from its text read as a whole.
 
 
 63
 We thus hold that Yousef was "found in the United States" as required by § 32(b).
 
 
 64
 B. Exercise of United States Extraterritorial Jurisdiction and Customary International Law
 
 
 65
 On appeal, Yousef challenges the District Court's jurisdiction over Counts Twelve through Nineteen of the indictment by arguing that customary international law does not provide a basis for jurisdiction over these counts and that United States law is subordinate to customary international law and therefore cannot provide a basis for jurisdiction.[24] See Yousef Br. at 136-37, 141-48. He particularly contests the District Court's conclusion that customary international law permits the United States to prosecute him under the so-called universality principle for the bombing of Philippine Airline Flight 434 charged in Count Nineteen. Yousef claims that, absent a universally agreed-upon definition of "terrorism" and an international consensus that terrorism is a subject matter over which universal jurisdiction may be exercised, the United States cannot rest jurisdiction over him for this "terrorist" act either on the universality principle or on any United States positive law, which, he claims, necessarily is subordinate to customary international law.
 
 
 66
 Yousef's arguments fail. First, irrespective of whether customary international law provides a basis for jurisdiction over Yousef for Counts Twelve through Nineteen, United States law provides a separate and complete basis for jurisdiction over each of these counts and, contrary to Yousef's assertions, United States law is not subordinate to customary international law or necessarily subordinate to treaty-based international law and, in fact, may conflict with both. Further contrary to Yousef's claims, customary international law does provide a substantial basis for jurisdiction by the United States over each of these counts, although not (as the District Court held) under the universality principle.
 
 
 67
 While the District Court correctly held that jurisdiction was proper over each count, and we affirm the substance of its rulings in full, we hold that the District Court erred in partially grounding its exercise of jurisdiction over Count Nineteen — the bombing of Philippine Airlines Flight 434 while en route from Manila, the Philippines, via Cebu, to Japan — on the universality principle.
 
 
 68
 We conclude, instead, that jurisdiction over Count Nineteen was proper, first, under domestic law, 18 U.S.C. § 32; second, under the aut dedere aut punire ("extradite or prosecute") jurisdiction created by the Montreal Convention, as implemented in 18 U.S.C. § 32 (destruction of aircraft) and 49 U.S.C. § 46502 (aircraft piracy); and third, under the protective principle of the customary international law of criminal jurisdiction.
 
 
 69
 1. Bases of Jurisdiction over the Counts Charged
 
 
 70
 a. Relationship between Domestic and International Law in Yousef's Prosecution
 
 
 71
 Jurisdiction over Yousef on Counts Twelve through Nineteen was based on 18 U.S.C. § 32. Yousef argues that this statute cannot give rise to jurisdiction because his prosecution thereunder conflicts with established principles of customary international law. Yousef's argument fails because, while customary international law may inform the judgment of our courts in an appropriate case, it cannot alter or constrain the making of law by the political branches of the government as ordained by the Constitution.
 
 
 72
 Principles of customary international law reflect the practices and customs of States in the international arena that are applied in a consistent fashion and that are generally recognized by what used to be called "civilized states." That is, principles of customary international law consist of the "settled rule[s] of international law" as recognized through "the general assent of civilized nations."[25] The Paquete Habana, 175 U.S. 677, 694, 20 S.Ct. 290, 44 L.Ed. 320 (1900) (emphasis added); id. at 686, 20 S.Ct. 290; see generally Ian Brownlie, Principles of International Law 5-7 (5th ed. 1999) (explaining generally the principles of customary international law).
 
 
 73
 It has long been established that customary international law is part of the law of the United States to the limited extent that "where there is no treaty, and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations." The Paquete Habana, 175 U.S. at 700, 20 S.Ct. 290 (emphasis added); see also Garcia-Mir v. Meese, 788 F.2d 1446, 1453 (11th Cir.1986) (noting that "public international law is controlling only" in the absence of controlling positive law or judicial precedent).
 
 
 74
 While it is permissible for United States law to conflict with customary international law, where legislation is susceptible to multiple interpretations, the interpretation that does not conflict with "the law of nations" is preferred. Murray v. Charming Betsy, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804).[26] The Charming Betsy canon comes into play only where Congress's intent is ambiguous. Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc., 268 F.3d 103, 128 (2d Cir.2001) (stating that United States courts "`are not to read general words ... without regard to the limitations customarily observed by nations upon the exercise of their powers.'" (quoting United States v. Aluminum Co. of Am., 148 F.2d 416, 443 (2d Cir.1945) (emphasis added))).
 
 
 75
 If a statute makes plain Congress's intent (instead of employing ambiguous or "general" words), then Article III courts, which can overrule Congressional enactments only when such enactments conflict with the Constitution, see, e.g., Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 215, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962) (stating that, "[i]n dealing with problems of interpretation and application of federal statutes, we have no power to change deliberate choices of legislative policy that Congress has made within its constitutional powers"), must enforce the intent of Congress irrespective of whether the statute conforms to customary international law. Thus the Supreme Court stated in The Nereide, 13 U.S. (9 Cranch) 388, 3 L.Ed. 769 (1815) (Marshall, C.J.), that while courts are "bound by the law of nations which is a part of the law of the land," Congress may "manifest [its] will" to apply a different rule "by passing an act for the purpose." Id. at 423. The Court reaffirmed this principle in McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963), stating that Congress may enact laws superseding "the law of nations" if "the affirmative intention of the Congress [is] clearly expressed." Id. at 21-22, 83 S.Ct. 671; see also, e.g., Comm. of United States Citizens Living in Nicaragua v. Reagan, 859 F.2d 929, 939 (D.C.Cir.1988) (holding that "under domestic law, statutes supersede customary international law" and that statutes are not subject to challenge on the basis of a violation of customary international law); United States v. Howard-Arias, 679 F.2d 363, 371-72 (4th Cir.1982) (holding that "the United States may violate international law principles" if Congress enacts federal statutes that conflict with international law). It also is established that Congress "may legislate with respect to conduct outside the United States, in excess of the limits posed by international law." United States v. Pinto-Mejia, 720 F.2d 248, 259 (2d Cir.1983).
 
 
 76
 In the event that there is no "controlling executive or legislative act or judicial decision" that the court must apply, The Paquete Habana, 175 U.S. at 700, 20 S.Ct. 290, a court should identify the norms of customary international law by looking to "the general usage and practice of nations[,] or by [looking to] judicial decisions recognizing and enforcing that law ...[, or by] consulting the works of jurists writing professedly on public law," United States v. Smith, 18 U.S. (5 Wheat.) 153, 5 L.Ed. 57 (1820) (Story, J.). However, materials beyond the laws and practices of States, such as the writings of jurists,[27] may serve only as "evidence" of these principles of customary international law, to which courts may look "not for the speculations of their authors concerning what the law ought to be, but for trustworthy evidence of what the law really is." The Paquete Habana, 175 U.S. at 700, 20 S.Ct. 290 (emphasis added); see also Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 789 (D.C.Cir.1984) (Edwards, J., concurring) (relying on The Paquete Habana for the proposition that courts should identify the "law of nations" primarily from the official acts and practices of States and, secondarily, as "evidence" of existing state practices, from the writings of scholars). We adopted the teaching of The Paquete Habana and Smith on the appropriate use of the sources of international law in Kadic v. Karadzic, 70 F.3d 232, 238-39 (2d Cir.1995) (quoting Smith, 18 U.S. at 160-61, 18 U.S. 153), and in Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir.1980), in which we emphasized that, to the extent that we rely on secondary writings by publicists as evidence of international law, we do so only for evidence of "what the law really is," id. at 881 (emphasis added) (internal quotation marks and citation omitted).
 
 
 77
 b. Treaty-Based Jurisdiction: The Hague and Montreal Conventions
 
 
 78
 Treaty law also may provide a basis for a State's action independent of the principles of customary international law. A treaty creates obligations in States parties to it that may differ from those of customary international law, and it generally is immaterial whether customary international law points in the same or in a different direction than the treaty obligation. See, e.g., The Tunis and Morocco Nationality Decrees Case, (Great Britain v. France) 1923 P.C.I.J. (ser. B) No. 4, at 24 (Feb. 7) (Permanent Court of International Justice, predecessor of the International Court of Justice ("ICJ"), recognizing that a country's treaty obligations could supersede the general norms of customary international law for the purpose of determining which questions of nationality fall within the domaine réservé of a State); see also Clive Parry, The Sources and Evidences of International Law 33 (1965) ("[I]f two or more States have unequivocally agreed to something by treaty, in relation to the matter in hand nothing other than the treaty has much relevance.").
 
 
 79
 Norms of customary international law can vitiate a treaty's effect only in the rare instance where the treaty or a provision thereof violates one of the few so-called "peremptory norms" of international law, or "jus cogens." See, e.g., United States v. Matta-Ballesteros, 71 F.3d 754, 4 n. 5 (9th Cir.1995) (stating, in dicta, that "[j]us cogens norms, which are nonderogable and peremptory, enjoy the highest status within customary international law, are binding on all nations, and can not [sic] be preempted by treaty"); Comm. of United States Citizens Living in Nicaragua, 859 F.2d at 940 (stating in dicta that "[a] treaty is void if, at the time of its conclusion, it conflicts with a peremptory norm of general international law" (internal quotation marks and citations omitted)); see also Vienna Convention on the Law of Treaties, May 23, 1969, art. 53, 1155 U.N.T.S. 332, 344, S. Exec. Doc. L, 92-1 ("Vienna Convention")[28] (stating that "a treaty is void if it conflicts with a peremptory norm of general international law from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character"); Ian Brownlie, Principles of Public International Law 627 (5th ed. 1999). A treaty between two nations to engage in the slave trade, for example, would be void; a treaty to engage in the ivory trade, though repugnant to many contemporaries, would not be.
 
 
 80
 Beginning with the Hague Convention for the Suppression of Unlawful Seizure of Aircraft, Dec. 16, 1970, 22 U.S.T. 1641, 860 U.N.T.S. 105, a number of international treaties have provided that where an individual who has committed an offense proscribed by the treaty is present in a State party to the treaty, the State is obliged either to prosecute the offender (even if the offense was extraterritorial) or to extradite the offender for prosecution by another State party to the convention.[29] id.; see Case Concerning the Arrest Warrant of 11 Apr. 2000 (Democratic Republic of the Congo v. Belgium), 41 I.L.M. 536, 560 (2002) (separate opinion of ICJ President Guillaume ¶¶ 7-9) (listing agreements); Michael P. Scharf, Symposium: Universal Jurisdiction: Myths, Realities, and Prospects: Application of Treaty-Based Universal Jurisdiction to Nationals of Non-Party States, 35 New Eng. L. Rev. 363, 363-66 & nn. 4-13 (2001) (listing conventions that require States parties to either extradite or prosecute offenders).
 
 
 81
 As discussed above at Section I.A.4, the Montreal Convention is one such treaty. The express purpose of the Convention is to ensure that terrorists who commit crimes on or against aircraft cannot take refuge in countries whose courts otherwise might have lacked jurisdiction over an offense against a foreign-flag aircraft that transpired either in another State or in international airspace. See Montreal Conv., art. 5, 24 U.S.T. at 565.
 
 
 82
 The Montreal Convention, unlike the customary international law principles of criminal jurisdiction (including universal jurisdiction), creates a basis for the assertion of jurisdiction that is moored in a process of formal lawmaking and that is binding only on the States that accede to it. The jurisdiction thus created is not a species of universal jurisdiction, but a jurisdictional agreement among contracting States to extradite or prosecute offenders who commit the acts proscribed by the treaty — that is, the agreements between contracting States create aut dedere aut punire ("extradite or prosecute") jurisdiction. Rosalyn Higgins, Problems and Process: International Law and How We Use It 64 (1994).
 
 
 83
 Article 1 of the Montreal Convention provides:
 
 
 84
 1. Any person commits an offence if he unlawfully and intentionally:
 
 
 85
 ...
 
 
 86
 (c) places or causes to be placed on an aircraft in service, by any means whatsoever, a device or substance which is likely to destroy that aircraft, or to cause damage to it which renders it incapable of flight, or to cause damage to it which is likely to endanger its safety in flight[.]
 
 
 87
 24 U.S.T. at 565. Section 2 of that article makes it an offense for anyone to attempt to commit such an offense or to act as an accomplice to one who commits such an offense. Id. Article 7 of the Convention establishes aut dedere aut punire jurisdiction, stating in relevant part:
 
 
 88
 The Contracting State in the territory of which the alleged offender is found shall, if it does not extradite him, be obliged, without exception whatsoever and whether or not the offence was committed in its territory, to submit the case to its competent authorities for the purpose of prosecution.
 
 
 89
 
 Id.
 
 
 
 90
 2. Jurisdiction over Counts Twelve through Eighteen
 
 
 91
 Jurisdiction over Counts Twelve through Eighteen is straight-forward, and we affirm both the District Court's finding of jurisdiction and its reasoning. United States domestic law provides a complete basis for jurisdiction over the conduct charged in these counts, independent of customary international law. Nevertheless, contrary to Yousef's claims, jurisdiction is consistent with three of the five principles of customary international law criminal jurisdiction — the objective, protective, and passive personality principles, described at note 24, ante.
 
 
 92
 First, jurisdiction over Counts Twelve through Eighteen is consistent with the "passive personality principle" of customary international jurisdiction because each of these counts involved a plot to bomb United States-flag aircraft that would have been carrying United States citizens and crews and that were destined for cities in the United States. Moreover, assertion of jurisdiction is appropriate under the "objective territorial principle" because the purpose of the attack was to influence United States foreign policy and the defendants intended their actions to have an effect — in this case, a devastating effect — on and within the United States. Finally, there is no doubt that jurisdiction is proper under the "protective principle" because the planned attacks were intended to affect the United States and to alter its foreign policy.
 
 3. Jurisdiction over Count Nineteen
 
 93
 a. The District Court's Holding and Yousef's Challenges on Appeal
 
 
 94
 Count Nineteen, the bombing of Philippine Airlines Flight 434, appears to present a less straight-forward jurisdictional issue because the airplane that was bombed was not a United States-flag aircraft, it was flying between two destinations outside of the United States, and there is no evidence that any United States citizens were aboard the flight or were targets of the bombing. The District Court nevertheless concluded that jurisdiction over Yousef for the offenses charged in Count Nineteen was proper, inter alia, under the principle of "universal jurisdiction." Yousef, 927 F.Supp. at 681-82.
 
 
 95
 Yousef makes a two-part argument on appeal challenging the District Court's holding with respect to the Court's jurisdiction over Count Nineteen. First, he claims that the District Court erred in holding that the universality principle provides jurisdiction over Count Nineteen. He bases this claim on the argument that, if his placing the bomb on the Philippine Airlines plane constituted terrorism, then jurisdiction under the universality principle is improper because terrorism is not universally condemned by the community of States and, therefore, is not subject to universal jurisdiction under customary international law. Yousef Br. at 143-48. Second, he argues that because customary international law does not provide for the punishment of terrorist acts under the universality principle, such failure precludes or invalidates United States laws that provide for the prosecution of such acts that occur extraterritorially. See id. at 139-141, 148 (arguing that jurisdiction over Count Nineteen cannot exist apart from a jurisdictional basis supplied by customary international law).
 
 
 96
 In light of the District Court's conclusion that Yousef's prosecution for the acts charged in Count Nineteen was proper under the universality principle, and in light of Yousef's arguments both that the universality principle does not provide jurisdiction over terrorist acts and that this failure precludes United States law from proscribing such acts, we (i) first present the District Court's holding as to its jurisdiction over this count, (ii) examine whether the District Court correctly concluded that the universality principle provides for jurisdiction over the acts charged in Count Nineteen, and (iii) examine whether the universality principle provides for jurisdiction over "terrorist" acts. We hold that the District Court erred as a matter of law in relying upon the universality principle as a basis for jurisdiction over the acts charged in Count Nineteen and further hold that customary international law currently does not provide for the prosecution of "terrorist" acts under the universality principle, in part due to the failure of States to achieve anything like consensus on the definition of terrorism. However, as discussed in full below in Discussion Section I.B.3(b), we hold that Yousef's conduct charged in Count Nineteen — regardless of whether it is termed "terrorist" — constitutes the core conduct proscribed by the Montreal Convention and its implementing legislation.[30] Accordingly, Yousef's prosecution and conviction on this Count is both consistent with and required by the United States' treaty obligations and domestic laws. We therefore reject Yousef's claim that jurisdiction over Count Nineteen was lacking and affirm the substance of the District Court's ruling.
 
 
 97
 i. The District Court's Opinion
 
 
 98
 In holding that it could exercise universal jurisdiction over Yousef for Count Nineteen, the District Court stated:
 
 
 99
 The issue of exercising extraterritorial jurisdiction over a criminal prosecution based on universal jurisdiction was also discussed in United States v. Yunis, [924 F.2d 1086 (D.C.Cir.1991)] ....
 
 
 100
 The Yunis court did not decide that universal jurisdiction was insufficient as the sole basis for jurisdiction under the Antihijacking Act....
 
 
 101
 Endorsing the exercise of universal jurisdiction in the prosecution of an aircraft-related crime, the [Yunis] court stated that "aircraft hijacking may well be one of the few crimes so clearly condemned under the law of nations that states may assert universal jurisdiction to bring offenders to justice, even when the state has no territorial connection to the hijacking and its citizens are not involved." Id. [at 1092.]
 
 
 102
 The court in Yunis cited to the Restatement (Third) of the Foreign Relations Law to support exercise of universal jurisdiction in a criminal prosecution related to crimes involving aircraft. Section 404 [of the Restatement (Third)] states, "[a] state has jurisdiction to define and prescribe punishment for certain offenses recognized by the community of nations as of universal concern, such as piracy, slave trade, attacks on or hacking of aircraft, genocide, war crimes, and perhaps certain acts of terrorism, even where none of the other bases of jurisdiction indicated in § 402 is present." Restatement (Third) § 404 (1987). Yousef, 927 F.Supp. at 681 (additional internal citations omitted) (emphasis removed).
 
 The District Court then added:
 
 103
 The disregard for human life which would accompany the placing of a bomb aboard an airplane with the intent for that bomb to explode while the airplane is in flight and fully occupied with people, or otherwise sabotaging that plane, is at least as heinous a crime of international concern as hijacking a plane. Id. at 682.
 
 
 104
 The District Court thus held, relying on Yunis, the Restatement (Third), and its own analogy between "the placing of a bomb aboard an airplane" and other "heinous" crimes that support universal jurisdiction, that the United States on this ground alone could exercise universal jurisdiction to prosecute "aircraft-related crime." Id. at 681-82. Like the court in Yunis, the District Court relied on the Restatement (Third) for the proposition that a "state has jurisdiction to define and prescribe punishment for certain offenses recognized by the community of nations as of universal concern," including "piracy, slave trade, attacks on or hijacking of aircraft,... [and] perhaps certain acts of terrorism." Yousef, 927 F.Supp. at 681 (quoting Restatement (Third) § 404) (alteration omitted; emphasis added). Drawing an analogy between aircraft hijacking and Yousef's act of placing a bomb aboard an aircraft, the District Court concluded that the acts charged in Count Nineteen are considered "by the United States and the international community to be `Offenses against the Law of Nations'" that support the exercise of universal jurisdiction over Yousef. Id. (internal citation omitted in original).
 
 
 105
 In relying primarily on the Restatement (Third) (and its incorporation into Yunis) and in expanding the scope of universal jurisdiction to new offenses by judicial analogy to its traditional subjects, the District Court erred, first, in its use of the sources of authority from which a court may discern the content of customary international law and, second, in its conclusion that universal jurisdiction may be expanded by judicial analogy to the crimes that currently are subject to jurisdiction under the universality principle. We address these points in turn.
 
 
 106
 ii. The Use of Authority in Determining Customary International Law
 
 
 107
 The District Court anchored its finding of universal jurisdiction over Yousef in the relevant provisions of the Restatement (Third). It erred in doing so because such treatises are not primary sources of international law. While a discussion of the sources of authority from which a court may discover the content of customary international law may seem rarefied, we address this subject here at some length because the incorrect use of such sources can easily lead to an incorrect conclusion about the content of customary international law. In the instant case, misplaced reliance on a treatise as a primary source of the customary international law of universal jurisdiction led to the erroneous conclusion that such jurisdiction existed over the acts charged in Count Nineteen.
 
 
 108
 The Restatement (Third), a kind of treatise or commentary, is not a primary source of authority upon which, standing alone, courts may rely for propositions of customary international law. Such works at most provide evidence of the practice of States, and then only insofar as they rest on factual and accurate descriptions of the past practices of states, not on projections of future trends or the advocacy of the "better rule." See note 31, post. Moreover, while a treatise never may serve as a primary source of law, reliance on this section of the Restatement (Third) in particular is error because it advocates the expansion of universal jurisdiction beyond the scope presently recognized by the community of States, as reflected in customary international law primary sources.[31] The District Court's reliance on Yunis for the proposition that it could exercise universal jurisdiction over Yousef similarly was misplaced because the holding in Yunis was grounded in the text of the Restatement (Third).
 
 
 109
 * * *
 
 
 110
 The "sources" of international law is a subject of much continuing scholarship. The Statute of the International Court of Justice sets forth in its Article 38 the sources of authority that the ICJ relies upon to determine international law. Article 38 provides in relevant part:
 
 
 111
 1. The Court, whose function is to decide in accordance with international law such disputes as are submitted to it, shall apply:
 
 
 112
 a. international conventions, whether general or particular, establishing rules expressly recognized by the contesting states;
 
 
 113
 b. international custom, as evidence of a general practice accepted as law;
 
 
 114
 c. the general principles of law recognized by civilized nations;
 
 
 115
 d. subject to the provisions of Article 59,[32] judicial decisions and the teachings of the most highly qualified publicists [i.e., scholars or "jurists"][33] of the various nations, as subsidiary means for the determination of rules of law.
 
 
 116
 Statute of the International Court of Justice, June 26, 1945, art. 38, 59 Stat. 1055, U.S.T.S. 993 (emphasis added).
 
 
 117
 Scholarly commentators themselves recapitulate the Article's schema — namely, that the acts and decisions of States are sources of law, while scholarly works are not:
 
 
 118
 The origins of the rules of international law, which may also be called "the sources" of that law ... are the opinions, decisions or acts constituting the starting-point from which their more or less gradual establishment can be traced.
 
 
 119
 ... The records or evidence of international law are the documents or acts proving the consent of States to its rules. Among such records or evidence, treaties and practice play an essential part, though recourse must also be had to unilateral declarations, instructions to diplomatic agents, laws and ordinances, and in a lesser degree, to the writings of authoritative jurists.
 
 
 120
 Clive Parry, The Sources and Evidences of International Law 2 (1965) (internal quotation marks and citation omitted) (final emphasis added).
 
 
 121
 Thus, according to the Statute of the International Court of Justice[34] and the writings of leading publicists themselves, publicists' writings are not true "sources" of international law, though they may be useful in explicating or clarifying an established legal principle or body of law. Nor do the writings of any particular publicists necessarily constitute strong evidence of a proposition of international law or of any State's consent thereto. Rather, as Professor Parry of Cambridge University observed, the writings of publicists are an acceptable additional source to shed light on a particular question of international law only when "recourse must also be had" beyond the "opinions," "decisions," and "acts" of States, and only then "to a lesser degree" than to more authoritative evidence, such as the State's own "declarations," "laws," and "instructions" to its agents. Id. (emphasis added).
 
 
 122
 Some contemporary international law scholars assert that they themselves are an authentic source of customary international law, perhaps even more relevant than the practices and acts of States. The most candid and aggressive formulation of the unfounded claim to legal suzerainty by the international law professoriate has been made by the eminent Louis B. Sohn, the emeritus Bemis Professor of International Law at the Harvard Law School, who stated:
 
 
 123
 I submit that states really never make international law on the subject of human rights. It is made by the people that care, the professors, the writers of textbooks and casebooks, and the authors of articles in the leading international law journals .... This is the way international law is made, not by states, but by "silly" professors writing books[.] Louis B. Sohn, Sources of International Law, 25 Ga. J. Int'l & Comp. L. 399, 399, 401 (1996) (emphasis added).[35] This notion — that professors of international law enjoy a special competence to prescribe the nature of customary international law wholly unmoored from legitimating territorial or national responsibilities, the interests and practices of States, or (in countries such as ours) the processes of democratic consent — may not be unique,[36] but it is certainly without merit.
 
 
 124
 Put simply, and despite protestations to the contrary by some scholars (or "publicists" or "jurists"), a statement by the most highly qualified scholars that international law is x cannot trump evidence that the treaty practice or customary practices of States is otherwise, much less trump a statute or constitutional provision of the United States at variance with x. This is only to emphasize the point that scholars do not make law, and that it would be profoundly inconsistent with the law-making processes within and between States for courts to permit scholars to do so by relying upon their statements, standing alone, as sources of international law. In a system governed by the rule of law, no private person — or group of men and women such as comprise the body of international law scholars — creates the law. Accordingly, instead of relying primarily on the works of scholars for a statement of customary international law, we look primarily to the formal lawmaking and official actions of States and only secondarily to the works of scholars as evidence of the established practice of States.[37]
 
 
 125
 iii. The Universality Principle Provides for Jurisdiction over Only a Limited Set of Acts Violating the Law of Nations
 
 
 126
 The District Court erred in holding that the universality principle provides a basis for jurisdiction over Yousef for the acts charged in Count Nineteen because the universality principle permits jurisdiction over only a limited set of crimes that cannot be expanded judicially, as discussed in full below. The District Court's reliance on the qualified language in Yunis that aircraft-related crime "may well be" one of the few crimes supporting universal jurisdiction, Yousef, 927 F.Supp. at 681 (quoting Yunis, 924 F.2d at 1092) (emphasis added), is facially at odds with this requirement because such language reflects that these crimes are not unequivocally condemned by all States.
 
 
 127
 Yousef argues that the District Court erred in finding that he was subject to universal jurisdiction because terrorist acts like his own are not universally condemned by the community of States and therefore not subject to jurisdiction under the universality principle. Yousef Br. at 144-45. Although we are doubtful that the District Court's finding of universal jurisdiction relies on the notion that all acts of terrorism are universally condemned, we emphasize that the indefinite category of "terrorism" is not subject to universal jurisdiction.
 
 
 128
 * * *
 
 
 129
 The universality principle permits a State to prosecute an offender of any nationality for an offense committed outside of that State and without contacts to that State, but only for the few, near-unique offenses uniformly recognized by the "civilized nations" as an offense against the "Law of Nations."[38] The strictly limited set of crimes subject to universal jurisdiction cannot be expanded by drawing an analogy between some new crime such as placing a bomb on board an airplane and universal jurisdiction's traditional subjects. Nor, as discussed above in our consideration of the use of sources in international law, can universal jurisdiction be created by reliance on treatises or other scholarly works consisting of aspirational propositions that are not themselves good evidence of customary international law, much less primary sources of customary international law. See Yousef, 927 F.Supp. at 681.
 
 
 130
 The class of crimes subject to universal jurisdiction traditionally included only piracy. See, e.g., Arrest Warrant of 11 Apr. 2000, 41 I.L.M. at 559 ¶ 5 (separate opinion of ICJ President Guillaume) (stating that "universal jurisdiction is accepted in cases of piracy because piracy is carried out on the high seas, outside all State territory"); see also Oppenheim's International Law 753 (Robert Jennings & Arthur Watts, eds., 9th ed. 1996) (discussing universal jurisdiction over acts of piracy); Michael P. Scharf, Symposium: Universal Jurisdiction: Myths, Realities, and Prospects: Application of Treaty-Based Universal Jurisdiction to Nationals of Non-Party States, 35 New Eng. L. Rev. 363, 369 (2001) (same). In modern times, the class of crimes over which States can exercise universal jurisdiction has been extended to include war crimes and acts identified after the Second World War as "crimes against humanity." See, e.g., Demjanjuk v. Petrovsky, 776 F.2d 571, 582-83 (6th Cir.1985), vacated on other grounds, 10 F.3d 338 (6th Cir.1993).
 
 
 131
 The concept of universal jurisdiction has its origins in prosecutions of piracy, which States and legal scholars have acknowledged for at least 500 years as a crime against all nations both because of the threat that piracy poses to orderly transport and commerce between nations and because the crime occurs statelessly on the high seas. See, e.g., United States v. Smith, 18 U.S. (5 Wheat) 153, 163, 5 L.Ed. 57 (1820) (Story, J.) (extensively quoting the writings of, among others, the seventeenth-century Dutch legal scholar Hugo Grotius to define piracy as prohibited by the "law of nations" and subject to universal jurisdiction; upholding the defendant's conviction, however, not based upon universal jurisdiction over acts of piracy but under the statute at issue in the case, id. at 153-54, which provided for the exercise of jurisdiction by the United States over those committing acts of piracy, as provided for in the Constitution, which states that Congress may legislate to "define and punish Piracies and Felonies committed on the high Seas, and Offenses against the Law of Nations," U.S. Const. Art. I, § 8, cl. 10); cf. Oscar Schachter, International Law in Theory and Practice 267 (1991) (recounting that Britain during the nineteenth century subjected slave traders apprehended at sea to universal jurisdiction on the view that they were pirates).
 
 
 132
 Universal jurisdiction over violations of the laws of war was not suggested until the Second World War. See Theodor Meron, International Criminalization of Internal Atrocities, 89 Am. J. Int'l L. 554, 572 (1995) (citing Hersch Lauterpacht, The Law of Nations and the Punishment of War Crimes, 2 Brit. Y.B. Int'l L. 58, 65 (1944), as the first to propose universal jurisdiction over war criminals). Following the Second World War, the United States and other nations recognized "war crimes"[39] and "crimes against humanity," including "genocide,"[40] as crimes for which international law permits the exercise of universal jurisdiction. Demjanjuk, 776 F.2d at 582.
 
 
 133
 A commentator of the time explained that war crimes are "similar to piratical acts" because "[i]n both situations there is... a lack of any adequate judicial system operating on the spot where the crime takes place — in the case of piracy it is because the acts are on the high seas and in the case of war crimes because of a chaotic condition or irresponsible leadership in time of war." Willard B. Cowles, Universality of Jurisdiction Over War Crimes, 33 Cal. L. Rev. 177, 194 (1945).
 
 
 134
 The historical restriction of universal jurisdiction to piracy, war crimes, and crimes against humanity demonstrates that universal jurisdiction arises under customary international law only where crimes (1) are universally condemned by the community of nations, and (2) by their nature occur either outside of a State or where there is no State capable of punishing, or competent to punish, the crime (as in a time of war).
 
 
 135
 Unlike those offenses supporting universal jurisdiction under customary international law — that is, piracy, war crimes, and crimes against humanity — that now have fairly precise definitions and that have achieved universal condemnation, "terrorism" is a term as loosely deployed as it is powerfully charged. Judge Harry T. Edwards of the District of Columbia Circuit stated eighteen years ago in Tel-Oren v. Libyan Arab Republic, 726 F.2d 774 (D.C.Cir.1984), that "[w]hile this nation unequivocally condemns all terrorist acts, that sentiment is not universal. Indeed, the nations of the world are so divisively split on the legitimacy of such aggression as to make it impossible to pinpoint an area of harmony or consensus." Id. at 795 (Edwards, J., concurring). Similarly, Judge Robert H. Bork stated in his opinion in Tel-Oren that the claim that a defendant "violated customary principles of international law against terrorism[] concerns an area of international law in which there is little or no consensus and in which the disagreements concern politically sensitive issues .... [N]o consensus has developed on how properly to define `terrorism' generally." Id. at 806-07 (Bork, J., concurring).
 
 
 136
 Finally, in a third concurring opinion, Judge Roger Robb found the question of assigning culpability for terrorist acts to be "non-justiciable" and outside of the competency of the courts as inextricably linked with "political question[s]." Id. at 823 (Robb, J., concurring). Judge Robb stated that
 
 
 137
 [I]nternational "law", or the absence thereof, renders even the search for the least common denominators of civilized conduct in this area [defining and punishing acts of terrorism] an impossible-to-accomplish judicial task. Courts ought not to engage in it when that search takes us towards a consideration of terrorism's place in the international order. Indeed, when such a review forces us to dignify by judicial notice the most outrageous of the diplomatic charades that attempt to dignify the violence of terrorist atrocities, we corrupt our own understanding of evil.
 
 
 138
 
 Id.
 
 
 
 139
 We regrettably are no closer now than eighteen years ago to an international consensus on the definition of terrorism or even its proscription;[41] the mere existence of the phrase "state-sponsored terrorism" proves the absence of agreement on basic terms among a large number of States that terrorism violates public international law. Moreover, there continues to be strenuous disagreement among States about what actions do or do not constitute terrorism, nor have we shaken ourselves free of the cliché that "one man's terrorist is another man's freedom fighter."[42] We thus conclude that the statements of Judges Edwards, Bork, and Robb remain true today, and that terrorism — unlike piracy, war crimes, and crimes against humanity — does not provide a basis for universal jurisdiction.
 
 
 140
 b. Jurisdiction Is Proper Under United States Laws Giving Effect to Its Obligations Under the Montreal Convention
 
 
 141
 While it is true, as Yousef asserts, that the District Court erred in concluding that the universality principle conferred jurisdiction over the crimes charged in Count Nineteen, Yousef's claim that principles of customary international law constrain Congress's power to enact laws that proscribe extraterritorial conduct is simply wrong.
 
 
 142
 In Count Nineteen, Yousef was charged with, and convicted of, violating 18 U.S.C. § 32(b)(3). Title 18 U.S.C. § 32 was enacted as part of the Aircraft Sabotage Act of 1984, Pub. L. No. 98-473, 98 Stat. 1837, 2187-88, which, as discussed above, implements the Montreal Convention. Section 32(a) proscribes offenses, and attempts and conspiracies to commit offenses, against United States-flag aircraft; Section 32(b) proscribes the same offenses when committed against the aircraft of all other nations. Absent § 32(b)'s extension of jurisdiction over perpetrators of offenses against non-United States-flag aircraft, the statute would not effectuate the purpose of the Convention — to forbid all States parties to the Convention from affording aircraft terrorists a safe haven by requiring each party to the Convention to extradite offenders to another party State or to prosecute the offender. As noted above, treaties may diverge broadly from customary international law, yet nevertheless may be enforced, provided that they do not violate one of the strictly limited "peremptory norms" of international law.
 
 
 143
 In the absence of requests for extradition by other States vested with jurisdiction, the Montreal Convention requires, and § 32 authorizes, the United States to prosecute Yousef for the acts charged in Counts Twelve through Nineteen of the indictment.[43] Thus, in this case, far from exceeding its jurisdictional competence, as Yousef claims, the United States merely met its non-discretionary obligation under the Convention to prosecute Yousef for the acts charged in these Counts. Article 7 of the Convention, as enacted into domestic law in § 32, unequivocally requires the United States to prosecute Yousef. Article 7 states that a State party to the Convention "shall ... be obliged, without exception whatsoever" and "whether or not the offence was committed in its territory" to prosecute (or extradite) an individual found within its borders who has committed one of the offenses proscribed by the Convention. 24 U.S.T. at 565. Moreover, the Convention does not condition the requirement that a State party extradite or prosecute such an individual found within the State on the existence of any additional contacts between that State and either the offender or the offense. In other words, no nexus requirement delimits the obligation of parties to the Convention to prosecute offenders. In the instant case, because the Philippines, Japan, and Pakistan, each of which could have asserted jurisdiction to prosecute Yousef for this particular offense, did not seek to prosecute Yousef, the United States "was obliged" by the Convention — "without exception whatsoever" — to indict Yousef once he was within the United States and irrespective of whether his acts were aimed at the United States.
 
 
 144
 Moreover, as noted above, "courts of the United States are ... obligated to give effect to an unambiguous exercise by Congress of its [power to grant jurisdiction to agencies or to courts] even if such an exercise would exceed the limitations imposed by international law." Federal Trade Comm'n v. Compagnie de Saint-Gobain-Pont-a-Mousson, 636 F.2d 1300, 1323 (D.C.Cir.1980) (emphasis added); see also Brown, 12 U.S. (8 Cranch) at 127 (stating that rules of customary international law "may be disregarded" by Congress); Comm. of United States Citizens Living in Nicaragua, 859 F.2d at 939 (holding that Congressional acts are not subject to challenge on the basis that they violate customary international law).[44]
 
 
 145
 Title 18 U.S.C. § 32 carefully tracks the text of the Montreal Convention; even if § 32 diverged from the Convention, however, jurisdiction under the statute still would be valid. The Supreme Court has held explicitly that legislative acts trump treaty-made international law, stating that "when a statute which is subsequent in time [to a treaty] is inconsistent with a treaty, the statute to the extent of conflict renders the treaty null." Breard v. Greene, 523 U.S. 371, 376, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998) (quoting Reid v. Covert, 354 U.S. 1, 18, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (plurality opinion)); see also Whitney v. Robertson, 124 U.S. 190, 194, 8 S.Ct. 456, 31 L.Ed. 386 (1888) (holding that if a treaty and a federal statute conflict, "the one last in date will control the other").
 
 
 146
 In sum, even though Yousef's prosecution under Count Nineteen did not comport with the universality principle, jurisdiction was properly predicated on the Montreal Convention and the United States' own statutes giving effect to the Convention.
 
 
 147
 c. In Any Event, Jurisdiction Over Count Nineteen Is Proper under the Protective Principle of Customary International Law
 
 
 148
 Although the government is not required to prove that its prosecution of Yousef comported with any of the customary international law bases of criminal jurisdiction, we note that, in fact, Yousef's prosecution by the United States is consistent with the "protective principle" of international law. The protective (or "security") principle permits a State to assume jurisdiction over non-nationals for acts done abroad that affect the security of the State. Rocha v. United States, 288 F.2d 545, 549 (9th Cir.1961); Nusselein v. Belgian State, ILR 17 (1950), no. 35; Public Prosecutor v. L., ILR 18 (1950), no. 48; Re van den Plas, ILR 22 (1955), no. 205. The protective principle generally is invoked to obtain jurisdiction over politically motivated acts but is not limited to acts with a political purpose. In re Marc Rich & Co., 707 F.2d 663, 666 (2d Cir.1983) (stating that the protective principle provides jurisdiction over acts committed outside of a State's territory that are directed at interfering with the State's "governmental functions," provided that the act also is contrary to the laws of the host State, if such State has a "reasonably developed" legal system); see also United States v. Pizzarusso, 388 F.2d 8, 10 (2d Cir.1968) (same).
 
 
 149
 The stated purpose of Yousef's plot to destroy United States commercial aircraft was to influence United States foreign policy, the making of which clearly constitutes a "governmental function." The bombing of the Philippine Airlines flight at issue in Count Nineteen, which killed one Japanese national and maimed another, was merely a test-run that Yousef executed to ensure that the tactics and devices the conspirators planned to use on United States aircraft operated properly.
 
 
 150
 Documentation stored on Yousef's laptop computer and adduced at trial, demonstrates that the Philippine Airlines bombing constituted part of the co-conspirators' plan to detonate numerous bombs on United States-flag aircraft. A letter, with a file date of November 19, 1994, found in Yousef's laptop states, in pertinent part:
 
 
 151
 We, the Fifth Division of the Liberation Army ... declare our responsibility for striking at some American targets in the near future in retaliation for the financial, political, and military support extended by the American government to the Jewish State .... [T]he Jewish State continues its massacres ... with American money, weapons, and ammunition, in addition to the support and blessing given ... by the U.S. Congress. The American people are quite aware of all this. [Therefore] [we] will consider all American nationals as part of our legitimate targets because they are responsible for the behavior of their government and its foreign policies, for the policy of the government represents the will of the people.
 
 
 152
 Letter from Fifth Division of the Liberation Army (Nov. 19, 1994)(emphasis added).
 
 
 153
 Extensive additional documentation was found on Yousef's laptop and presented at trial. These documents, which set forth, inter alia, the flight schedules and paths of United States-flag aircraft and detailed plans for planting bombs on these flights, confirmed that the co-conspirators intended to bomb United States-flag aircraft using a modus operandi identical to that which permitted them to place the bomb on Philippine Airlines flight 434. All of these flights were scheduled to depart from cities in Southeast Asia where the bomber would board the plane, make a stopover in that region where the bomber would disembark, and then continue on to a United States destination, at which point the previously-planted explosive device would detonate. Id. This is more than enough to permit the United States to claim jurisdiction over Yousef under the protective principle.
 
 
 154
 To summarize, we hold that the District Court erred in holding that jurisdiction over the acts charged in Count Nineteen is proper under the customary international law principle of universal jurisdiction, but conclude that the District Court properly asserted jurisdiction over Counts Twelve through Nineteen under United States law (18 U.S.C. § 32), the treaty obligations of the United States, and various principles of customary international law other than the universality principle. We reject Yousef's claim that the absence of jurisdiction under the universality principle over so-called "terrorist" acts precludes his prosecution under United States law.
 
 C. Due Process Claims
 
 155
 Yousef also challenges his prosecution under the Due Process Clause of the Fifth Amendment to the United States Constitution. He argues that he cannot lawfully be tried in the United States because the connection between his conduct and the United States was too tenuous. He and Murad further assert that their prosecution in the United States was fundamentally unfair because of their difficulty in obtaining evidence and assistance from overseas.
 
 1. Due Process Nexus
 
 156
 Our Circuit has not yet decided the extent to which the Due Process Clause limits the United States' assertion of jurisdiction over criminal conduct committed outside our borders.[45] The Ninth Circuit has held that "[i]n order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." United States v. Davis, 905 F.2d 245, 248-49 (9th Cir.1990) (citation omitted). We agree.
 
 
 157
 Applying this standard, it seems clear that assertion of jurisdiction over the defendants was entirely consistent with due process. The defendants conspired to attack a dozen United States-flag aircraft in an effort to inflict injury on this country and its people and influence American foreign policy, and their attack on the Philippine Airlines flight was a "test-run" in furtherance of this conspiracy. Given the substantial intended effect of their attack on the United States and its citizens, it cannot be argued seriously that the defendants' conduct was so unrelated to American interests as to render their prosecution in the United States arbitrary or fundamentally unfair. As a consequence, we conclude that prosecuting the defendants in the United States did not violate the Due Process Clause.
 
 2. Due Process in Conduct of Trial
 
 158
 Nor did the conduct of the trial deny the defendants the process due to them under the Constitution. The defendants focus the bulk of their due process complaints on the United States Government's alleged failure to help them obtain cooperation from Philippine authorities, which they allege significantly hindered their defenses. First, Yousef contends that he was not permitted to refute effectively the testimony of the Philippine Airlines flight attendant who identified him as the bomber of that flight. Yousef argues that, although he wanted to contact other passengers on that flight to obtain a more detailed description of the person who sat in the seat where the bomb was planted, he was unable to do so because of "the logistical difficulties faced from 12,000 miles away!" Yousef Br. at 157. However, Yousef neglects to note that the Government provided him with a list of the other passengers on the Philippine Airlines flight, and that the Court authorized funds for the defendants to obtain at least two defense investigators to collect evidence in the Philippines. Moreover, Yousef does not claim that such evidence would have been exculpatory. We have no reason to doubt that Yousef was given all the evidence the Government was obligated to give him and that he had an adequate opportunity to rebut this testimony. Cf. In re United States, 267 F.3d 132, 135 (2d Cir.2001) (detailing the Government's requirements to disclose certain exculpatory material under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and certain information which could be used to impeach a Government witness under Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)).
 
 
 159
 Second, Yousef claims that he was unable to obtain a videotape held by a Manila hotel that he alleges would have shown Philippine police surveilling a man whom they initially believed to be "Naji Haddad" on January 13, 1995, more than a week after Yousef had left the Philippines. Yousef Br. at 157. Yousef implies that this tape would have helped to establish that he was not the same "Naji Haddad" who rented the Manila apartment where authorities discovered bomb-making materials. Id. at 157.
 
 
 160
 At the outset, we note that Yousef employed none of the procedural tools at his disposal to obtain a copy of the tape.[46] But even if Yousef had obtained this videotape, it would have provided little help to his defense. For example, Yousef elicited testimony about the videotape from a Philippine police officer who testified that the person on the tape was "not discernible" and that the security guard who identified the person on the tape as Naji Haddad saw the man he identified as Haddad only from behind. ATr. 2217. Furthermore, there was more than ample evidence establishing that Yousef did in fact use the alias Naji Haddad in connection with the Manila apartment, including the testimony of three eyewitnesses who identified Yousef as Naji Haddad and telephone records showing calls to "Naji Haddad" at Yousef's cellular telephone number.
 
 
 161
 In sum, Yousef cannot now be heard to complain about his inability to obtain the tape when he did not use the tools at his disposal to seek the tape and when any possible error ascribable to Yousef's inability to obtain the tape was harmless.
 
 
 162
 Third, Yousef argues that the District Court erred when it failed to admit into evidence a Philippine police report on the movie theater bombing. In the report, one victim described three suspicious men who changed seats prior to the explosion near where the bomb went off. The report includes speculation by the reporting officer that the men whom witnesses saw switching seats may have been injured when the bomb went off, and the report suggested further investigation of two injured Filipino men who evaded questioning by police. The District Court excluded the report as speculation and hearsay because it consisted of the officer's deductions based on interviews with various victims of the bombing. We conclude that, in the circumstances presented, the District Court did not abuse its discretion in excluding this report from evidence. See Provost v. City of Newburgh, 262 F.3d 146, 163 (2d Cir.2001) ("Decisions to admit or exclude evidence are reviewed for abuse of discretion and are overturned only where arbitrary or irrational." (internal citation and quotation marks omitted)).
 
 
 163
 Yousef also implies that he was denied due process because the officer who prepared the theater bombing report did not testify. But Yousef made no effort to take the officer's testimony in the Philippines.[47] Moreover, the officer's testimony describing what moviegoers observed would also have been inadmissible hearsay, and his suggestion that investigators follow up with two Filipino men is of little probative value because it was based on speculation. Any speculation by the officer that the defendants were not involved in the movie theater bombing was rebutted by overwhelming documentary evidence linking the defendants to the bombing, including watch fragments recovered from the theater that matched the make and model of the watch recovered in the defendants' Manila apartment, records that showed Shah's contacts with Yousef that night, and a map recovered from Shah's apartment that showed a route drawn from Yousef's Manila apartment to the movie theater. In light of this overwhelming evidence, any arguable error resulting from Yousef's inability to obtain the officer's testimony — and we discern no such error — was harmless and involved no denial of due process.
 
 
 164
 Fourth, Yousef complains that the District Court erred when it denied him the opportunity to call Judge Ernesto Reyes of the Philippines as a witness. Yousef Br. at 158. Judge Reyes had authorized the search of Yousef's apartment in Manila. After the other defendants had rested and after Yousef had put on the rest of his case, Yousef requested that the District Court adjourn to permit Judge Reyes to travel to New York. The District Court rejected this request.
 
 
 165
 "A district court's rulings regarding... the conduct of a trial ... will not be disturbed on appeal absent an abuse of discretion." Sequa Corp. v. GBJ Corp., 156 F.3d 136, 147 (2d Cir.1998). We see no abuse of discretion in the District Court's denial of Yousef's requested adjournment. Even if the Court had granted an adjournment and Judge Reyes had testified, nothing in the record suggests that his testimony would have added much, if anything, to Yousef's case. Yousef claims that he wanted to call Judge Reyes to impeach the testimony of two Philippine police officers who applied for a warrant to search Yousef's apartment. However, one of the officers had already admitted in court that he had provided false information to the judge. Thus, Judge Reyes' testimony would have been merely cumulative and of no substantial additional probative value. In sum, we conclude that the defendants have failed to establish that the conduct of their trial deprived them of due process of law under the Fifth Amendment.[48]
 
 D. Venue in Southern District of New York
 
 166
 Yousef asserts that his prosecution should not have gone forward in the Southern District of New York. Instead, he maintains that venue would have been proper only in the Philippines, Japan, or Pakistan.
 
 
 167
 Article III of the U.S. Constitution provides that "the Trial of all Crimes... shall be held in the State where the said Crimes shall have been committed." U.S. Const. Art. III, § 2, cl. 3. Under the Sixth Amendment, a defendant must be tried in the "district wherein the crime shall have been committed, which district shall have been previously ascertained by law." Id. amend. VI. Congress enacted 18 U.S.C. § 3238 under the above constitutional provisions to specify the applicable venue when a crime is committed outside the United States:
 
 
 168
 [t]he trial of all offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, shall be in the district in which the offender, or any one of two or more joint offenders, is arrested or is first brought.
 
 
 169
 Each count in the airline bombing case alleged that Yousef was "first brought to and first arrested in" the Southern District of New York. Indeed, Yousef and the Government stipulated at trial that "Yousef was first arrested on the charges [in the airline bombing case] in the Southern District of New York." ATr. 4695. Because Yousef was charged with offenses committed outside the jurisdiction of any State, venue was proper in the Southern District of New York, where Yousef was first brought and arrested.
 
 
 170
 Since venue was proper in the Southern District of New York as to Yousef, it also was proper as to the joint defendants, including Murad. See 18 U.S.C. § 3238; United States v. Pearson, 791 F.2d 867, 869-70 (11th Cir.1986) (trial of all defendants proper in district where one defendant was first brought).
 
 E. Doctrine of Specialty
 
 171
 Yousef also alleges for the first time in his reply brief that his prosecution in the United States violated the United Kingdom Extradition Treaty, Dec. 22, 1931, U.S.-U.K., 1931 U.S.T. LEXIS 60, which governs extradition between the United States and Pakistan,[49] because he was prosecuted for an offense different from that for which he was extradited by Pakistan to the United States. More specifically, Yousef argues that his prosecution for the airline bombing plot violated the "doctrine of specialty" provision from Article 7 of the Treaty[50] because he was extradited to answer for the World Trade Center bombing charges, not the airline bombing conspiracy.
 
 
 172
 The "doctrine of specialty" prohibits prosecution of a defendant for a crime other than the crime for which he has been extradited. United States v. Alvarez-Machain, 504 U.S. 655, 659, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992); see also United States v. Levy, 947 F.2d 1032, 1034 (2d Cir.1991). Because the doctrine of specialty only limits a Court's personal jurisdiction over the defendant, see Levy, 947 F.2d at 1034, it may be forfeited if it is not raised in a timely manner, see, e.g., Ford v. United States, 273 U.S. 593, 606, 47 S.Ct. 531, 71 L.Ed. 793 (1927) (holding that defendant's objection to personal jurisdiction was forfeited where defendant did not object before he entered his plea); United States v. Rosenberg, 195 F.2d 583, 603 (2d Cir.1952) (holding that defendant forfeited his right to challenge personal jurisdiction because he did not raise that defense pre-trial, as required by Federal Rule of Criminal Procedure 12(b)(2)).
 
 
 173
 We will not consider an argument raised for the first time in a reply brief. See, e.g., United States v. Greer, 285 F.3d 158, 170 n. 3 (2d Cir.2002); Thomas v. Roach, 165 F.3d 137, 146 (2d Cir.1999). Therefore, we conclude that Yousef forfeited any argument on the doctrine of specialty when he failed to assert it in his initial appellate brief.
 
 
 174
 II. Conviction of Yousef Under 18 U.S.C. § 2332
 
 
 175
 Yousef argues that we should overturn his conviction on Count Fifteen because 18 U.S.C. § 2332 unconstitutionally delegates legislative power to the Attorney General of the United States. Alternatively, he contends that his conviction should be overturned because the District Court failed to charge the jury that it had to find intent to retaliate against the United States and its citizens as an element of the crime charged in Count Fifteen.
 
 
 176
 In Count Fifteen, Yousef and his co-defendants were charged with conspiring to kill United States nationals outside the United States in violation of 18 U.S.C. § 2332(b) and (d).
 
 
 177
 Under 18 U.S.C. § 2332(a) it is a crime to "kill[] a national of the United States, while such national is outside the United States." Section 2332(b) prohibits any person outside the United States from "engag[ing] in a conspiracy to kill[] a national of the United States." Section 2332(d) is entitled "Limitation on prosecution" and provides:
 
 
 178
 No prosecution for any offense described in this section shall be undertaken by the United States except on written certification of the Attorney General or the highest ranking subordinate of the Attorney General with responsibility for criminal prosecutions that, in the judgment of the certifying official, such offense was intended to coerce, intimidate, or retaliate against a government or a civilian population.
 
 
 179
 A. Prosecutorial Discretion Under Section 2332(d)
 
 
 180
 Yousef argues that § 2332 is an unconstitutional delegation of legislative authority, see generally J.W. Hampton, Jr. & Co. v. United States, 276 U.S. 394, 404-06, 48 S.Ct. 348, 72 L.Ed. 624 (1928), because the statute authorizes the Attorney General to define what conduct constitutes an offense.
 
 
 181
 Section 2332 does not represent an unconstitutional delegation of power to the Attorney General. Indeed, § 2332(d) does not delegate any legislative power to the Attorney General. Rather, it merely sets limits on how the Attorney General can exercise his discretion to prosecute. Cf. Whitman v. Am. Trucking Assn., Inc., 531 U.S. 457, 472-74, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) (holding that the Clean Air Act was not an unconstitutional delegation because it prescribed limits on how agency could exercise its authority). Section 2332(d) limits the Justice Department's prosecution of crimes under § 2332 to those crimes in which the defendant intended to target the Government or civilian population of the United States. Exercise of such prosecutorial discretion involves no rulemaking power on the part of the Executive Branch and, therefore, cannot constitute delegation of legislative power to the Attorney General — let alone an unlawful delegation of such power.
 
 
 182
 Even if § 2332(d) did represent a delegation of legislative power to the Attorney General, such a delegation would not be unconstitutional. It has long been the rule that Congress may delegate some of its legislative powers to the Executive Branch, so long as that delegation is made "under the limitation of a prescribed standard." United States v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co., 282 U.S. 311, 324, 51 S.Ct. 159, 75 L.Ed. 359 (1931). This standard need only provide "an intelligible principle to which the person or body authorized to [act] is directed to conform." J.W. Hampton, Jr. & Co., 276 U.S. at 409, 48 S.Ct. 348; see also Whitman, 531 U.S. at 472, 121 S.Ct. 903. Moreover, this standard need not be precisely defined. See, e.g., Wis. Dep't of Health and Family Servs. v. Blumer, 534 U.S. 473, 496 n. 13, 122 S.Ct. 962, 151 L.Ed.2d 935 (2002) (noting "Congress' delegation of extremely broad regulatory authority to the Secretary [of Health and Human Services] in the Medicaid area"); Whitman, 531 U.S. at 475, 121 S.Ct. 903 ("[E]ven in sweeping regulatory schemes we have never demanded[] ... that statutes provide a determinate criterion for saying how much of the regulated harm is too much." (Internal quotation marks and alterations omitted)).
 
 
 183
 Subsection (d) provides a clearly intelligible principle to which the Attorney General must adhere — namely, to prosecute only those cases where the intent of the offense was to coerce, intimidate, or retaliate against the Government or civilian population of the United States. Cf. N.B.C., 319 U.S. at 225, 63 S.Ct. 997 (upholding statute delegating power to Federal Communications Commission to regulate broadcast spectrum as required by "public interest, convenience, or necessity").
 
 
 184
 In sum, § 2332 does not unconstitutionally delegate legislative power to the Attorney General.
 
 
 185
 B. Failure to Charge Jury on Intent to Retaliate
 
 
 186
 Nor does § 2332 unconstitutionally remove an element of the offense from the jury. Although a criminal defendant has the right to a jury determination of every element of the crime, see Apprendi v. New Jersey, 530 U.S. 466, 477, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), an analysis of the text and structure of § 2332 demonstrates that subsection (d) does not comprise an element of the offenses proscribed by § 2332. First, subsection (d) follows three self-contained subsections each of which defines the elements of a distinct offense. See 18 U.S.C. § 2332(a)(d).[51] In particular, each subsection of (a) through (c) imposes an attendant level of intent, and none of these subsections makes reference to § 2332(d). Second, subsection (d) is expressly designated as a "limit on prosecution" rather than as an element of the offenses set forth in § 2332. We conclude, therefore, that the District Court did not err by failing to charge an intent to retaliate against the United States Government or its citizens. Even if the Court had erred in this regard, any error would have been harmless, given the overwhelming evidence that the defendants specifically intended the aircraft bombings to serve as retaliation against the United States Government and its citizens for United States foreign policy.
 
 
 187
 III. District Court Failure to Sua Sponte Voir Dire the Jury Mid-Trial Regarding the Pope and the Roman Catholic Church
 
 
 188
 During the January 7, 1995 search of the Manila apartment that uncovered extensive bomb-making materials, Philippine National Police also discovered photographs of Pope John Paul II, Bibles, and confession materials. Because the Pope was due to arrive in the Philippines five days later, law enforcement authorities in the Philippines feared that an attack was planned against the Pope and began an extensive investigation into the matter.
 
 
 189
 Prior to the airline bombing trial, the Government agreed that it would not elicit testimony regarding the Pope in its direct case. Some of the Government's witnesses, however, did refer to the religious artifacts found in the apartment on cross-examination.
 
 
 190
 Yousef claims that the District Court erred because, following this testimony, it did not sua sponte conduct a mid-trial voir dire of the jury with respect to its views on the Pope and the Roman Catholic Church. He contends that because the defendants were "originally investigated in the Philippines for their alleged attempt to assassinate the Pope," the Court should have questioned the jury about whether this alleged plot would affect its ability to render an impartial verdict. Yousef Br. at 228.
 
 
 191
 Yousef argues that "defense counsel made numerous requests that the Court voir dire the jury" regarding the Pope and the Catholic Church. Yousef Br. at 230. However, close inspection of the record reveals that, while the defendants made requests for dismissal of the indictment, see, e.g., ATr. 2064, a severance, see, e.g., ATr. 1205, 1247, 2412-13, a mistrial, see, e.g., ATr. 1247, 1948, and jury instructions, see, e.g., ATr. 5084-86, and made other assorted objections, see, e.g., ATr. 2249 (general objection), ATr. 5090 (objection to proposed charge); ATr. 1783 (continuing objection), ATr. 2433 (same); ATr. 1452-53 (general objection), they never specifically requested that the jury be examined regarding the Pope and the Roman Catholic Church. Accordingly, we need only decide whether the District Court erred in failing to voir dire the jury on this issue sua sponte.
 
 
 192
 The trial court has ample discretion to determine how best to conduct voir dire. Rosales-Lopez v. United States, 451 U.S. 182, 189, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981) (plurality opinion); United States v. Taylor, 92 F.3d 1313, 1324 (2d Cir.1996); cf. Turner v. Murray, 476 U.S. 28, 38 n. 12, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986) (concluding in a habeas context that "[w]hat we held in Ristaino [v. Ross, 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976)], and reaffirm today, is that absent `special circumstances' that create a particularly compelling need to inquire into racial prejudice, the Constitution leaves the conduct of voir dire to the sound discretion of state trial judges"). In Rosales-Lopez, we were warned that questioning the jury about its views on race or ethnicity may "create the impression that justice in a court of law may turn upon the pigmentation of skin [or] the accident of birth[,] [and] [t]rial judges are understandably hesitant to introduce such a suggestion into their courtrooms." 451 U.S. at 190, 101 S.Ct. 1629 (citation and internal quotation marks omitted). It is in part for this reason that the Supreme Court has concluded that "it is usually best to allow the defendant to ... mak[e] the determination of whether or not he would prefer to have the inquiry into racial or ethnic prejudice." Id. at 191, 101 S.Ct. 1629; see also Ristaino, 424 U.S. at 597 n. 9, 96 S.Ct. 1017 ("the wiser course generally is to propound appropriate questions designed to identify racial prejudice if requested by the defendant").
 
 
 193
 We discern no error in the District Court's failure to conduct a mid-trial voir dire of the jury sua sponte on these issues. The defendants were fully aware that they could request a mid-trial voir dire of the jury. Indeed, the defendants requested and were granted such a mid-trial voir dire after TWA Flight 800 crashed off Long Island, New York, and after some members of the media speculated that the crash was in retaliation for the Government's prosecution of Yousef. Furthermore, there was an explicit discussion on the record in the middle of the trial that indicated that the defendants were aware of the availability of a voir dire regarding the plot against the Pope. ATr. 2064. Shah's attorney told the Court that if he had been aware before trial of the testimony that would be elicited about the Pope, he would have requested that the Court ask questions about the Pope as part of the pre-trial voir dire. ATr. 2063-64. Nevertheless, the defendants did not make such a mid-trial request for voir dire on this issue.
 
 
 194
 In fact, a review of the record indicates that the defendants made a tactical choice not to request voir dire on the Pope. For example, when the Court mentioned to Shah's attorney that a cautionary instruction on evidence regarding the Pope might, on balance, be damaging to the defense case, Shah's attorney responded that he did not "necessarily disagree." ATr. 2065. We have held that decisions made to obtain tactical advantage waive any later right to claim error. See United States v. Yu-Leung, 51 F.3d 1116, 1122 (2d Cir. 1995) (holding that "strategic choice" not to object to admission of evidence waives defendant's right to appeal the admission).[52]
 
 
 195
 Nor did the District Court appear to believe that a voir dire regarding the Pope was necessary. The Court suggested that, in light of the severity of the charged crimes, references to a plot against the Pope were, in comparison, not very "highly charged." ATr. 1705. Moreover, the Court indicated its concern that highlighting the issue for the jury might "cause more damage than anything else." ATr. 2065. As discussed in Rosales-Lopez, appellate courts are in a poor position to second-guess a trial court's determination that a voir dire is not warranted, 451 U.S. at 188, 101 S.Ct. 1629, and we decline to do so here where the defendants did not even request such a voir dire during trial.
 
 
 196
 For all of the above reasons, we conclude that there was no error in the District Court's failure to conduct sua sponte a voir dire of the jury regarding the Pope or the Roman Catholic Church.
 
 IV. Liberation Army Letter
 
 197
 Yousef contends that the District Court erred in admitting into evidence a letter found at his Manila apartment and further erred in failing to redact it. The letter at issue was found on a laptop computer recovered from the apartment and stated, in translation from the Arabic:
 
 
 198
 We, the Fifth Division of the Liberation Army under the command of Staff Lieutenant General Abu Bakr al-Makki, declare our responsibility for striking at some American targets in the near future in retaliation for the financial, political, and military support extended by the American government to the Jewish state, which occupies the land of Palestine. While the government of America is donating military planes to the Jewish State, the Jewish State continues its massacres in south Lebanon and is killing, torturing, and detaining our Palestinian brothers with American money, weapons, and ammunition, in addition to the support and blessing (to Israel) given by the U.S. Congress. The American people are quite aware of all of this. (Therefore), we will consider all American nationals as part of our legitimate targets because they are responsible for the behavior of their government and its foreign policies, for the policy of the government represents the will of the people.
 
 
 199
 We will also strike at French and British targets because of the arms embargo they imposed against the government of Bosnia and because of their undeclared collaboration with the Serbs against the Muslims.
 
 
 200
 We will also attack Swedish targets because they granted asylum to a woman who declared her animosity to Islam and the Muslims. By this kind of behavior, Sweden has become a protector of people who attack and slander the religion of the Muslims, their God, and their prophet.
 
 
 201
 Again, we warn the American government that if it does not stop its aid to Israel, then our retaliatory operations will continue, inside and outside America. Some of our operations will include attacks against American nuclear targets. We consider the American government an accomplice of Israel in the occupation of the land of Palestine and the aggression against its people.
 
 
 202
 Allah is Great and victory for the believers.
 
 
 203
 ATr. 4165-66.
 
 
 204
 Although Yousef's attorney-advisor[53] argued at trial that the prejudicial impact of the letter outweighed its probative value, ATr. 4147, he did not specifically object to the letter's admission into evidence. He did however state that he "underst[ood] the government's argument certainly in terms of motive and how it certainly has probative value, but the question I would suggest ... [is] whether or not the entire content of the letter is necessary to establish that." ATr. 4147. Despite his suggestion that the entire contents of the letter should not be admitted, Yousef's advisor did not propose any specific redaction. In response to the defense's suggestion that the letter could be redacted, the Court stated, "I think you can't do it halfway. You've got to do it the whole way." ATr. 4147.
 
 
 205
 Under Federal Rule of Evidence 403 ("Rule 403"), relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." A District Court has "broad discretion" to admit or exclude evidence under Rule 403. United States v. Birney, 686 F.2d 102, 106 (2d Cir.1982). We will reverse a District Court on this ground "only if there is a clear showing that the court abused its discretion or acted arbitrarily or irrationally." United States v. Salameh, 152 F.3d 88, 110 (2d Cir.1998) ("Salameh I") (quoting United States v. Valdez, 16 F.3d 1324, 1332 (2d Cir.1994)).
 
 
 206
 Even where a district court has erred in admitting or excluding evidence under Rule 403, we will disregard the error if there is "fair assurance" that the jury's "judgment was not substantially swayed by the error." Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); see also United States v. Spell, 789 F.2d 143, 144 (2d Cir. 1986) (applying harmless error analysis to admission of evidence); Fed.R.Crim.P. 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."). Finally, where the defendant has not objected to the admission of certain evidence at trial, we may reverse only if there has been plain error. See, e.g., United States v. Hourihan, 66 F.3d 458, 463 (2d Cir.1995) ("Ordinarily, we review a district court's evidentiary rulings for abuse of discretion. However, when a defendant fails to object at trial, we review only for plain error." (internal citations omitted)); Fed. R. Crim P. 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").
 
 A. Admission of Liberation Army Letter
 
 207
 Even assuming that the defense had expressly objected to admission of the letter, we cannot say that the District Court abused its discretion in admitting the Liberation Army letter. First, the probative value of the letter was high. It supported an inference that the defendants intended to commit imminent attacks on United States targets and made clear that the strike was motivated by America's support of Israel.[54]
 
 
 208
 Second, the risks entailed by admission of the letter did not substantially outweigh its probative value. Although the letter contained threats against a number of other countries, these threats comprised a relatively small portion of the letter and were far less likely to influence the jury than were the threats against the United States, which were highly probative of the defendants' motives.
 
 
 209
 Moreover, we upheld the admission of similar evidence in Salameh I. In that case, we sustained the District Court's admission into evidence of materials — similar to the letter in the instant case — that detailed the motives of some of Yousef's co-conspirators for attacking the World Trade Center. Id. at 111. Those materials, including a document urging terrorist attacks on all alleged enemies of Islam, while potentially inflammatory, "evidenced the conspiracy's motive and intent to bomb targets in the United States." Id. Likewise, in the instant case, the Liberation Army letter suggested a motive and intent to kill Americans in the very near future. Accordingly, we conclude that the District Court did not abuse its discretion in admitting the letter.
 
 B. Failure to Redact Liberation Army Letter
 
 210
 Yousef also claims that we should find error in the District Court's failure to redact the letter. He implies that admission of the unredacted letter put before the jury evidence of a number of uncharged and unrelated crimes and threats — including threats against France, Britain, and Sweden, as well as threatened attacks against American nuclear facilities — in violation of Federal Rule of Evidence 404(b) ("Rule 404(b)").
 
 
 211
 Although Yousef did not expressly argue before the District Court that the letter should be redacted pursuant to Rule 404(b), even if the issue had been properly presented to the District Court, we would find no error in the Court's failure to redact the letter. Rule 404(b) provides in relevant part that
 
 
 212
 [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
 
 
 213
 While the letter provided evidence of other threats, its salient feature was the trumpeting of a motive for the crimes for which the defendants were indicted: retaliation against the United States for its support of Israel. Because Rule 404(b) expressly permits evidence that establishes motive, intent, or plan, and these permissible evidentiary uses of the letter outweighed any arguably impermissible use under Rule 403, we hold that the District Court did not abuse its discretion in admitting the letter without redaction. In any event, even if the letter had been improperly admitted without redaction, we conclude that any such error was harmless since the references to other targets were "unimportant in relation to everything else the jury considered" during the trial. United States v. Rea, 958 F.2d 1206, 1220 (2d Cir.1992) (citation and internal quotation marks omitted).
 
 
 214
 V. District Court Denial of Murad's Motion to Suppress His Post-Arrest Statement
 
 
 215
 Murad argues that the District Court erred in denying his pre-trial motion to suppress the confession he gave to FBI agents during his April 12, 1995 flight from the Philippines to the United States. He asserts that FBI agents on the plane violated his Fifth and Sixth Amendment rights when they continued to question him even after he inquired, "where is the lawyer?" According to Murad, when the agents responded that counsel would be available in the United States, Murad told them that he would talk to them in the United States — thereby, he maintains, asserting his Fifth Amendment right to remain silent and his Sixth Amendment right to an attorney. Murad admits that he did not assert these arguments before the District Court. Murad Br. at 68.
 
 
 216
 In addition, Murad contends that his statement to the FBI was improperly admitted because it was involuntary — the result of torture by Philippine authorities and coercion by the FBI. And while Murad did claim before the District Court that his confession was improperly coerced by Philippine authorities, he concedes that his argument of coercion by the FBI is being raised for the first time on appeal. Murad Br. at 76.
 
 A. District Court Decision
 
 217
 Before trial, Murad moved to suppress his confession on two grounds: that (1) his Miranda warning was incomplete and, as a consequence, he did not understand the effect of speaking to the FBI; and (2) the statement he made to the FBI was the direct result of torture by Philippine officials and as such should have been suppressed. See Yousef, 925 F.Supp. at 1077.
 
 
 218
 After a thorough suppression hearing, the District Court denied Murad's motion to suppress his statement in a comprehensive written order. See United States v. Yousef, 925 F.Supp. 1063 (S.D.N.Y.1996). The District Court made the following factual findings: (1) Murad was advised of the charges against him and was read his Miranda rights, see generally Miranda v. Arizona, 384 U.S. 436, 467-72, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), in English twice after he was brought on the aircraft transporting him from the Philippines to the United States, Yousef, 925 F.Supp. at 1067-68; (2) Murad was able to read and understand English and was able to read the advice-of-rights form; id. at 1068; (3) Murad was also read his Miranda rights in Arabic, id.; (4) after he was read his rights, Murad acknowledged that he (a) understood those rights and (b) was shown written copies of the Miranda forms in English and Arabic, id.; and (5) the forms advising Murad of his rights included an additional section, beyond the standard Miranda warnings, informing Murad that (a) he was in United States custody; (b) he was no longer in the custody of the Philippine National Police; and (c) he should not rely on any promises or representations made by the Philippine National Police because nothing the Philippine authorities told him was binding on the United States, id. In addition, the District Court found that Murad told the agents that he wanted to cooperate with the United States Government, id., and that he agreed to make a statement to the FBI agents "[a]fter [he] was assured that he was in United States custody and that being on board the plane was as if he was in the United States." Id.
 
 
 219
 Turning to Murad's allegations of torture and mistreatment by Philippine authorities, the District Court concluded that Murad's testimony was riddled with inconsistencies and was "not credible." Id. at 1069. The Court first observed that the "United States in no way participated in or condoned Murad's incarceration in the Philippines and the alleged torture that occurred there." Id. at 1067. Next, the Court found that a medical report compiled after Murad's physical examination onboard the plane indicated that Murad denied any current injuries or health problems. Id. at 1068. The Court also observed that Murad never told the agents on the plane that he had been tortured in the Philippines. Id. In addition, the Court found that, although FBI agents had access to transcripts of several interviews of Murad by Philippine authorities, "nothing in those transcripts remotely indicates the presence of any torture." Id. at 1069.
 
 
 220
 Applying its factual findings to the law, the Court rejected Murad's assertion that his Miranda warning was defective. On the contrary, the Court held that "a careful and thorough Miranda warning was given and ... Murad was knowledgeable of his rights and made a knowing and voluntary waiver of them." Id. at 1077. The Court also addressed Murad's contention that "`three months of threats, torture, denial of proper sustenance, and fear at the hands of the Philippine interrogators and the knowledge that he had already confessed, influenced the defendant in such a manner so that he could not have made a conscious and deliberate choice when asked to waive his rights after leaving the Philippines.'" Id. (quoting Murad Suppression Br. at 4-5). The Court found that Philippine authorities were not acting as agents of the United States and that the United Stated was not alleged to have mistreated Murad in any way. Id. In addition, the Court found that, even if Murad had been tortured by Philippine authorities and suffered post-traumatic stress disorder — as Murad's expert witness testified — "Murad's psychological state at the time the statement was given" did not render his confession involuntary. Id. After discerning no allegation of threats, coercion, or other tricks by the FBI agents in obtaining Murad's statement, the Court held that the circumstances of Murad's interrogation were not "unduly coercive." Id. Accordingly, the District Court concluded that, based on the totality of the circumstances, Murad "understood his rights and made a knowing and voluntary waiver of them." Id.
 
 B. Standard of Review
 
 221
 "The standard of review observed by this court in evaluating the district court's ruling in a suppression motion is `clearly erroneous' as to that court's factual findings viewing the evidence in the light most favorable to the government and de novo as to questions of law ...." United States v. Brown, 52 F.3d 415, 420 (2d Cir.1995). Further, "[c]redibility determinations are the province of the trial judges, and should not be overruled on appeal unless clearly erroneous." Fujitsu, Ltd. v. Federal Express Corp., 247 F.3d 423, 435 (2d Cir.2001).
 
 C. Murad's Alleged Request for a Lawyer
 
 222
 Murad contends that he queried FBI agents onboard the plane, "where is the lawyer?" and then informed them that he would speak after the aircraft landed in the United States, thereby asserting his Fifth Amendment right to silence and his Sixth Amendment right to a lawyer. Murad Br. at 61-68. Although Murad concedes that he did not raise this argument before the trial court, he nonetheless argues that, even under "plain error" review, the alleged error is sufficiently serious to warrant reversal of his conviction or at least vacatur of the judgment and a new trial.
 
 
 223
 Under Federal Rule of Criminal Procedure 12(f) ("Rule 12(f)"), "[f]ailure by a party to raise defenses or objections or to make requests which must be made prior to trial ... shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver."[55] See also United States v. Crowley, 236 F.3d 104, 110 (2d Cir.2000); United States v. Schwartz, 535 F.2d 160, 163 (2d Cir. 1976). Murad contends that we may review this newly raised argument for suppression of his statement for "plain error" under Federal Rule of Criminal Procedure 52(b). We disagree. Under Rule 12(f) a district court may excuse waiver of a pretrial suppression argument only "for cause shown." Likewise, we will find complete waiver of a suppression argument that was made in an untimely fashion before the district court unless there is a showing of cause. See United States v. Wilson, 11 F.3d 346, 353 (2d Cir.1993) (holding that the failure to make a suppression motion prior to the deadline set by the trial court constitutes a complete waiver where there is no "reasonable excuse"); United States v. Howard, 998 F.2d 42, 52 (2d Cir.1993) (holding that the failure to file a suppression motion on time in district court constitutes waiver "[a]bsent a demonstration of cause"). A strategic decision by counsel not to pursue a claim, inadvertence of one's attorney, and an attorney's failure to timely consult with his client are all insufficient to establish "cause." See United States v. Forrester, 60 F.3d 52, 59 (2d Cir.1995) (holding that counsel's inadvertence does not establish cause); United States v. Yu-Leung, 51 F.3d 1116, 1122 (2d Cir.1995) (holding that a strategic decision not to object to the admission of evidence waives defendant's right to appeal the admission); Howard, 998 F.2d at 52 (holding that an attorney's failure to consult his client in timely manner was insufficient to show cause).
 
 
 224
 In the instant case, Murad does not explain why he waited until his appeal before making these suppression arguments. Indeed, Murad's attorney raised two other grounds for suppression during the lengthy pre-trial suppression proceedings. Furthermore, Murad filed an affidavit reciting his allegations,[56] testified at the hearing,[57] and had an opportunity during the hearing to cross-examine the FBI agents who interviewed him on the plane as well as the Arabic interpreter who was present on the plane when Murad was read his rights. In sum, Murad had ample opportunity to raise and develop this argument before the District Court and he has not provided, much less established, any reasonable excuse for his failure to so. Accordingly, we hold that Murad has waived this argument.
 
 D. Voluntariness of Confession
 
 225
 Murad also argues that his confession to FBI agents should have been suppressed because it was the product of torture by Philippine authorities and because the FBI agents coerced it from him. Specifically, Murad argues that the District Court: (1) erred by failing to consider his claim that the FBI coerced him; (2) abused its discretion in rejecting the testimony of one of Murad's witnesses who testified about his alleged torture by Philippine officials; and (3) erred by crediting the Government's contention that it was unaware of Murad's alleged mistreatment at the hands of Philippine authorities.
 
 1. FBI Coercion
 
 226
 For the first time on appeal, Murad argues that his statement to the Government should have been suppressed because the FBI coerced him into confessing while he was mentally incapable of making a voluntary confession. Murad also suggests that the District Court "failed to address" his argument that the FBI acted coercively. Murad Br. at 87.
 
 
 227
 Because Murad did not raise this coercion argument before the District Court and has offered no cause for his failure to do so, he has waived this argument. See Fed R.Crim. P. 12(f); Wilson, 11 F.3d at 353; Howard, 998 F.2d at 52. Moreover, even if Murad had not waived this argument, the District Court expressly found an absence of coercion: "There is absolutely no allegation that the FBI agents who questioned Murad in any way threatened, coerced, or tricked him into giving a statement. The circumstances of the questioning were not unduly coercive. I find that Murad understood his rights and made a knowing and voluntary waiver of them." Yousef, 925 F.Supp. at 1077 (emphases added). Because this finding is not clearly erroneous, Murad's coercion argument fails.
 
 2. Hegarty's Testimony
 
 228
 Murad also argues that the District Court abused its discretion when, at the suppression hearing, it failed to give sufficient weight to the testimony of one of his expert witnesses, Dr. Angela M. Hegarty. Hegarty testified that, although Murad admitted that he "sometimes lies," she believed that Murad "most likely" had been tortured in the Philippines. ATr. 4969, 4983. Hegarty diagnosed Murad as suffering from, among other things, post-traumatic stress disorder as a result of his torture. Yousef, 925 F.Supp. at 1071. Based on her opinion that Murad was suffering from mental disorders, Hegarty concluded that he "lacked the capacity to voluntarily and knowingly waive his rights." Hegarty Psychiatric Legal Report on Murad of Aug. 20, 1996 at 36.
 
 
 229
 After reviewing Hegarty's opinions and conclusions, the District Court discounted her views about Murad:
 
 
 230
 As with many other psychological disorders, there is a great possibility that a patient suffering from these disorders may in fact be malingering. Although Murad admitted to Dr. Hegarty that he sometimes lies, and that he in fact lied to Dr. Fredrick, who had conducted a prior evaluation of Murad, Dr. Hegarty stated that if she knew that Murad had lied about his arrest in the Philippines, she would have just considered that another lie that would not change the conclusions of her report. I believe that Dr. Hegarty was bamboozled by Murad and I therefore must give little weight to her testimony and her conclusions.
 
 
 231
 Yousef, 925 F.Supp. at 1071 (internal citations omitted).
 
 
 232
 We conclude that the District Court did not abuse its discretion in finding that Hegarty had been "bamboozled" and consequently discounting her testimony and conclusions. The Court was entitled to give whatever weight it thought appropriate to Hegarty's opinion, see, e.g., United States v. Rosa, 11 F.3d 315, 329 (2d Cir.1993), particularly because Hegarty's opinion was principally based on her interviews with Murad — whose testimony the Court found to be riddled with inconsistencies and, as a whole, not credible, see Yousef, 925 F.Supp. at 1069.
 
 
 233
 3. Murad's Allegations of Torture by Philippine Officials
 
 
 234
 Murad recounts in great detail the torture he allegedly suffered in the Philippines, Murad Br. at 4-14, 21-27, 34-37, 71-73, 76, but he offered the District Court insufficient evidence to establish that any mistreatment occurred. Murad claims that the worst of his torture occurred during the three days after he was first taken into custody by Philippine authorities on December 26, 1994. In particular, he alleges that he was beaten, raped, burnt on his hands and feet by cigarettes, and subjected to simulated drowning. Yousef, 925 F.Supp. at 1067. Yet the District Court found that some of the contorted positions Murad claimed to have been forced into were "physically impossible," and it discerned no scars on Murad's body or other evidence that Murad had been burned. Id. at 1069. Furthermore, the American physician who examined Murad on the plane did not find any evidence of torture or mistreatment, nor did Murad tell that doctor that Philippine authorities had abused him. Id. at 1068. In addition, during the period that Murad claims he was in Philippine custody, a hotel register shows the signature of one of Murad's aliases. Id. at 1070. Murad testified that this signature was in his handwriting, id. at 1070-71, and witnesses testified that Murad was living at the bomb-making apartment in Manila during the time he alleges he was in police custody.
 
 
 235
 Aside from Murad's testimony and Hegarty's testimony, Murad also introduced a transcript of a tape-recording of his interrogation by Philippine authorities on January 7, 1995 in order to support his theory. See id. at 1069. During that interrogation, Murad revealed details about the timers and explosives that the airline bombers would use. In response to questioning, Murad denied that the bombing plot involved any terrorist activity aimed inside the Philippines. Murad's interrogators were not persuaded by this assertion and accused him of lying. Soon after Murad insisted that he was being truthful, the tape recorder was turned off. When the tape recorder was turned back on, Murad sounded highly agitated and stated that there was a plan to bomb the Pope's motorcade during his trip to Manila.
 
 
 236
 The fact that Murad changed a portion of his statement while the tape recorder was turned off does not establish the vicious torture Murad alleges. Moreover, based on the numerous internal inconsistencies in Murad's story, the overwhelming evidence rebutting Murad's allegations, and the absence of corroborating physical evidence of mistreatment, the District Court did not err, much less clearly err, in finding that Murad's testimony "regarding his torture and forced cooperation with the Philippine authorities is not credible." Id.
 
 
 237
 4. United States Government's Lack of Knowledge Regarding Philippine Mistreatment
 
 
 238
 Finally, Murad alleges that the District Court should not have given credence to the United States Government's assertion that it was unaware of his alleged mistreatment by police in the Philippines. Based on "common sense," Murad argues, the FBI knew more than it admitted about Murad's detention and torture. Murad Br. at 82. Murad also attacks the testimony of Philippine National Police officials as showing a "sinister knowledge and lack of conscience." Id. at 84. But after hearing lengthy testimony from the FBI agents involved in the investigation, the District Court made a clear and explicit factual finding that there was no evidence that the United States "participated in or condoned Murad's incarceration in the Philippines and the alleged torture that occurred there." Yousef, 925 F.Supp. at 1067. Rather, the Court found that "[t]he United States role in Murad's custody [in the Philippines] was limited to negotiating the transfer of ... custody from the Philippines government to the United States." Id. Nothing in this record suggests any error in the District Court's finding that the United States Government was unaware of Murad's alleged mistreatment in the Philippines.
 
 E. Harmless Error
 
 239
 Finally, even if it could be argued that the District Court erred in failing to suppress Murad's statement sua sponte based on the arguments he raises for the first time on appeal, we conclude that such an error would be harmless given the ample evidence adduced at trial connecting Murad to the charged crimes. See Milton v. Wainwright, 407 U.S. 371, 377-78, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972) (applying harmless error analysis to allegation that confession was improperly admitted); see also Arizona v. Fulminante, 499 U.S. 279, 306-12, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (applying harmless error analysis to erroneous admission of involuntary confession). The evidence showed that Murad used an assumed name when he arrived in Manila and moved into Yousef's bomb-making apartment shortly thereafter. Fifty-four of Murad's fingerprints were found in the apartment on various notebooks and pads that contained detailed instructions on building the specific type of bomb and timer the defendants planned to use. Murad's picture was also discovered in a file on Yousef's laptop computer attached to a fake "wanted" poster for an "international terrorist," along with other files relating to the airline bombing plot. In sum, any possible error in failing to suppress Murad's statement was harmless.
 
 
 240
 For all of the above reasons, we hold that the District Court did not err in admitting Murad's confession into evidence. Moreover, any possible error in admitting Murad's confession was harmless.
 
 
 241
 VI. Murad's Sixth Amendment Right to Present a Defense
 
 
 242
 According to Murad, the District Court denied him his Sixth Amendment right to present a defense. First, he contends that the Court improperly excluded "evidence of human rights violations and bias [against] Muslims in the Philippines." Murad Br. at 94. Second, he asserts that his right to present a defense was violated because of his inability to obtain full discovery in the Philippines. Id. Third, Murad insists that the District Court erred in instructing the jury about the legal definition of voluntariness. Id. at 94-95.
 
 A. Applicable Law
 
 243
 Under the Sixth and Fourteen Amendments of the Constitution, a person charged with a crime has a fundamental right to present a defense. See, e.g., Herring v. New York, 422 U.S. 853, 856-57, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975); Chambers v. Mississippi, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); United States v. Corr, 543 F.2d 1042, 1051 (2d Cir.1976). Nonetheless, "[a] criminal defendant's right to present a full defense and to receive a fair trial does not entitle him to place before the jury evidence normally inadmissible." United States v. Bifield, 702 F.2d 342, 350 (2d Cir.1983). We will overturn a district court's exclusion of evidence pursuant to Federal Rule of Evidence 403 "only if there is a clear showing that the court abused its discretion or acted arbitrarily or irrationally." Salameh I, 152 F.3d at 110 (internal citation and quotation marks omitted).
 
 
 244
 B. Reports by Amnesty International and the United States Department of State Regarding Abusive Treatment by Philippine Police
 
 
 245
 Although Murad presented a vigorous defense based in part on the involuntariness of his confession, he nonetheless maintains that his Sixth Amendment right to present a defense was violated when the District Court excluded from evidence reports from Amnesty International and the United States Department of State which were offered to show Philippine police misconduct toward Muslims. Murad regarded these reports as "crucial" corroboration for his claims of torture in the Philippines. Murad Br. at 93.
 
 
 246
 Notably, however, Murad did not offer these reports into evidence at trial.[58] Although Hegarty's final written evaluation — which stated that she believed Murad's account of torture — relied in part on these reports, Murad's attorney did not question Hegarty about these reports or try to offer them into evidence. It is therefore not surprising that the District Court "never made a comment or finding," Murad Br. at 93, to support their exclusion. By failing to offer these reports into evidence at trial, Murad has waived any right to argue before us that they should have been admitted.[59] See United States v. Harvey, 959 F.2d 1371, 1374 (7th Cir. 1992) (holding that a defendant "cannot complain about the district court's `decision' to refuse to admit evidence that he never moved to admit"); cf. Fed.R.Evid. 103(a)(2) ("Error may not be predicated upon a ruling which ... excludes evidence unless ... the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked"); United States v. Carson, 52 F.3d 1173, 1187 (2d Cir.1995) ("neither the trial court ... nor the appellate court ... will ordinarily take note of errors that were not pointed out to the district court judge by the party at the proper time.") (quoting 9A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, § 2472, at 95 (1995)).
 
 C. Discovery from the Philippines
 
 247
 Murad also asserts that his Sixth Amendment right to present a defense was undercut by his inability to timely obtain thorough discovery reports and testimony of Philippine police officers and other Philippine witnesses. Specifically, Murad objects that "[t]he Philippine government cooperated with the United States government, but not with the defense." Murad Br. at 92.
 
 
 248
 The Government is not under an obligation to produce prior statements of foreign law enforcement officials that it does not possess. Instead, "even in the course of a joint investigation undertaken by United States and foreign law enforcement officials the most the Jencks Act requires of United States officials is a good-faith effort to obtain the statements of prosecution witnesses in the possession of the foreign government." United States v. Paternina-Vergara, 749 F.2d 993, 998 (2d Cir.1984). The record reflects that the Government made such a goodfaith effort. The Government disclosed a number of documents from the Philippines, including statements by Philippine witnesses, and made good-faith, but ultimately futile, efforts to obtain further materials.[60] Indeed, Shah's attorney acknowledged the Government's efforts: "the government has clearly indicated on the record that they've made efforts to gather all the reports created. The Philippine government has not turned those reports over." ATr. 3292. The District Court "accept[ed] [the Government's] representation that they made a complete effort." ATr. 3293.
 
 
 249
 Nonetheless, Murad contends that he should have received earlier the testimony of various Philippine law enforcement officers given in connection with the January 7, 1995 proceeding before the Philippine court to obtain a search warrant for the defendants' Manila apartment. Even if this delay could be attributed to the United States Government, we discern no prejudice from the late production of this evidence. Murad primarily sought the testimony of Lieutenant José Cruz, Jr. See note 5, ante. Yet, Cruz acknowledged at trial that he had testified falsely in connection with the search warrant application. In particular, Cruz admitted that he had not been given an attaché case containing bomb parts by local police after their search of the defendants' Manila apartment — as he had attested to before the Philippine court — but, rather, he had collected the items in the apartment and placed them inside the case himself. ATr. 2122-27, 2168-76. In light of Cruz's admission that he lied to the Philippine court, it is not clear that Cruz's prior testimony would have been particularly helpful to Murad's defense. Murad's attorney vigorously cross-examined Cruz about his false testimony before the Philippine court and assailed the competence and honesty of the Philippine law enforcement during his summation.
 
 
 250
 In sum, we conclude that Murad received adequate discovery from the Philippines to meet Sixth Amendment requirements.
 
 D. Jury Charge on Voluntariness
 
 251
 Murad also argues that the District Court erred because it "failed to give a more detailed instruction to the jury on the legal definition of voluntariness." Murad Br. at 94. A defendant who challenges a jury instruction must establish (1) that he requested an instruction that "accurately represented the law in every respect" and (2) that the instruction actually given was, viewed as a whole, prejudicial to his rights. United States v. Pujana-Mena, 949 F.2d 24, 27 (2d Cir.1991) (internal citation and quotation marks omitted).
 
 
 252
 The District Court gave the following jury instruction on the voluntariness of confessions:
 
 
 253
 You have also heard the testimony of certain statements or admissions made by the defendants after they had been arrested in this case. I instruct you that these statements can only be used against the defendant who made the statement and not as proof against any other defendant.
 
 
 254
 In deciding what weight to give each of these statements, you should first examine with great care whether the statement was made and whether in fact it was voluntarily and understandingly made.
 
 
 255
 I instruct you that you are to give each statement such weight as you feel it deserves in light of all the other evidence. Remember, this applies only to statements made to government agents after the particular defendant was arrested in this case.
 
 
 256
 ATr. 5585-86.
 
 
 257
 In contrast, Yousef's attorney-advisor requested the following instruction during the charge conference:
 
 
 258
 I have charged you at the beginning of my instructions concerning testimony you heard of post-arrest statements allegedly made by each of the defendants to government agents following his being taken into custody by FBI agents. In this regard it is for you and you alone to determine whether you believe the testimony of the interviewing agent as to what a particular defendant is alleged to have said and the circumstances under which such statement was made.
 
 
 259
 ...
 
 
 260
 In the event you determine that a statement of a defendant was not freely and voluntarily made, that such statement was the proximate result of some type of force or circumstance which immediately preceded his being taken into custody, and were [sic] circumstances which existed at the time the alleged statement was made, you should disregard the statement as having been involuntarily made. In determining the voluntariness of a statement at the time it was allegedly made, you may consider the following:
 
 
 261
 Was the defendant influenced in any way to make the statement?
 
 
 262
 Was the defendant relying on any promise as an inducement to make the statement?
 
 
 263
 Was he intimidated by any events or circumstances existing either prior to or at the time of the statement?
 
 
 264
 Thus, you should consider the state of mind of the defendant as it existed at the time of making the alleged statement in determining the voluntariness of such statement and its usefulness.
 
 
 265
 ATr. 5711-12. The Court denied the requested charge. ATr. 5712.
 
 
 266
 The District Court's charge was neither erroneous nor prejudicial to Murad's rights. The instruction was consistent with 18 U.S.C. § 3501(a), which requires a district court to "instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances." See United States v. Bloom, 865 F.2d 485, 489, 491-92 (2d Cir. 1989) (holding that jury instructions on voluntariness are proper as long as they are consistent with § 3501(a)). Furthermore, the charge was virtually identical to a commonly used instruction on defendant confessions. See 1 L. Sand et al., Modern Federal Jury Instructions ¶ 5.07, Instr. 5-19.
 
 
 267
 Having concluded that the instruction given was proper, it is unnecessary to analyze the instruction proposed by Yousef's attorney-advisor. Nevertheless, we observe that the proposed instruction did not provide an accurate recitation of the law on voluntariness. For example, Yousef's instruction apparently would have required the jury to find involuntary any statement which resulted from "some type of force or circumstance which immediately preceded his being taken into custody." But as Murad concedes, "[n]o single criteria controls whether a statement is voluntary." Murad Br. at 74. Rather, voluntariness depends on the totality of the circumstances. See Haynes v. Washington, 373 U.S. 503, 513-14, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963). Because the proposed instruction would have rendered one factor all-important in the determination of voluntariness, Yousef's instruction did not accurately convey the law.
 
 
 268
 In sum, the District Court's jury instruction on voluntariness did not violate Murad's Sixth Amendment right to present a defense.
 
 
 269
 VII. "Bully" Charge on Circumstantial Evidence of Intent
 
 
 270
 Yousef complains that the District Court erred when it gave the jury charge on inferring intent based on circumstantial evidence. Specifically, he alleges that the District Court's illustration of the concept of intent, by using an example involving a bully, was improper because it assumed the guilt of the bully and implied that Yousef was the bully.
 
 
 271
 In charging the jury, the Court told the jury that it should take circumstantial evidence into account to determine intent. To illustrate how the jury could discern intent, the Court used the following example:
 
 
 272
 You remember when you were in school, there was one kid who was a bully. Every school had a bully. He'd step on some other kid's foot, and then he'd laugh, and if he was caught he'd say: Oh, that's an accident. Well, the direct evidence was that he claimed his intent was an accident, and yet everybody knew from the circumstantial evidence what he really intended. Well, ladies and gentlemen, grown-up life is much the same.
 
 
 273
 Thus, it should be clear that direct evidence is never required to prove intent or knowledge. Direct evidence, in fact, on that particular score is often misleading. Here circumstantial evidence is quite sufficient, but it's one of those things, ladies and gentlemen, that must be proved beyond a reasonable doubt.
 
 
 274
 ATr. 5611-12. As Yousef concedes, neither he nor his attorney-advisor objected to this charge. See Yousef Br. at 267 n. 231.
 
 
 275
 Where a defendant has not objected to a jury charge at trial, we may reverse only if there has been plain error. See, e.g., United States v. Ciak, 102 F.3d 38, 45 (2d Cir.1996); Fed. R. Crim P. 52(b). Despite this rule, Yousef argues that we nevertheless should review the instruction de novo because he was a pro se defendant. Although some appellate courts grant special consideration to pro se defendants, such deference is inappropriate in this case because, despite his pro se status, Yousef was assisted by an attorney-advisor who proved capable of objecting to other portions of the jury charge.[61] Cf. Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 82 n. 4 (2d Cir.2001) (holding that pro se attorneys "cannot claim the special consideration which the Courts customarily grant to pro se parties"); Harbulak v. County of Suffolk, 654 F.2d 194, 198 (2d Cir.1981) (same).
 
 
 276
 Even if we were to review the jury charge de novo, as Yousef urges us to do, we would still conclude that the "bully" charge does not merit reversal. First, although we stated in Salameh I that a district court would "be[] better advised to use a neutral example in describing the difference between direct and circumstantial evidence to prove culpable knowledge," 152 F.3d at 142, we concluded that the use of this very same hypothetical example was "not sufficiently prejudicial to require reversal."[62] Id. Nonetheless, Yousef argues that the instruction was more damaging in the instant case than in Salameh for two reasons. First, he claims that the charge in the case at hand was not mitigated — as it was in Salameh — by a more neutral description of the difference between direct and circumstantial evidence illustrated with an example from Robinson Crusoe. Second, Yousef argues that the bully example is more harmful to him than it was to the defendants in Salameh because, throughout the trial, the Government tried to portray Yousef as the mastermind of the operation or, by implication, the bully.
 
 
 277
 Yousef's first argument is plainly wrong. The very same Robinson Crusoe example given in Salameh was also given by the District Court in the case at hand.[63] In addition, any potential for misimpression by the jury based on the bully charge was likely mitigated because the District Court made a point to clarify in its charge that the jury was free to draw whatever inferences it thought appropriate based on the evidence in this case.[64] Furthermore, the District Court properly instructed the jury about circumstantial evidence generally:
 
 
 278
 Let me start off by explaining the difference between direct and circumstantial evidence. Direct evidence is something that a witness sees, hears, tastes, touches, something that comes directly to his knowledge through his senses. Circumstantial evidence is evidence of facts and circumstances from which one may infer connected facts which reasonably follow in the common experience of mankind. Circumstantial evidence is evidence which tends to prove a disputed fact by proof of another fact or other facts which have a logical tendency to lead the mind to the conclusion that the disputed fact has been established.
 
 
 279
 ATr. 5578. Moreover, as in Salameh, the Government in the present case adduced overwhelming evidence of the defendants' guilt, so any possible error arising from the bully charge was harmless. See Salameh I, 152 F.3d at 143.
 
 
 280
 For all of the reasons stated above, we conclude that the use of the bully charge in the instant case does not require reversal.
 
 
 281
 VIII. Sufficiency of the Evidence on Yousef's Attempt Convictions
 
 
 282
 Yousef argues that the Government failed as a matter of law to establish that his conduct was sufficient to support his conviction on Count Thirteen, charging him with attempt to damage or destroy United States aircraft serving routes in Asia, in violation of 18 U.S.C. § 32(a)(1) and (7), and Count Fourteen, charging him with attempt to place a bomb on United States aircraft servicing routes in Asia, in violation of 18 U.S.C. § 32(a)(2) and (7). Yousef Br. at 251-54. He argues that, because the Government failed to prove his conduct rose to the legal level of an "attempt," these counts should have been dismissed. Id. at 254.
 
 
 283
 In order to establish that a defendant is guilty of an attempt to commit a crime, the government must prove that the defendant had the intent to commit the crime and engaged in conduct amounting to a "`substantial step'" towards the commission of the crime. United States v. Rosa, 11 F.3d 315, 337 (2d Cir.1993) (quoting United States v. Martinez, 775 F.2d 31, 35 (2d Cir.1985)). For a defendant to have taken a "substantial step," he must have engaged in more than "mere preparation," but may have stopped short of "the last act necessary" for the actual commission of the substantive crime. Id. (internal citations and quotation marks omitted); accord United States v. Delvecchio, 816 F.2d 859, 861 (2d Cir. 1987). A defendant may be convicted of attempt even where significant steps necessary to carry out the substantive crime are not completed, so that "dangerous persons [may be apprehended] at an earlier stage ... without immunizing them from attempt liability." United States v. Jackson, 560 F.2d 112, 120 (2d Cir.1977).
 
 
 284
 In reviewing whether the evidence at trial was sufficient to support Yousef's convictions on the attempt crimes charged in Counts Thirteen and Fourteen, we view the evidence in the light most favorable to the Government and will not disturb the verdict if there is substantial evidence to support it. United States v. Vasquez, 267 F.3d 79, 91 (2d Cir.2001), cert. denied, 534 U.S. 1148, 122 S.Ct. 1111, 151 L.Ed.2d 1005 (2002) (citation omitted); see generally Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
 
 
 285
 Viewed in the light most favorable to the Government, there is ample credible evidence that Yousef took substantial steps toward damaging or destroying United States commercial aircraft and toward placing a bomb on such aircraft to support his conviction on Counts Thirteen and Fourteen, respectively. At trial, the Government established that Yousef acting alone or with his co-conspirators: (i) rented an apartment in a suburb of Manila for the purposes of manufacturing bombs therein; (ii) purchased chemicals suitable for the manufacture of bombs; (iii) manufactured bombs, timers, and related devices; (iv) detonated a bomb in a movie theater in Manila; and (v) detonated a bomb on a Philippine airliner, killing one passenger. The Government also established that Yousef's laptop contained information connecting his activities in the Philippines to the plot to bomb United States airliners servicing routes in Asia.
 
 
 286
 Acknowledging the evidence above, Yousef nonetheless argues that it was insufficient to support his conviction on Counts Thirteen and Fourteen because all of the predicate acts occurred in the Philippines. Yousef Br. at 252-54. He contends that, because he took no steps directly connected to the United States or to a United States airliner, his conduct amounted to no more than "mere preparation" to bomb United States aircraft. Id. at 254.
 
 
 287
 This argument is unavailing because the defendants' conduct need not have occurred in the United States to constitute a substantial step toward commission of the charged crimes. Indeed, because the targeted airliners were operating on East Asian routes, the substantive crimes could have been — and were intended to be — completed far from the territory of the United States. Just as the defendants were properly convicted of substantive crimes pursuant to 18 U.S.C. § 32 based on conduct committed entirely outside the United States, so too they were properly convicted for attempting to commit such crimes based wholly on conduct that occurred outside the territorial bounds of the United States.
 
 
 288
 In sum, Yousef extensively planned and rehearsed his plot to bomb a dozen United States aircraft. Overwhelming evidence established that he had the requisite intent to carry out the substantive offenses and that he took substantial steps toward effectuating the attack. We therefore hold that there is sufficient evidence to sustain Yousef's convictions on Counts Thirteen and Fourteen.
 
 
 289
 We have considered the defendants' remaining arguments pertaining to the airline bombing case and conclude that they are without merit.
 
 WORLD TRADE CENTER CASE
 BACKGROUND
 
 290
 I. Indictment and Apprehension of Yousef and Ismoil
 
 
 291
 Not long after the World Trade Center bombing in February 1993, investigators identified Yousef and Ismoil as prime suspects in the bombing. The first break in the investigation came almost immediately, when the vehicle identification number of the rented van used to transport the bomb was recovered from the debris of the bombing. Investigators traced this number to a leasing agency in Jersey City, New Jersey. When defendant Salameh returned to the leasing agency six days after the bombing to obtain his deposit, FBI agents were waiting to arrest him. Searches and information emanating from that arrest ultimately led to the identification of Yousef and Ismoil as the two individuals who drove the bomb-laden van into the basement parking garage of the World Trade Center.
 
 
 292
 Yousef was indicted in the first superseding indictment, filed on March 31, 1993. As described above, Yousef was not apprehended until nearly two years later, when United States authorities received a tip from a confidential informant that Yousef could be found in Islamabad, Pakistan. See United States v. Yousef, 925 F.Supp. 1063, 1065-66 (S.D.N.Y.1996). Yousef was arrested in Islamabad on February 7, 1995 and was transferred to United States custody the next day pursuant to an extradition request. See id. at 1066. After being taken into custody by the United States and while on a flight from Pakistan to the United States, FBI agents read Yousef Miranda warnings and Yousef signed a waiver of rights form. Id. at 1067. Following the waiver of his rights, Yousef made a detailed statement to the agents in which he admitted that he had traveled to the United States in 1992 with defendant Ajaj in order to select American bombing targets, that he and another person had driven the van containing the bomb into the World Trade Center garage and prepared it to detonate, and that he had fled the country the same day.
 
 
 293
 Investigators did not link Ismoil to the World Trade Center bombing until after the first World Trade Center bombing trial ended in March 1994 with convictions of defendants Salameh, Ajaj, Nidal Ayyad, and Mahmoud Abouhalima. See generally Salameh I, 152 F.3d 88. On August 8, 1994, the Government filed the seventh superseding indictment, which named Ismoil as a defendant. Ismoil was apprehended in Jordan in July 1995 and extradited to the United States. While in Jordanian custody, Ismoil made oral and written statements to Jordanian authorities in which he admitted driving a van into the World Trade Center garage; he stated, however, that he did not know until after he left the parked van that it contained a bomb.
 
 II. The World Trade Center Bombing Trial
 
 294
 Yousef and Ismoil were ultimately charged in eleven counts relating to their participation in the World Trade Center bombing. Specifically, Yousef and Ismoil were both charged with: conspiracy to commit the crimes listed below, in violation of 18 U.S.C. § 371 (Count One); bombing a building used in interstate and foreign commerce, in violation of 18 U.S.C. §§ 844(i) and 2 (Count Two); bombing property and vehicles owned, used, and leased by an agency of the United States, in violation of 18 U.S.C. §§ 844(f) and 2 (Count Three); transporting a bomb in interstate commerce, in violation of 18 U.S.C. §§ 844(d) and 2 (Count Four); two counts of bombing or destroying a vehicle used in interstate commerce, in violation of 18 U.S.C. §§ 33, 34, and 2 (Counts Five and Six); assaulting federal officers (three Secret Service Agents injured by the bomb), in violation of 18 U.S.C. §§ 111 and 2 (Count Eight); and two counts of using and carrying a destructive device in relation to a crime of violence (one count for using the bomb in the assault on federal officers and one count for using and carrying the bomb during and in relation to the conspiracy to bomb the World Trade Center), in violation of 18 U.S.C. §§ 924(c) and 2 (Counts Nine and Ten). Yousef and Ismoil were charged separately, in Counts Seven and Eleven respectively, with traveling and using facilities in interstate and/or foreign commerce to commit crimes of violence, in violation of the Travel Act, 18 U.S.C. § 1952.
 
 
 295
 The Government's theory at trial was that Yousef was an explosives expert who masterminded the plot to bomb the World Trade Center, and that he and Ismoil drove together in a rented Ryder van from New Jersey and parked the van in the public parking level of the World Trade Center. The principal evidence against Yousef at trial was the post-arrest statements he made to FBI agents en route from Pakistan to the United States, as well as testimony and evidence that linked him to several apartments he shared with defendant Salameh and to activities directly connected to the charged offenses. The last apartment the two men shared was located at 40 Pamrapo Avenue in Jersey City, New Jersey (the "Pamrapo Apartment"). Yousef's fingerprints were found in the Pamrapo Apartment and in the storage shed where investigators discovered several chemicals believed to have been used in assembling the bomb. Yousef's fingerprints were also found on the bomb-making materials that were part of the "terrorist kit" that had been found in the suitcase carried by defendant Ajaj when he traveled with Yousef from Pakistan to the United States in September 1992. In addition, telephone records and surveillance photos established that, prior to the bombing, Yousef placed telephone calls to Ajaj, who was in a local jail in Maryland, to Ismoil, and to City Chemical Corporation, the chemical company where many of the chemicals found in the storage shed were purchased. Finally, a neighbor of the Pamrapo Apartment identified Yousef as one of the tenants of the apartment, the president of City Chemical identified Yousef as the man who purchased chemicals found in the storage shed, and an employee at the storage shed testified that a man fitting Yousef's description waited there with Salameh for a delivery of hydrogen gas cylinders two days before the bombing.
 
 
 296
 Evidence at trial against Ismoil included the statements he made to Jordanian authorities after his arrest in Jordan; hotel and airline records establishing that he traveled from Dallas to New York a few days before the bombing and then flew to Jordan from New York on the day of the bombing; records from the Harbor Motor Inn in Brooklyn, N.Y., showing that the day before the bombing, Ismoil registered under his own name and stated that he was driving a "vane [sic]"; telephone records and surveillance photos showing telephone calls made to Ismoil by Yousef and others; and Ismoil's fingerprints found on a telephone book and a catalog in the Pamrapo Apartment.
 
 
 297
 After defendants' four-month jury trial ended on November 12, 1997, Yousef and Ismoil were convicted on all counts. On January 8, 1998 and April 3, 1998, respectively, the District Court sentenced Yousef and Ismoil each to a total of 240 years of imprisonment, in addition to five years of supervised release and various restitution obligations, as well as special assessments.
 
 DISCUSSION
 
 298
 Yousef and Ismoil raise several challenges to their convictions for the 1993 World Trade Center bombing and argue that various trial errors deprived them of a fair trial. Many of these claims concern the admission into evidence of their post-arrest statements. Yousef contends that the District Court erred by (1) denying Yousef's motions to suppress his post-arrest statement and to dismiss his indictment; (2) requiring the defendants to produce their expert witnesses at a Daubert hearing; (3) denying Yousef's motion to sever; and (4) denying Yousef's motion for a change of venue.
 
 
 299
 Ismoil argues that the District Court erred by (1) admitting Ismoil's redacted statement at the joint trial and precluding Ismoil from eliciting the full text of the statement on cross-examination; (2) denying Ismoil's motion to suppress his statement to Jordanian authorities; (3) precluding Ismoil from introducing evidence of inconsistent theories presented by the Government at the first World Trade Center trial; (4) admitting the Government's fingerprint evidence and telephone call charts; (5) failing expressly to instruct the jury that Ismoil had to know he was transporting a bomb; and (6) not dismissing the alternate jurors when the jury retired to deliberate. Ismoil also maintains that, independent of the prejudicial effect of each of these errors, their cumulative effect violated his right to a fair trial.
 
 
 300
 In addition, each defendant joins in the arguments made by the other. We address each of these claims in turn.
 
 I. Yousef's Pre-Trial Motions
 
 301
 Yousef challenges the District Court's denial, following a hearing, of his pre-trial motions to dismiss his indictment and to suppress the statements he made to United States agents on the plane that carried him from Pakistan to the United States. See United States v. Yousef, 927 F.Supp. 673, 676-78 (S.D.N.Y.1996); Yousef, 925 F.Supp. at 1065-67, 1073-77.
 
 A. Motion to Dismiss the Indictment
 
 302
 Yousef challenges the District Court's denial of his motion to dismiss the indictment and its refusal to hold an evidentiary hearing based on his contention that alleged torture by Pakistani captors was attributable to the United States. We review a district court's decision denying a motion to dismiss an indictment de novo. See United States v. Fernandez-Antonia, 278 F.3d 150, 156 (2d Cir.2002) (alien's motion to dismiss indictment pursuant to 8 U.S.C. § 1326 involves mixed questions of law and fact and therefore is reviewed de novo); United States v. Leyland, 277 F.3d 628, 631 (2d Cir.2002) (denial of a motion to dismiss on double jeopardy grounds reviewed de novo because it presents a question of law); United States v. Cuervelo, 949 F.2d 559, 567 (2d Cir.1991) (motion to dismiss based on allegations of outrageous governmental conduct reviewed de novo). We review a district court's factual findings for clear error. See United States v. Casado, 303 F.3d 440, 443 (2d Cir.2002).
 
 
 303
 Yousef submitted an affidavit, dated January 15, 1996 (nearly a year after his February 1995 arrest), in support of his motion to suppress his post-arrest statements and to dismiss the indictment. Yousef Aff. in Supp. of Mot. to Suppress ¶ 38 ("Yousef Aff."). In the affidavit, Yousef asserts that he was kidnapped in Pakistan in November 1994. Id. ¶¶ 2-4. Yousef alleges that he and some of his family members were tortured until he agreed to put his fingerprints on various documents and books, write out letters in his own handwriting, and make telephone calls. Id. ¶¶ 5-21. Although Yousef does not specifically allege it, we assume these claims pertain to the incriminating documents found in and phone calls made from the Philippines and introduced at the Philippine Airlines bombing trial. See Airline Bombing Case, Background, section II, ante. He also alleges that he was held continuously by Pakistanis until he was turned over to United States officials in Islamabad in February 1995, id. ¶¶ 23, 25, 27-29, 37, and that at various times while in Pakistani custody he was interrogated by people claiming to be with the FBI, one of whom forced him to sign a Miranda waiver, id. ¶¶ 25, 30-31.
 
 
 304
 Yousef argues that his torture by Pakistanis is attributable to the United States because the Pakistanis who captured and tortured him were acting as agents to the United States or, in the alternative, because the United States and Pakistan were engaged in a joint venture to "track and trap" him. Consequently, Yousef argues, the District Court was required to dismiss the indictment against him or, in the alternative, to suppress his post-arrest statements as involuntary and coerced.
 
 
 305
 In support of this claim, Yousef relies on a line of cases for the proposition that when the United States engages in conduct that "shocks the conscience" in order to bring a defendant within the jurisdiction of the United States, a district court must divest itself of jurisdiction over the case and dismiss the indictment. See United States v. Toscanino, 500 F.2d 267, 272-73 (2d Cir.1974). In Toscanino, we held that United States agents' alleged involvement in the defendant's forcible abduction or torture by agents of a foreign government in connection with his extradition to this country to stand trial, if proved, would constitute a deprivation of due process and would require a district court to divest itself of jurisdiction over the case. See id. at 275. We also held, however, that a hearing concerning such allegations would be required only if the defendant "offer[ed] some credible supporting evidence, including specific[] evidence that the action was taken by or at the direction of United States officials." Id. at 281; see also United States v. Toscanino, 398 F.Supp. 916, 916-17 (E.D.N.Y.1975) (following remand from Court of Appeals, refusing to hold hearing because only supporting evidence was defendant's affidavit, which failed to show participation by United States officials).
 
 
 306
 The District Court denied Yousef's motion to dismiss without holding a hearing for two reasons. First, it found Yousef's allegations of torture to be incredible in light of evidence that Yousef had traveled to Bangkok during the time period that he was alleged to have been in captivity and because several of Yousef's factual assertions were contradicted by the testimony of the United States agents involved in Yousef's arrest in Pakistan. In particular, agents testified that Yousef was arrested at the Su Casa guest house in Islamabad on February 7, 1995, which was inconsistent with Yousef's assertion that he had been in captivity since the previous November. See Yousef, 927 F.Supp. at 677.
 
 
 307
 We find no clear error in this factual finding, which was supported by additional evidence presented to the District Court, including the fact that Yousef disclaimed any medical problem or injury when he was examined by a doctor following his transfer to United States custody, see Yousef, 925 F.Supp. at 1066-67, and that Yousef did not mention his purported captivity or torture to the United States agents at the time he was taken into United States custody, see id. at 1066 n. 1. Indeed, as stated above, Yousef first asserted his claim of torture nearly a year after his arrest. See Yousef Aff. ¶ 38. We also note that the 1996 Philippine Airlines bombing trial yielded substantial eyewitness testimony and evidence of travel records placing Yousef outside of Pakistan during the time he claims to have been in captivity. See Airline Bombing Case, Background, sections I-II, ante (discussing evidence presented at Philippine Airlines bombing trial).
 
 
 308
 The District Court's second basis for denying the motion to dismiss was that, even taking Yousef's factual assertions as true, Yousef had failed to allege United States involvement in his kidnapping, captivity, or torture sufficient to make them attributable to the United States. See Yousef, 927 F.Supp. at 677. We find no error in this conclusion. As the District Court noted, apart from the undisputed presence of United States officials at the time of his arrest in February 1995, Yousef's only allegation of United States involvement in his captivity and torture is that sometime during the middle of his alleged captivity, notably after most of the alleged mistreatment had taken place, he was "placed in a room and was interrogated by an English-speaking Pakistani and a man who claimed to be an FBI agent from the United States," and that later, when he was being interrogated by FBI agents just prior to being transferred to their custody, he "recognized one of the FBI agent's voices, as a man who was with `No. 3' [Yousef's asserted primary torturer] when I was first being detained in the desert." Yousef Aff. ¶¶ 25, 31; see Yousef, 927 F.Supp. at 677. This claim was contradicted by the FBI Legal Attache responsible for Pakistan, who testified at the suppression hearing that no FBI agents investigating Yousef were present in Pakistan prior to February 6, 1995. See Yousef, 927 F.Supp. at 677. Even if we accept Yousef's allegations as true, however, his claim necessarily fails because his affidavit does not allege that the FBI agent he claims was in Pakistan either knew about or participated in his torture. See id.
 
 B. Motion to Suppress
 
 309
 In denying Yousef's motion to suppress his statements, the District Court reviewed the circumstances surrounding his arrest and held that the fact that Yousef had originally been given incomplete Miranda warnings did not taint the voluntariness of the statements he made after being given complete Miranda warnings and signing a waiver. See Yousef, 925 F.Supp. at 1074-75. The District Court noted that the Government never sought to introduce any statements Yousef made before he was given full Miranda warnings. Id.
 
 
 310
 Yousef does not challenge this particular holding. Instead, he argues that any Miranda waiver he gave was invalid because (1) he invoked his right to counsel during an extradition proceeding in Pakistan, which took place after he was indicted for the World Trade Center bombing and, hence, after his Sixth Amendment right to counsel had attached; (2) his right to counsel also attached in 1992, when the New York law firm of Willkie Farr & Gallagher ("Willkie Farr") was appointed to represent him in immigration proceedings, and thus he was represented by counsel at the time of his interrogation; and (3) he was denied his right to due process by the FBI agents' failure to provide him with counsel before interrogating him. Yousef also argues that, as a consequence of his alleged kidnapping and torture by Pakistanis acting as agents of the United States government, his subsequent post-arrest statements were coerced and involuntary, and hence inadmissible.
 
 
 311
 Only the first of these arguments was raised in the District Court. In reviewing a preserved challenge to the denial of a motion to suppress, "we review de novo the legal issues presented [and] we accept the district court's factual findings unless clearly erroneous, ... view[ing] those facts in the light most favorable to the government." Casado, 303 F.3d at 443; see United States v. Harrell, 268 F.3d 141, 145 (2d Cir.2001); United States v. Peterson, 100 F.3d 7, 11 (2d Cir.1996). As for Yousef's unpreserved claims, we review them for plain error. See Fed.R.Crim.P. 52(b).
 
 
 312
 1. Attachment of Sixth Amendment Right to Counsel Upon Indictment for the World Trade Center Bombing
 
 
 313
 The Sixth Amendment's right to counsel attaches at the "initiation of adversary judicial proceedings," such as the filing of an indictment. United States v. Gouveia, 467 U.S. 180, 188, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984); United States v. Abdi, 142 F.3d 566, 569 (2d Cir.1998). Once the right has attached, the Sixth Amendment renders inadmissible in the Government's case-in-chief statements elicited by the Government outside the presence of a defendant's counsel that are not accompanied by a waiver of this right. See generally United States v. Henry, 447 U.S. 264, 273-74, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). In addition, in Michigan v. Jackson, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), the Supreme Court adopted the prophylactic rule that once a defendant invokes his Sixth Amendment right to counsel in a government-initiated interrogation, any subsequent waiver of that right is presumed invalid, even if the waiver is knowing and voluntary. See id. at 635, 106 S.Ct. 1404. Statements elicited in violation of this rule are inadmissible in the government's case-in-chief. Cf. Michigan v. Harvey, 494 U.S. 344, 345, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990) (limiting the applicability of the Jackson rule to statements proffered in the prosecution's case-in-chief).
 
 
 314
 Yousef argues that because his Sixth Amendment right to counsel attached when he was indicted in 1993 for the World Trade Center bombing, the written Miranda waiver he gave to United States agents was void and, therefore, his post-arrest statements should have been suppressed.[65] It is settled law, however, that the attachment of the Sixth Amendment right to counsel, by itself, does not preclude a defendant from validly waiving his right to counsel. See Patterson v. Illinois, 487 U.S. 285, 298, 300, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988) (holding admissible statements given after indictment, where defendant had been given Miranda warnings and had not asked for counsel). Rather, as the Court in Jackson held, it is the defendant's invocation of his right to counsel that vitiates the validity of a waiver subsequently obtained during a government-initiated interrogation. See Jackson, 475 U.S. at 635, 106 S.Ct. 1404; see also id. at 635 & n. 9, 106 S.Ct. 1404 (leaving open the possibility that a valid waiver could be provided outside the context of a government-initiated interrogation). Yousef does not dispute that, while en route from Pakistan to the United States, he provided a written waiver of his Miranda rights prior to making his statements to FBI agents. Accordingly, unless Yousef can establish that he invoked his right to counsel, this claim must fail.
 
 2. Invocation of Right to Counsel
 
 315
 Yousef contends that he invoked his right to counsel during his extradition proceeding before Pakistani officials with United States officials present. However, this bald assertion has no factual support in the record. None of the United States agents who testified at the suppression hearing stated that they had attended an extradition hearing or that they had heard Yousef invoke his right to counsel. One agent told the Court that, following an initial interview with FBI agents, Yousef remained in Pakistani custody until he was turned over to the United States the next day. See Yousef, 925 F.Supp. at 1066. Another agent testified that, to his knowledge, no United States official was present at any extradition proceeding. The only evidence suggesting that Yousef ever invoked his right to counsel appears in the affidavit he submitted, wherein, after explaining that he had been brought to a Pakistani police station, he states the following:
 
 
 316
 30. While I was there, a Pakistani officer came in with FBI officials. One of the FBI officials said "It is he." I was then blindfolded again and taken out.
 
 
 317
 31. I was then chained up in a room. Present were several officials who identified themselves as FBI and Pakistani security officers. One of the FBI agents started asking me questions and the other wrote out a "Miranda warning" and ordered me to sign it. I was questioned by those agents for several hours. Significantly, I recognized one of the FBI agent's voices as a man who was with "No. 3" when I was first being detained in the desert.
 
 
 318
 32. I was then turned over to the Pakistani officials who continued to interrogate me. The Pakistani officials brought a video camera, and filmed me sitting there.
 
 
 319
 33. At one point, when I was with the Pakistani intelligence officers, I told them I wanted an attorney. They responded that it was not a matter for them to decide.
 
 
 320
 34. Later that evening, I was taken to a room that was the office of the commander of that special division. A man entered the room and identified himself as a judicial officer, appointed by the Pakistani Minister of the Interior. Also present in the room were several Pakistani guards and a person who was recording the proceeding. There were no lawyers present.
 
 
 321
 35. The judicial officer read to me the charges pending against me in the United States. As he read each of the charges, he asked me if I had committed any of them. I answered his questions, saying "No" or "That is not true." I asked the judge what was going to happen next. He told me I would first stand trial in Pakistan because of my Pakistani citizenship, and if the validity of the charges was confirmed, I would be turned over to the United States.
 
 
 322
 Yousef Aff. ¶¶ 30-35 (emphasis added). Yousef alleges that Pakistani officers then forced him to sign several papers and that he was held in prison for several more hours before he was transported to the airport and into United States custody. See id. ¶¶ 36-37.
 
 
 323
 As Yousef's counsel acknowledges, a request for counsel in the context of an investigation conducted solely by foreign officials does not, in itself, amount to an invocation of the right to counsel with respect to United States proceedings. See United States v. Coleman, 25 M.J. 679, 686-87 (A.C.M.R.1987), aff'd, 26 M.J. 451 (C.M.A.1988); cf. United States v. Covington, 783 F.2d 1052, 1055-56 (9th Cir.1985) (holding that no constitutional violation occurs when a foreign law enforcement officer fails to cease questioning upon a defendant's invocation of the right to counsel).[66] Accordingly, Yousef's claim is deficient because he does not allege in his affidavit that any United States officials were present when he assertedly asked the Pakistani intelligence officers for an attorney or when the Pakistani judicial officer questioned him. Although Yousef's counsel asserts that Yousef invoked his right to counsel during his extradition proceedings before a Pakistani judicial officer, see Yousef Br. at 89, there is no evidence that any United States official was aware of this request and, therefore, Yousef has failed to establish that his request had any cognizable legal effect under American law or the Sixth Amendment thereunder. Moreover, even if Yousef's request before a foreign law enforcement officer were legally significant, Yousef has failed to allege in his affidavit that he even asked the Pakistani judicial officer for an attorney.
 
 
 324
 United States law enforcement officers are not required to "monitor the conduct of representatives of each foreign government to assure that a request for extradition or expulsion is carried out in accordance with American constitutional standards." United States v. Lira, 515 F.2d 68, 71 (2d Cir.1975). Thus, the District Court properly concluded that "[a]ny request Yousef made of the Pakistani government prior to his surrender to United States officials ... cannot be extended to require the United States officials to proceed as if that request was made of them." Yousef, 925 F.Supp. at 1076. Yousef does not allege that he ever asked United States officials for an attorney either before he provided a written waiver of his Miranda rights on board the plane that took him to the United States, or at any time during his statement to FBI agents following that waiver.
 
 
 325
 We conclude that Yousef did not invoke his right to counsel before any United States official and, therefore, that the admission of his post-arrest statements, which were provided after he had been given full Miranda warnings and had signed a written waiver of his rights, did not violate his Sixth Amendment right to counsel. See Patterson, 487 U.S. at 300, 108 S.Ct. 2389.
 
 
 326
 3. Sixth Amendment Rights Based on Assignment of Asylum Counsel
 
 
 327
 Yousef next contends that his post-arrest statement should have been suppressed because FBI agents knew that pro bono counsel had been appointed to represent him in deportation proceedings upon his arrival in the United States in 1992, and thus should not have questioned him regarding the World Trade Center bombing in the absence of counsel. While acknowledging that the Sixth Amendment is offense specific, see, e.g., McNeil v. Wisconsin, 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991), Yousef maintains that his Sixth Amendment right to counsel attached for purposes of the deportation proceedings and extended to the World Trade Center bombing charges because Yousef's deportation hearing was based on his illegal entry into the country and an asylum claim, and thus was "closely related" to the Travel Act charge contained in the World Trade Center bombing indictment, which alleged that he entered the country with an intent to commit violent crimes, in violation of 18 U.S.C. § 1952.
 
 
 328
 This claim fails for several reasons. To begin with, the "closely related" exception on which Yousef relies to tie his immigration representation to the World Trade Center charges was recently rejected by the Supreme Court. See Texas v. Cobb, 532 U.S. 162, 164, 168, 121 S.Ct. 1335, 149 L.Ed.2d 321 (2001) (reaffirming the tenet that Sixth Amendment right to counsel is "offense specific," and rejecting the "closely related" exception). Moreover, there simply is no Sixth Amendment right to counsel and no claim for ineffective assistance of counsel in connection with deportation proceedings, which are civil in nature. See United States v. Paredes-Batista, 140 F.3d 367, 377 (2d Cir. 1998) (Sixth Amendment right to counsel does not apply to civil deportation proceedings); Montilla v. INS, 926 F.2d 162, 166 (2d Cir.1991) (noting that "[b]ecause a deportation proceeding is civil, not criminal, in nature, various constitutional protections are not required," including Sixth Amendment right to counsel); see also INS v. Lopez-Mendoza, 468 U.S. 1032, 1038-39, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984) (because deportation proceeding is civil in nature, "various protections that apply in the context of a criminal trial do not apply in a deportation hearing"); Michelson v. INS, 897 F.2d 465, 467 (10th Cir.1990) (no Sixth Amendment right to counsel in a deportation proceeding).
 
 
 329
 Finally, in what can only be characterized as a comedic interlude, Yousef argues that pro bono counsel's withdrawal in March 1993, on the grounds that Yousef could not be located and had failed to appear at his deportation hearing, constituted ineffective assistance. Yousef contends that counsel was ineffective by failing to give Yousef notice of the withdrawal. Although it is clear that Yousef's claim of ineffective assistance has no bearing on the present case, we note the obvious irony of the fact that Yousef's pro bono counsel could hardly have notified him of his withdrawal because Yousef had already fled the country, his whereabouts unknown.
 
 
 330
 4. Purported Due Process Requirement of Appointment of Counsel
 
 
 331
 Yousef also argues that the United States was obligated to provide him with counsel upon taking him into custody, and that failure to do so violated his right to due process. Yousef offers no direct support for this argument and, instead, seeks to employ the Mathews balancing test developed in the context of civil proceedings to argue that his liberty interests outweighed any burden that would be placed on the United States if required to provide him with counsel. See Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (applying a balancing test to determine what pre-deprivation safeguards were required in an administrative proceeding to guarantee a party's right to procedural due process). We reject this argument as inconsistent with the entire body of law that has developed under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), including the principle that an individual can waive his or her rights against self-incrimination and to have an attorney present during questioning. Id. at 444, 86 S.Ct. 1602; see generally Dickerson v. United States, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). Here, Yousef affirmatively waived his right to counsel, after being given full Miranda warnings. To allow a defendant to waive his Miranda rights and then later argue that his right to due process was violated because the government failed to ignore that waiver and appoint counsel anyway would simply defeat the purpose of giving Miranda warnings, which is to provide a criminal suspect with the informed choice either to exercise his Fifth and Sixth Amendment rights or to waive them.
 
 
 332
 5. Voluntariness of Yousef's Post-Arrest Statements
 
 
 333
 Finally, at various points in his brief, Yousef appears to argue that his post-arrest statements should have been suppressed because they were involuntary and coerced as a result of the torture he allegedly suffered. We hold that, because this argument was not raised in Yousef's pre-trial suppression motion, it was waived. See Fed.R.Crim.P. 12(b)(3) (requiring that motions to suppress evidence be raised prior to trial); Fed.R.Crim.P. 12(f) (failure to raise 12(b) motions before trial constitutes waiver thereof); cf. United States v. Crowley, 236 F.3d 104, 108-10 (2d Cir.2000) (failure to raise specificity challenge to indictment before trial, as required by Rule 12(b)(2), constituted waiver under Rule 12(f)). Yousef has not demonstrated cause for the waiver, nor is any plain error apparent from the record. See Fed.R.Crim.P. 12(f), 52(b).
 
 
 334
 II. Ismoil's Motion to Suppress His Statement to Jordanian Authorities
 
 
 335
 Ismoil challenges the District Court's denial of his pre-trial motion to suppress the post-arrest written statement he provided to Jordanian officials on the ground that the Jordanians did not read him his Miranda rights before taking the statement. Ismoil also challenges the District Court's subsequent denial of his two renewed motions to suppress both his written and his oral post-arrest statements on the basis that (1) his statements were not voluntary and (2) the Government had failed to comply with discovery orders. As stated above, we review the legal issues presented in a motion to suppress de novo, and, viewing the facts in the light most favorable to the Government, we review the District Court's factual findings for clear error. See Casado, 303 F.3d at 443.
 
 
 336
 In Ismoil's affidavit accompanying his December 15, 1995 pre-trial motion, he asserts that the Jordanian officials who arrested him repeatedly questioned him and asked him to write a statement. See Ismoil Aff. in Supp. of Mot. to Suppress ¶ 3 ("Ismoil Aff."). He further stated that at various times during his custody he heard these officials speaking in English on the telephone. See id. ¶¶ 5-6. Although Ismoil asserts that he was not given Miranda warnings by the Jordanian officials, he does not claim in his affidavit that they mistreated him in any way or that his statements were given involuntarily. See id. ¶ 3. In its opposition to Ismoil's motion, the Government submitted an affidavit from FBI Special Agent Brian Fortin asserting that the United States government had not encouraged, requested, or participated in Ismoil's interrogation or written statement, and that the government did not receive Ismoil's written statement from the Jordanian authorities until after Ismoil was in United States custody. See Fortin Aff. in Opp. to Mot. to Suppress ¶¶ 4, 7-9. The District Court denied from the bench Ismoil's pre-trial motion concerning his written statement and denied in a written opinion Ismoil's first renewed motion, in which he sought to suppress the oral statements he made to Jordanian authorities. In denying these two motions, the District Court concluded that Ismoil had failed to allege sufficient United States involvement in his interrogation to warrant suppression of either statement, relying on Lira, 515 F.2d at 71 (denying motion to suppress where the "only suggestion of possible involvement on the part of United States officials comes from [defendant's] testimony that he heard English spoken at the time of his torture").
 
 
 337
 Prior to the testimony of Brigadier General Fayez Qablan, the Jordanian official who had obtained Ismoil's written statement and through whom it was offered at trial, Ismoil renewed his motion to suppress a second time, arguing now that newly discovered evidence found in notes taken by Qablan at the time of Ismoil's interrogation revealed that (1) the Jordanians had been "asked to help" by the United States in apprehending Ismoil, and (2) Qablan had told Ismoil that he would not turn his statement over to the United States. The District Court denied this renewed motion on the ground that it added nothing new to the previous motions.
 
 
 338
 We hold that the District Court properly denied all of Ismoil's motions to suppress. As an initial matter, we reject Ismoil's contention that the District Court improperly considered the Government's affidavit in determining the admissibility of Ismoil's statement. The Federal Rules of Evidence explicitly permit the District Court to do so. See Fed.R.Evid. 104(a) (court not bound by rules of evidence in preliminary proceedings concerning admissibility of evidence, except for issues of privilege); Fed.R.Evid. 1101(d)(1) (evidence rules inapplicable to "[t]he determination of questions of fact preliminary to admissibility of evidence when the issue is to be determined by the court under rule 104"); see also United States v. Raddatz, 447 U.S. 667, 679, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) ("At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial.").
 
 
 339
 As for Ismoil's claim that his statements should be suppressed because he was not read Miranda warnings, the law is settled that statements taken by foreign police in the absence of Miranda warnings are admissible if voluntary. See United States v. Bagaric, 706 F.2d 42, 69 (2d Cir.1983), overruled on other grounds, Nat'l Org. for Women, Inc. v. Scheidler, 510 U.S. 249, 259-60, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994); United States v. Welch, 455 F.2d 211, 213 (2d Cir.1972); United States v. Nagelberg, 434 F.2d 585, 587 n. 1 (2d Cir.1970); United States v. Bin Laden, 132 F.Supp.2d 168, 182 n. 9 (S.D.N.Y. 2001); see also United States v. Covington, 783 F.2d 1052, 1056 (9th Cir.1985). There are two exceptions to this rule.
 
 
 340
 One exception is the "joint venture" doctrine, under which statements elicited during overseas interrogation by foreign police in the absence of Miranda warnings must be suppressed whenever United States law enforcement agents actively participate in questioning conducted by foreign authorities. See, e.g., United States v. Heller, 625 F.2d 594, 599 (5th Cir.1980); Pfeifer v. United States Bureau of Prisons, 615 F.2d 873, 877 (9th Cir. 1980); United States v. Emery, 591 F.2d 1266, 1267 (9th Cir.1978); United States v. Hensel, 509 F.Supp. 1364, 1375 (D.Me. 1981). The Second Circuit has implicitly adopted this doctrine, but has failed to define its precise contours in speculating that the joint venture doctrine may also apply where United States officials, although asking no questions directly, use foreign officials as their interrogation agents in order to circumvent the requirements of Miranda. See Bagaric, 706 F.2d at 69; Welch, 455 F.2d at 213; see also Heller, 625 F.2d at 599. We agree with the District Court that the joint venture doctrine is inapplicable here because Ismoil's only support for his allegation that United States agents played a role in his interrogation is his assertion that he heard English being spoken on the telephone and the fact that Qablan's notes stated that the United States had asked the Jordanians "to help" in his apprehension. In United States v. Lira, we held that evidence that the United States may have solicited the assistance of a foreign government in the arrest of a fugitive within its borders is insufficient as a matter of law to constitute United States participation under the joint venture doctrine, noting that United States law enforcement officers are not required to "monitor the conduct" of foreign officials who execute a request for extradition or expulsion. See Lira, 515 F.2d at 71. We also held that a defendant's allegation that he had heard English spoken was insufficient to warrant dismissal of an indictment. See id. In line with that decision, we conclude that the evidence proffered by Ismoil is insufficient to warrant the suppression of a statement given to foreign officials.
 
 
 341
 The second exception to the general admissibility of voluntary statements taken by foreign officials is that any such statements obtained under circumstances that "shock the judicial conscience" will be suppressed. See United States v. Cotroni, 527 F.2d 708, 712 n. 10 (2d Cir.1975) (stating that if "the conduct of foreign police [were] so reprehensible as to shock the conscience," then application of the exclusionary rule might be warranted); Nagelberg, 434 F.2d at 587 n. 1 (noting that "there [was] no claim of `rubbing pepper in the eyes,' or other shocking conduct" that might warrant exclusion); United States v. Molina-Chacon, 627 F.Supp. 1253, 1262 (E.D.N.Y.1986) ("Statements obtained by foreign officials under circumstances that shock the judicial conscience will be suppressed."), aff'd sub nom. United States v. DiTommaso, 817 F.2d 201 (2d Cir.1987); see also Heller, 625 F.2d at 599. This exception has no application here because Ismoil has not alleged that he was mistreated in any way by the Jordanians or that his statements were obtained in a manner that "shocks the judicial conscience."
 
 
 342
 On appeal, Ismoil argues that Qablan's statement to Ismoil that he would not turn his statement over to the Americans raises a question as to the voluntariness of Ismoil's statements, and he faults the District Court for not addressing this claim when it denied his motion. It is not clear to us, reading Ismoil's motion papers, that he actually raised this claim in the District Court. But even if he did, we conclude that the claim lacks foundation and merit. Ismoil's affidavit in support of his pre-trial motion to suppress contained no assertion that his statement was involuntary and made no mention of Qablan's purported assurance, see Ismoil Aff. ¶¶ 1-8, nor did Ismoil file a new affidavit with the second renewed motion asserting reliance on Qablan's statement. Nor do we see any reason why Qablan's assurance, even if true, would lead to a finding of involuntariness.
 
 
 343
 Finally, Ismoil claims that his statements should have been suppressed because the Government violated Fed. R.Crim.P. 16 and the District Court's discovery orders. He argues that the Government's failure to disclose Qablan's notes concerning Ismoil's statements until the day before Qablan testified was a violation of Rule 16. Assuming without deciding that there was a Rule 16 violation, we nevertheless reject Ismoil's claim because it is clear that he suffered no prejudice from the Government's failure to disclose. The Government had previously disclosed the substance of Qablan's notes and Ismoil's statements, and disclosure of the notes themselves would have added nothing material to the defense case. See United States v. McClelland, 141 F.3d 967, 972 (10th Cir.1998) (affirming denial of motion to suppress based on purported Rule 16 violation where defendant had failed to demonstrate prejudice).
 
 
 344
 Ismoil also argues that the Government failed to comply with the District Court's discovery order to provide certain information to Ismoil. When this issue was first raised in the District Court, however, the Government asserted that it had complied and provided the District Court with a copy of its internal directory showing that a discovery letter had been drafted. The District Judge accepted the Government's representation in part because his law clerks remembered seeing the letter. Ismoil's effort to revisit the issue here is unavailing because we will not second-guess the District Court's findings of fact on the matter or its conclusion that the Government complied with one of its own orders. In any event, Ismoil has alleged no prejudice from this alleged failure to comply.
 
 III. The Daubert Hearing
 
 345
 At trial, defendants challenged whether the bomb used at the World Trade Center was composed of the various chemicals found in the Pamrapo Apartment and the storage shed and also sought to undermine the reliability of the Government's laboratory analysis of samples collected at these locations and elsewhere. Both sides sought to call expert witnesses to testify on these points. Accordingly, the District Court ordered a hearing prior to trial to examine the Government's experts pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Two months before the hearing was held, during a status conference concerning the hearing, the District Court informed counsel,
 
 
 346
 ... We are going to have whatever we are going to have in the way of a Daubert hearing at that point [i.e., the scheduled hearing date]. I don't know whether [the defendants] are going to produce — something you may want to think about, whether you want to produce, on the defense side of it, the [I]nspector [G]eneral [Whitehurst] or any of his people. I don't know. He is the one who stirred up the [controversy concerning the reliability of the Government's laboratory analysis]. So you may want to call Whitehurst. I don't know, but the time to do it is then.
 
 
 347
 ... [T]he matter would have to be resolved before trial ....
 
 
 348
 Yousef's attorney responded that he was not sure he could be ready to have his experts participate by then, and requested another status conference before the hearing to determine readiness. After several postponements, the Daubert hearing was held just prior to trial during jury selection. After the Government's witnesses testified, the District Court informed defense counsel that their experts would be expected to testify the next day. The next morning, however, counsel reported that they would not be calling their experts at the hearing. The District Court responded that if the experts did not appear for the hearing they would not be allowed to testify at trial and rejected defense counsel's request to hold a "mini-Daubert hearing" outside the presence of the jury just prior to the experts' testimony. The District Court adjourned the hearing until the following morning, at which time the defendants produced two experts, both of whom were permitted to testify at trial.
 
 
 349
 Yousef claims that the District Court committed reversible error by conducting the Daubert hearing in the manner it did. Specifically, Yousef argues that (1) it was impermissible for the District Court to require defendants to produce their expert witnesses for the Daubert hearing; (2) in doing so, the District Court shifted the burden to defendants to prove that the Government's experts were not reliable; (3) conducting a Daubert hearing for the defense experts caused prejudice to defendants because the Government was provided with advance notice of the defense experts' testimony; (4) the District Court's ruling barred defendants from presenting any experts at trial other than the two who testified at the Daubert hearing; (5) the District Court erred in rejecting defendants' request to hold a separate "mini-Daubert hearing" prior to their experts' testimony during trial; and (6) defendants were given insufficient notice that they would be required to present their experts at the hearing.
 
 
 350
 We review a district court's rulings concerning the admissibility of expert testimony for abuse of discretion, see United States v. Rahman, 189 F.3d 88, 134 (2d Cir.1999), and note that a district court is accorded broad discretion in terms of the procedures it adopts in conducting a Daubert hearing, see Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).
 
 
 351
 We conclude that the first five of Yousef's arguments are utterly without merit. As the Government notes, Daubert applies to both defense and government experts. See United States v. Kwong, 69 F.3d 663, 668 (2d Cir.1995) (discussing applicability of Daubert to defense polygraph expert); see, e.g., United States v. Triplett, 195 F.3d 990, 998 (8th Cir.1999) (affirming preclusion of defense expert following Daubert hearing). The burden of proof concerning the reliability of the Government's experts was not shifted to the defendant. Rather, the District Court's purpose in having the defense experts at the hearing was to test their reliability, not to have them rebut the reliability of the Government's experts. Nor did the defense experts' testimony provide the Government with any more information than they were already entitled to under Fed.R.Crim.P. 16, which requires a defendant to provide at the Government's request a written summary of all expert testimony he plans to use at trial when the Government has complied with a similar request by the defendant, as was the case here. See Fed.R.Crim.P. 16(b)(1)(C). Defendants made no showing that the District Court's order excluding any experts not presented in the Daubert hearing deprived them of additional experts, and thus have failed to establish prejudice. And finally, the District Court's refusal to postpone the Daubert hearing was well within its discretion, given the fact that jury selection was underway when the Daubert hearing occurred, and holding a Daubert hearing thereafter would have interrupted the trial and wasted the jurors' time. See Harris v. Barkley, 202 F.3d 169, 173 (2d Cir.2000) (acknowledging district court's broad discretion to manage trial schedule).
 
 
 352
 The only issue that gives us pause is whether, in light of the sequence of events and the District Court's somewhat ambiguous earlier statements, defendants were given adequate notice that they would be required to produce their experts at the hearing or be precluded from presenting them at trial. But we need not decide the issue because both of the defense experts presented at the hearing were permitted to testify and defendants have not alleged that they would have produced additional experts but for the lack of notice. Therefore, any arguable error was harmless.
 
 IV. Yousef's Motion to Sever
 
 353
 Prior to trial, Yousef moved before the District Court either to sever his trial from that of Ismoil or to select two separate juries on the ground that the admission of Ismoil's post-arrest statement, which identified Yousef as a participant in the 1993 World Trade Center bombing, would violate his right of cross-examination secured by the Confrontation Clause of the Sixth Amendment. See Bruton v. United States, 391 U.S. 123, 126, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (holding that admission of confession directly inculpating codefendant in joint trial violated codefendant's confrontation rights). The statement did not mention Yousef's name, but it did identify Abdul-Basit[67] as a former neighbor who had contacted Ismoil when Ismoil was in Dallas. Yousef used the name Abdul-Basit as an alias, as is set forth in the caption of the indictment. Ismoil's statement named Abdul-Basit four times, but referred to him more frequently as "he" or "him." In the statement, Ismoil asserted that it was Abdul-Basit who had "duped" him to go to New York and participate in the bombing conspiracy. In addition, the statement described Abdul-Basit as "tall a little, thin, dark, wears glasses, his hair is black." In his motion, Yousef argued that introduction of the statement at trial would be prejudicial and would violate his confrontation rights. See id.
 
 
 354
 The District Court denied the motion to sever but ordered that the statement be redacted to eliminate any direct reference to Abdul-Basit. The redacted version of Ismoil's statement that was admitted at trial replaced the first reference to Abdul-Basit with the words "my neighbor," and omitted the other references altogether.
 
 
 355
 On appeal, Yousef claims that the District Court erred in denying his motion for severance or separate juries, arguing that (1) the substitution of "neighbor" for the name "Abdel-Basset [sic]" in the redacted statement was insufficient to protect his rights under Bruton; (2) he was prejudiced by statements made by the Government and Ismoil's counsel at trial that impermissibly suggested that Yousef was the "neighbor" to whom Ismoil referred in his statement; and (3) the trials should have been severed because Ismoil's "duped" defense was mutually antagonistic to Yousef's defense that there was insufficient evidence to prove that he participated in the bombing.
 
 
 356
 Rule 14 of the Federal Rules of Criminal Procedure permits a district court to "grant a severance of defendants" if "it appears that a defendant ... is prejudiced by a joinder ... of defendants ... for trial together." Under the rule, the decision to sever a joint trial "is committed to the sound discretion of the trial judge." United States v. Blount, 291 F.3d 201, 209 (2d Cir.2002) (internal quotation marks and citation omitted). "[T]here is a preference, in the federal system, for the joint trial of defendants indicted together," United States v. Rosa, 11 F.3d 315, 341 (2d Cir.1993), and thus, a district court order denying a Rule 14 motion is considered "virtually unreviewable" and will be overturned "only if a defendant can show prejudice so severe that his conviction constituted a miscarriage of justice and that the denial of his motion constituted an abuse of discretion." United States v. Diaz, 176 F.3d 52, 102 (2d Cir.1999) (internal quotation marks and citation omitted). "[A] district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent a jury from making a reliable judgment about guilt or innocence." Zafiro v. United States, 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). Such a risk might occur if evidence inadmissible against one defendant but probative of his guilt is admitted against a codefendant, or if exculpatory evidence is excluded due to a codefendant's presence. See id. However, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." Id.
 
 
 357
 Within this framework, the fashioning of remedial steps to minimize prejudice to a defendant is committed to the sound discretion of the district court. See id. Various remedies short of severance are available to the district court, including, inter alia, issuing limiting instructions to the jury, empaneling separate juries, or redacting out-of-court statements that refer to a codefendant by name. Such redactions are permissible so long as the redaction does not distort the statements' meaning, exclude substantially exculpatory information, or change "the tenor of the utterance as a whole." United States v. Alvarado, 882 F.2d 645, 651 (2d Cir.1989) (internal quotation marks and citation omitted), overruled on other grounds, Bailey v. United States, 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995); see also United States v. Castro, 813 F.2d 571, 576 (2d Cir.1987). The District Court chose to redact, and we conclude that the District Court acted well within its discretion in so doing.
 
 
 358
 Nothing in the redacted statement, standing by itself, implicated Yousef or made the fact of redaction obvious, thus meeting the requirements set forth in Gray v. Maryland, 523 U.S. 185, 192-93, 196, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998) (holding that Bruton may be violated if the fact of redaction is obvious). Therefore, admission of the redacted statement did not violate the Bruton doctrine and was not an abuse of discretion. See id. at 192, 118 S.Ct. 1151.
 
 
 359
 As Yousef points out, however, two incidents that occurred during the trial do raise the possibility of prejudice. The first incident occurred when Ismoil's counsel, on cross-examination, sought to elicit from Qablan the fact that Ismoil's written statement referred to Abdul-Basit. We conclude that any prejudice was minimal, however, because the Government's objections to the questions were sustained, the questions were not answered, the questions referred not to Yousef but to one of his many aliases, and the entire incident was but a brief occurrence in a four-month-long trial replete with abundant, independent evidence of Yousef's guilt, including his own confession. Accordingly, this incident failed to "show prejudice so severe that [Yousef's] conviction constituted a miscarriage of justice and that the denial of his motion [for severance] constituted an abuse of discretion." Diaz, 176 F.3d at 102 (internal quotation marks and citation omitted); see United States v. Kirsh, 54 F.3d 1062, 1068 (2d Cir.1995) (no reversal required for Bruton violation where prejudice insignificant in light of overwhelming evidence of guilt); United States v. Williams, 927 F.2d 95, 99 (2d Cir.1991) (harmless error analysis applies to Bruton violations).
 
 
 360
 The second incident involved statements made by the Government during its summation, in which the Government asserted that Ismoil and Yousef had known each other for many years, and that Ismoil was the person whom Yousef had known the longest. Although there was evidence of a long history of telephone calls between the two, we are inclined to agree with Yousef that the inference of long-standing acquaintance could not have been drawn absent Ismoil's post-arrest statement. Nevertheless, in light of the plethora of independent evidence of Yousef's guilt, this incident was insufficient to establish significant prejudice. See Kirsh, 54 F.3d at 1068; Williams, 927 F.2d at 99; see also Salameh I, 152 F.3d at 133 (holding that "[a] prosecutor's statements during summation, if improper, will result in a denial of due process rights only if, in the context of the entire summation, they cause the defendant substantial prejudice," and noting that there is no substantial prejudice if there is "certainty" that the defendant would have been convicted "absent the misconduct" (quoting United States v. Rivera, 22 F.3d 430, 437 (2d Cir.1994)) (internal quotation marks omitted)).
 
 
 361
 Yousef also argues that severance was warranted because he and Ismoil mounted mutually antagonistic defenses. Defenses are mutually antagonistic when accepting one defense requires that "the jury must of necessity convict a second defendant." United States v. Cardascia, 951 F.2d 474, 484 (2d Cir.1991); see also Zafiro, 506 U.S. at 542, 113 S.Ct. 933 (Stevens, J., concurring) (describing "mutually antagonistic" defenses as those as to which "acceptance of one ... necessarily preclude[s] acceptance of the other and acquittal of the codefendant"). In Zafiro, the Supreme Court made clear, however, that "[m]utually antagonistic defenses are not prejudicial per se" and further noted that "Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." Zafiro, 506 U.S. at 538-39, 113 S.Ct. 933. The Court concluded that severance would be justified "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt." Id. at 539, 113 S.Ct. 933. In this case, Yousef has "not articulate[d] any specific instances of prejudice. Instead, [he] contend[s] that the very nature of [his and Ismoil's] defenses, without more, prejudiced [him]"—a complaint that Zafiro held presented a "risk of prejudice ... of the type that can be cured with proper instructions." Id. at 540, 113 S.Ct. 933. Here, the District Court instructed the jury that
 
 
 362
 the issue of each defendant's guilt is totally personal to the individual defendant. You must make a separate determination as to whether or not any defendant's guilt as to the specific charge has been proven beyond a reasonable doubt.
 
 
 363
 In making that judgment, you are to disregard entirely the circumstance that two defendants have been tried together
 
 
 364
 ....
 
 
 365
 ...
 
 
 366
 You have also heard testimony of certain statements or admissions made by each of the defendants after each was arrested on these charges. I instruct you that if you find such a statement was made, each of the statements can be used only against the defendant who allegedly made the statement and not against the other defendant.
 
 
 367
 World Trade Center Bombing Trial Transcript ("WTr.") at 5474-75, 5494. We hold that these "instructions sufficed to cure any possibility of prejudice." Zafiro, 506 U.S. at 541, 113 S.Ct. 933.
 
 
 368
 V. The Admission of Ismoil's Redacted Statement
 
 
 369
 Ismoil also challenges the admission at trial of his redacted written statement and the District Court's denial of Yousef's motion for severance (in which he joined). Neither of these claims has merit.
 
 
 370
 Ismoil argues that the District Court impermissibly "bound" him to the redacted version of his written statement by precluding him from eliciting the fact that he had expressly referred to "Abdel-Basset [sic]." The result of this error, according to Ismoil, was that he was prevented from arguing to the jury that he had been "duped" by the cunning Yousef rather than some faceless unknown.
 
 
 371
 By written order dated October 31, 1997, the District Court denied Ismoil's request that he be allowed to argue, inter alia, "that Ismoil disclosed the name of his co-defendant as the person who initially contacted him, and further involved him in the incident, at the very beginning of his written statement." The District Court held that
 
 
 372
 [c]losing arguments must be based upon admitted evidence. If Mr. Aidala intends to argue that Ismoil disclosed the name of Ramzi Yousef at the very beginning of Ismoil's statement, he may do so only by means of "other evidence." (See Part A of this Memorandum and Order). I have seen no "other evidence" offered by the defense.
 
 
 373
 United States v. Yousef, No. S12 93 Cr. 180(KTD), slip op. at 8 (S.D.N.Y. Oct. 31, 1997) (emphasis added).
 
 
 374
 Nothing in the holding of the District Court precluded Ismoil from arguing that he was duped by Yousef or making any related argument apart from asserting that he had actually named Yousef in his written statement. Significantly, Ismoil's counsel appears to have interpreted the court's statement the same way. In a letter to the court responding to the ruling. Ismoil's counsel stated that he understood the District Court to have precluded him from arguing that Ismoil had actually disclosed Yousef's name in the statement, but not from arguing that Yousef had duped Ismoil and that the jury could infer from the evidence that Yousef was the neighbor referred to in the statement.
 
 
 375
 Ismoil's counsel asserts nevertheless that during the hearing on this issue, the District Court barred him from arguing that Ismoil was duped by Yousef on threat of attorney sanctions. Again, this claim is not supported by the record. The transcript of the October 31, 1997 hearing reveals that the District Court, after criticizing counsel for advancing arguments that lacked any legal support, WTr. at 5143-44, warned counsel against attempting to inject any
 
 
 376
 incident [at trial] which is intended to result in a mistrial. I'm warning everyone now, that if that incident does occur, it will be considered a direct contempt of court and will be dealt with then and there. The mistrial will not benefit the client of the person seeking it ... [and] I want to warn everybody I will do my best to make sure that the perpetrator is disbarred for life.
 
 
 377
 WTr. at 5147.
 
 
 378
 The District Court's comments do not support Ismoil's claim that his attorney was barred from arguing that Ismoil was duped by Yousef. Rather, as Ismoil's counsel acknowledged in his letter to the court, he was free to argue that Yousef was the one who duped Ismoil and the jury could infer that Ismoil's written statement was referring to Yousef from the corroborating evidence presented at trial, including the numerous telephone calls Yousef placed to Ismoil in Dallas, evidence establishing that Ismoil had been in the Pamrapo Apartment in which Yousef lived, and Yousef's own statements, which corroborated some of the details mentioned in Ismoil's statement.
 
 
 379
 The only argument the District Court actually precluded Ismoil from making was that Ismoil had named Yousef in his statement, a point Ismoil contends would have bolstered the credibility of Ismoil's statement. No error can be assigned to this ruling because Ismoil's reference in his written statement to Abdul-Basit was hearsay. See Fed.R.Evid. 801(c) (defining hearsay as "a statement, other than one made by the declarant while testifying at the trial," introduced "to prove the truth of the matter asserted") (emphasis added). While Ismoil could have testified to everything asserted in his statement, he could not offer the document itself for the truth of the matter asserted—namely, that it was Abdul-Basit (Yousef) who had caused Ismoil's unwilling participation in the bombing. See United States v. Marin, 669 F.2d 73, 84 (2d Cir.1982) ("When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible."). Moreover, the most crucial reference to Abdul-Bassit in Ismoil's statement from the perspective of Ismoil's defense, was the following:
 
 
 380
 They all left and we stayed behind myself, ABDEL-BASSET [sic] and SHAKIB; then ABDEL-BASSIT [sic] said to me, I would like to tell you something that the bus which you have parked that which you thought that it was merchandise to be delivered, it is nothing but a bomb, we did not tell you so that you would be calm, so that you would act naturally and you wouldn't become nervous. Don't you dare tell anyone.
 
 
 381
 This statement would have constituted double hearsay because it is an out-of-court statement assertedly repeating another out-of-court statement being offered by Ismoil for the truth of the matter asserted. Thus, while the Government was free to introduce the statement as an admission by a party-opponent, see Fed.R.Evid. 801(d)(2)(A),[68] Ismoil had no right to introduce it on his own, see Marin, 669 F.2d at 84 (holding that defendant "had no right to have [his unredacted] statement admitted into evidence because it was, as offered by [the defendant], hearsay, and because it was not needed, in fairness, to make complete the portions of his statement that were admitted against him," and that this is so "regardless of which purpose the government had in offering the defendant's statement"). Absent a genuine entitlement to introduce the unredacted statement on his own at a severed trial (as distinct from an expectation that the Government would choose to introduce the entire, unredacted statement at a severed trial), Ismoil has offered no reason why the District Court's denial of the severance motion was an abuse of discretion.
 
 
 382
 In a related argument, Ismoil contends that the redacted version of his statement violated the rule of completeness embodied in Fed.R.Evid. 106[69] because the redaction distorted the meaning of Ismoil's statement by conveying the impression that Ismoil had omitted Yousef's name from his statement in order to protect him. We have held that the rule of completeness is violated "only where admission of the statement in redacted form distorts its meaning or excludes information substantially exculpatory of the declarant." United States v. Benitez, 920 F.2d 1080, 1086-87 (2d Cir.1990) (quoting Alvarado, 882 F.2d at 651) (internal quotation marks omitted); see also Castro, 813 F.2d at 575-76 (discussing origins of rule of completeness). In Benitez we found "it clear that neither of these defects [was] present" where the redaction involved substituting the word "friend" for the codefendant's name. Benitez, 920 F.2d at 1087-88; see also Alvarado, 882 F.2d at 651 (holding that redacting statement by substituting words "another person" for codefendant's name did not violate rule of completeness). The redactions in Ismoil's statement are no different.
 
 
 383
 This case is indistinguishable from the numerous cases in which we have upheld similar redactions on Bruton grounds. Indeed, we have rejected precisely the arguments raised by Ismoil under circumstances where the redactions at issue arguably created considerably more distortion, and potential disadvantage to the declarant, than was created here by the simple removal of the four references to Abdul-Basit. See, e.g., Benitez, 920 F.2d at 1086-87; Alvarado, 882 F.2d at 651; Castro, 813 F.2d at 575-77; Marin, 669 F.2d at 83-84.
 
 
 384
 In Castro, for example, we upheld the district court's denial of severance and the introduction of a redacted statement that omitted the defendant's statement that a bag containing cocaine belonged to his codefendant, but retained the fact that the defendant had pointed the bag out to police officers. See Castro, 813 F.2d at 575. We acknowledged that "[n]o doubt, the meaning of Castro's conduct and statement was changed somewhat by not allowing the jury to know that Castro had stated that the cocaine belonged to Acosta." Id. at 576. We nevertheless found no abuse of discretion on the part of the district court in taking the action it did, recognizing that in multi-defendant cases in which statements by one defendant implicate another defendant, the district court faces "competing interests." Id. Although the defendant whose statement is redacted "ha[s] an interest in having his statement presented in context, the court ha[s] concurrent obligations both to protect the interests of the co-defendant ... and to consider the interests in judicial economy, which are advanced by a joint trial." Id. The Castro court also concluded that any error was harmless because any "prejudice resulting from the error [was] relatively insignificant." Id. at 577. The reasoning of Castro applies fully here: the substitution of the word "neighbor" for the name "Abdel-Basset [sic]", which did not distort the meaning of Ismoil's statement in any way or cause any discernable prejudice, was a "reasonabl[e] accommodat[ion of] the[] competing interests" in the case. Id. at 576.
 
 
 385
 Ismoil next claims that the redaction inaccurately attributed one of Abdul-Basit's statements to someone named "Shakib," resulting in prejudice to Ismoil. In its opinion denying the severance motion, the District Court expressly permitted the parties to correct the misattribution by stipulation. Ismoil never took up the District Court's offer, however, and therefore has waived his right to raise this claim now. See United States v. Bayless, 201 F.3d 116, 127 (2d Cir.2000) (a defendant's intentional relinquishment or abandonment of a known right "permanently extinguishes the right to raise [the] claim" (internal quotation marks and citation omitted)).
 
 
 386
 Finally, Ismoil argues that his confrontation rights were violated by the District Court's order precluding him from eliciting during his cross-examination of Qablan the fact that the statement had mentioned Abdul-Basit. We reject this claim as meritless. See Alvarado, 882 F.2d at 651 (rejecting claim that curtailment of cross-examination with respect to redacted statement violated defendant's confrontation rights); see also United States v. Pedroza, 750 F.2d 187, 195 (2d Cir.1984) (collecting cases that articulate the rule that the scope and extent of cross-examination are generally within the sound discretion of the district court).
 
 VI. Yousef's Motion for a Change of Venue
 
 387
 Yousef argues that the District Court erred in denying his pre-trial motion for a change of venue in light of negative publicity. We review a district court's decision to deny a motion to change venue for abuse of discretion, see United States v. Maldonado-Rivera, 922 F.2d 934, 967 (2d Cir.1990), and find no such abuse in the instant case. The first World Trade Center bombing trial, United States v. Salameh, had taken place two years earlier, press coverage had substantially subsided by the time Yousef was brought to trial, and there was minimal publicity in the months immediately preceding his trial. Indeed, the news stories that Yousef points to on appeal were not about Yousef's involvement in the World Trade Center bombing, but about speculation that he may have been involved in other crimes, such as the Oklahoma City bombing.
 
 
 388
 Moreover, as Yousef acknowledges, the key to determining the appropriateness of a change of venue is a searching voir dire of the members of the jury pool. See United States v. Gaggi, 811 F.2d 47, 51 (2d Cir.1987) (setting forth three-part analysis for determining if change of venue is warranted, two of which pertain to questioning potential jurors during voir dire to determine their exposure to the publicity). Here, the District Court conducted an extensive voir dire and the jurors that were picked had either never heard of Yousef or could not remember any of the details of his alleged involvement in the World Trade Center bombing. See United States v. Washington, 48 F.3d 73, 78 (2d Cir.1995) (affirming denial of venue motion where publicity was not shown to be sufficiently pervasive and negative and where thorough voir dire screened jurors who may have formed an opinion). Notably, Yousef has not challenged the District Court's voir dire or suggested that the voir dire resulted in a jury tainted by the pre-trial publicity. In addition, while the District Court's decision denying the motion stated that "a thorough voir dire of potential jurors will be sufficient in detecting and eliminating any prospective jurors prejudiced by pretrial publicity," United States v. Yousef, No. S12 93 Cr. 180(KTD), slip op. at 8 (S.D.N.Y. July 16, 1997), Yousef did not renew the motion for a change of venue after the voir dire—an indication that counsel was satisfied that the voir dire resulted in a jury that had not been tainted by publicity.
 
 
 389
 VII. Exclusion of Evidence of Government's Inconsistent Theories
 
 
 390
 During the course of the trial, Ismoil sought to introduce various items of evidence from the first World Trade Center trial, United States v. Salameh, in which defendant Salameh and others were convicted, on the ground that the evidence demonstrated that the Government had presented inconsistent theories with respect to Ismoil's involvement in the bombing. See generally Salameh I, 152 F.3d 88. Specifically, Ismoil sought to introduce (1) an FBI affidavit used to obtain a search warrant at the outset of the investigation that stated that defendant Abdul Rahman Yasin had told the FBI that up until two days before the bombing, he had been teaching defendant Salameh how to drive a van; (2) the testimony of Willie Moosh from the first trial stating that he had seen Yousef, Salameh, and others drive in to his New Jersey gas station in a van and towncar at 3 a.m. the morning of the bombing and that Salameh had been driving the Ryder van; (3) the Government's summation at the first trial repeating Moosh's testimony; and (4) the affidavit submitted to Jordanian authorities in support of Ismoil's extradition, which also referred to Moosh's testimony that Salameh had been seen driving the van in the early morning hours of the day of the bombing.
 
 
 391
 The District Court precluded Ismoil from introducing any of the above evidence on the ground that the use of prior jury arguments, which would ordinarily be hearsay but might be admissible as an admission by a party-opponent, see Fed R. Evid. 801(d)(2)(A), is to be narrowly circumscribed. See United States v. Yousef, No. S12 93 Cr. 180(KTD), slip op. at 2-3 (S.D.N.Y. Oct. 31, 1997) (citing United States v. McKeon, 738 F.2d 26, 31-32 (2d Cir.1984)). The District Court found that circumstances in this case did not warrant the introduction of prior jury arguments. Id. We review a district court's evidentiary rulings for abuse of discretion, and will not reverse unless the district court's decision was "manifestly erroneous." United States v. SKW Metals & Alloys, Inc., 195 F.3d 83, 87-88 (2d Cir.1999) (internal quotation marks and citation omitted). Moreover, even if the district court errs in admitting or excluding evidence, harmless error analysis applies in determining whether reversal is required. See United States v. Khalil, 214 F.3d 111, 122 (2d Cir.2000).
 
 
 392
 We are "free to affirm an appealed decision on any ground which finds support in the record, regardless of the ground upon which the trial court relied." Millares Guiraldes de Tineo v. United States, 137 F.3d 715, 719 (2d Cir.1998) (quoting Leecan v. Lopes, 893 F.2d 1434, 1439 (2d Cir.1990) (internal quotation marks omitted)). Here, we affirm the District Court's exclusion of the evidence from the Salameh trial on the ground that it was irrelevant, and hence inadmissible, under Federal Rule of Evidence 402.[70] On the one hand, if Ismoil sought to offer the evidence for the truth of the matters asserted, i.e., that Salameh had been learning to drive the van in the days preceding the bombing, and had been seen by Moosh driving the van at 3 a.m. the day of the bombing, such evidence was irrelevant because it did not have the "tendency to make the existence of any fact that [was] of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401 (defining relevancy). Ismoil's defense at trial was never that he was not the driver of the bomb-laden van, but only that he lacked criminal knowledge, having been duped by Yousef. On the other hand, if Ismoil sought to use the evidence to undermine the Government's credibility by pointing to prior inconsistent theories (and therefore not for the truth of the matters asserted), the evidence was also irrelevant because an assertion that Salameh was seen driving the van in the early morning hours of February 26, 1993 was not inconsistent with the Government's theory at the instant trial that Ismoil drove the van into the World Trade Center later that same day. Thus, whether proffered as hearsay or non-hearsay, the evidence that Ismoil sought to introduce was irrelevant and, hence, inadmissible under Rule 402. Accordingly, we find no fault with the District Court's ruling.
 
 
 393
 VIII. Admission of Government's Fingerprint Evidence and Telephone Call Charts
 
 
 394
 Ismoil argues that it was an abuse of the District Court's discretion to admit into evidence comparisons made of Ismoil's latent fingerprints found on items at the Pamrapo Apartment and latent fingerprints found on innocuous personal documents Ismoil was known to have handled. He argues that, because the Government also introduced comparisons made of the Pamrapo Apartment latent fingerprints with direct fingerprints taken by the Jordanian officials who arrested Ismoil, the latent-to-latent comparisons were irrelevant and cumulative and served only to bolster and exaggerate the Government's evidence against Ismoil, in violation of Federal Rules of Evidence 402 and 403. Ismoil also challenges the admission of a fingerprint card created by the Jordanian officials because it contained only Arabic writing and may have misled the jury into thinking that Ismoil had a criminal record in Jordan. Finally, Ismoil challenges the Government's use of charts to highlight certain patterns of telephone calls that were culled from a two-binder set of telephone-record summaries that was given to the jury. None of these arguments has merit.
 
 
 395
 We will not hold that a district court's evidentiary rulings were an abuse of discretion unless the decision was "manifestly erroneous," SKW Metals & Alloys, Inc., 195 F.3d at 87-88, and the error was not harmless, see Khalil, 214 F.3d at 122. Those standards are not met here.
 
 
 396
 As the Government points out, Ismoil's counsel—in his opening statement—challenged the integrity of the Government's procedures in collecting evidence by referring to a recent, altogether different case in which it was discovered that the authorities had planted fingerprints to incriminate defendants. WTr. at 64-65. In addition, a defense expert provided extensive testimony about perceived flaws and inadequacies in the Government's procedures for collecting and analyzing evidence. See, e.g., WTr. at 5035-43, 5045-49, 5077-81. By putting forth these statements, the defendants placed the integrity of the Government's evidence-gathering procedures at issue, thereby making relevant evidence concerning the investigative process through which Ismoil was identified and connected to the case.
 
 
 397
 We also reject Ismoil's speculation that the jury might have interpreted the Arabic writing on the fingerprint card as evidence of a criminal record. Ismoil could have sought to cure any such asserted misimpression by raising that specific objection and requesting a limiting instruction, but failed to do so.
 
 
 398
 Ismoil's argument that the Government's use of telephone summary charts violated Federal Rule of Evidence 1006[71] is baseless because the Government was (and Ismoil, if he had so chosen, would have been) entirely within its rights to use charts to draw the jurors' attention to particular evidence culled from a voluminous set of records. We have regularly affirmed the use of such charts. See, e.g., United States v. Casamento, 887 F.2d 1141, 1149-50 (2d Cir.1989); United States v. Pinto, 850 F.2d 927, 935 (2d Cir.1988); United States v. Baccollo, 725 F.2d 170, 173 (2d Cir.1983). Moreover, any possible prejudice was cured by the District Court's limiting instruction stating that the charts were not evidence; they were only "graphic demonstrations of the underlying evidence," and the jury had to determine for itself whether they fairly and accurately summarized the underlying evidence.
 
 
 399
 Accordingly, we find no abuse of discretion in the District Court's admission of this evidence.
 
 
 400
 IX. Jury Instructions Concerning Ismoil's Knowledge
 
 
 401
 During jury deliberations, the jurors sent a note to the District Court asking,
 
 
 402
 In order to be guilty does Eyad Ismoil have to know ... what he was doing is illegal, that is, carrying a bomb in the van for each charge against him? If not, for which charges would he have to know ... that he was involved in something illegal?
 
 
 403
 WTr. at 5631. Ismoil's counsel requested the District Court to give the jury the following instruction:
 
 
 404
 With respect to your inquiry concerning one of the elements which the prosecution must prove namely knowledge, I charge you the prosecution must prove beyond a reasonable doubt Eyad Ismoil in fact knew that he was transporting a bomb in the van, and that he in fact knew the purpose of transporting the bomb was to assist in blowing up the World Trade Center.
 
 
 405
 WTr. at 5639 (emphasis added). The District Court re-read to the jury all of the portions of the main charge concerning knowledge, and then, clearly intending to read Ismoil's requested charge as written, charged the jury as follows:
 
 
 406
 The question of knowledge of the law I submit could be approached by you in a reverse way.
 
 
 407
 The prosecution has to prove that Eyad Ismoil was transporting a bomb in the van; that he knew that the purpose of transporting the bomb was to assist in blowing up the World Trade Center.
 
 
 408
 WTr. at 5644. This charge omitted the words "in fact knew that he" highlighted in Ismoil's requested charge quoted above. Thus, the instruction, instead of reading that "Ismoil in fact knew that he was transporting a bomb," read only that "Ismoil was transporting a bomb."
 
 
 409
 Ismoil argues that the failure of the District Court to read the instruction as requested constituted reversible error because it omitted an element of the crime by "totally eviscerat[ing] the issue of the element of knowledge, and instead inform[ing] the jury that [it] simply had to find only that the government had proved Ismoil was transporting a bomb, regardless of his knowledge of same." Ismoil Br. at 124. To succeed on his challenge to the jury charge, Ismoil has to show that, "viewing as a whole the charge actually given, he was prejudiced." United States v. Ouimette, 798 F.2d 47, 49 (2d Cir.1986).
 
 
 410
 Whatever superficial appeal Ismoil's argument may have, it is without merit. To begin with, a defendant does not have the right "to dictate the precise language of a jury instruction." United States v. Imran, 964 F.2d 1313, 1317 (2d Cir.1992). Moreover, there is no error if the charge, while omitting language requested by the defendant, in fact, "delivered a correct interpretation of the law." United States v. Carr, 880 F.2d 1550, 1555 (2d Cir.1989) (internal quotation marks and citation omitted). In this case, the very concept conveyed by the omitted sentence fragment (with respect to knowledge) appears in a later fragment of the same sentence uttered by the Court.
 
 
 411
 A review of the District Court's instruction as a whole demonstrates that it accurately reflected the law, and thus was not erroneous, even if it did not reflect the precise instruction requested by Ismoil. See Carr, 880 F.2d at 1555. The District Court, in re-reading the main charge, instructed the jury that
 
 
 412
 ... [A] person has to recognize that the purpose of the conspiracy is unlawful.... His act in furtherance of the conspiracy has to be done knowingly. It cannot be some act that is done as a matter of mistake or inadvertence or negligence or as a result of trickery or deceit or some other innocent reason.
 
 
 413
 ...
 
 
 414
 ... [T]he fact that the act of a defendant without knowledge merely happened to further the purpose or objects of the conspiracy, does not make the defendant a member. More is required under the law.
 
 
 415
 What is necessary is that the defendant must have participated with knowledge of at least some of the basic aims and purposes of the conspiracy, and with the intention of aiding in the accomplishment of these unlawful ends.
 
 
 416
 WTr. at 5641, 5642. The jury was then specifically charged that it had to find that Ismoil "knew that the purpose of transporting the bomb was to assist in blowing up the World Trade Center." WTr. at 5644. Implicit in this latter instruction is that Ismoil knew he was transporting a bomb, because otherwise he could not have known the purpose of transporting it. Ismoil's counsel essentially acknowledged this very point in a colloquy with the court concerning the jury's question and the proposed instruction:
 
 
 417
 Mr. Aidala: ... It seems to me that the jury is honing in on what I deemed to be the main issue with my client, namely, his knowledge, and knowledge pla[ys] a part in two aspects. Number one, I believe the jury would have to find that the government proved beyond a reasonable doubt that Mr. Ismoil knew that in fact it was in the van with the bomb and secondly —
 
 
 418
 The Court: They say in their question, carrying a bomb in the van, that he knew that. That's the only thing that can be inferred from that.
 
 
 419
 Mr. Aidala: I read that....
 
 
 420
 ...
 
 
 421
 Mr. Aidala: There is one other thing there. Doesn't the defendant have to have known or the jury have to find that the government proved beyond a reasonable doubt that the defendant knew that there were explosives? In other words, there has not been any issue whether there was an explosive on the van. The key issue here with Mr. Ismoil is whether he knew that it was an explosive here.
 
 
 422
 The Court: Yes, but that's what it says [referring to the main charge's requirement that the defendant transported explosives and did so with the knowledge and intent that they would be used to destroy buildings — charges that were not objected to by Ismoil].
 
 
 423
 Mr. Aidala: Well, the third element says that he did so with knowledge that it would be used. Implied there I suppose is saying he has to first know that there was an explosive, otherwise he couldn't know that it was going to be used unlawfully.
 
 
 424
 WTr. at 5633-38 (emphasis added).
 
 
 425
 We conclude that despite Ismoil's arguments to the contrary, the jury was thoroughly and correctly instructed on the element of knowledge, as reflected in the initial instruction, the re-read portions of the main charge, and the direct response by the Court to the jury's question. Moreover, even if it was error for the District Court to fail to expressly charge the jury that it had to find that Ismoil knew he was transporting a bomb, any such error was harmless because the jury simply could not have found that Ismoil transported the bomb with knowledge that it would be used to blow up the World Trade Center unless it first found that Ismoil knew he was transporting a bomb. See Chapman v. California, 386 U.S. 18, 22-24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (harmless error analysis applies to jury instruction that omits an element of the offense).
 
 
 426
 X. Jury Instruction on "Aiding and Abetting"
 
 
 427
 Yousef challenges the District Court's jury instruction on the issue of aiding and abetting. He asserts that the District Court failed to instruct the jury that, in order to convict someone for aiding and abetting, the jury first had to find that someone else had actually committed the crime. Yousef further argues that the District Court erred by instructing the jury that it could convict Yousef as either an aider and abettor or as a principal who actually committed the crime. Because this claim was not raised in the District Court, we review it for plain error. See Fed.R.Crim.P. 52(b). The claim fails because it relies on a misstatement of the record: The District Court expressly instructed the jury that "the first requirement for aiding and abetting liability is that you find that another person has committed the crime charged." WTr. at 5531. In addition, it was not error to instruct the jury that it could convict Yousef as either an aider and abettor or as a principal. See United States v. Knoll, 16 F.3d 1313, 1323 (2d Cir.1994) (charge of aiding and abetting may be proved by demonstrating that defendant was in fact a principal); United States v. Peterson, 768 F.2d 64, 67 (2d Cir.1985) (jury need not unanimously agree as to which defendant was the principal and which was the aider and abettor). Accordingly, there was no error in the jury charge, much less plain error.
 
 XI. Failure to Dismiss the Alternate Jurors
 
 428
 Ismoil next contends that the District Court erred in not dismissing the alternate jurors when the jury retired to deliberate, in violation of Fed.R.Crim.P. 24(c), which at the time of trial required alternates to be discharged upon the commencement of deliberations.[72] Because Ismoil did not object when the District Court announced it would keep the alternate jurors, we review this claim, as well, for plain error. See Fed.R.Crim.P. 52(b).
 
 
 429
 Ismoil cannot establish that retaining the alternates resulted in any prejudice or affected his substantial rights because the District Court kept the alternates segregated and assigned a separate marshal to oversee them. See United States v. Olano, 507 U.S. 725, 737, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (retention of alternates in "deviation" from Rule 24(c) did not mandate reversal under plain error standard because defendants did not make a "specific showing" of actual prejudice and prejudice would not be presumed); see also United States v. Hayutin, 398 F.2d 944, 950-51 (2d Cir.1968) (holding that keeping alternates in a separate room and assigning a separate marshal eliminated any potential prejudice). Ismoil's speculation that the alternates may have communicated with jurors in transit to and from the courthouse is insufficient to establish prejudice. See Hayutin, 398 F.2d at 950 (finding no prejudice to defendant despite contact between alternates and jury because "nothing in the trial record ... indicates that there was any communication between the regular and alternate jurors"); see also United States v. Houlihan, 92 F.3d 1271, 1286-87 (1st Cir.1996) (finding no risk of prejudice despite "sporadic[]" contact between alternates and jury at the start of each day and at lunch recess). Accordingly, we reject this claim.
 
 
 430
 XII. Cumulative Violation of Right to Fair Trial
 
 
 431
 Without citing to any cases, Ismoil argues that the cumulative effect of all the District Court's trial errors denied him his right to a fair trial. We have recognized such claims, see, e.g., Salameh I, 152 F.3d at 157 (addressing similar claim raised by defendant Ajaj and collecting cases). However, because we have concluded that there were no trial errors as to Ismoil, much less cumulative errors, this claim fails.
 
 SENTENCING ISSUES
 
 432
 Yousef was sentenced to 240 years of imprisonment on the ten World Trade Center counts: 180 years on Counts One through Eight, plus thirty years each on Counts Nine and Ten, to be served consecutively. The District Court also sentenced Yousef to life imprisonment on the eight counts relating to the airline bombing plot (Counts Twelve through Nineteen), to be served consecutively to the 240-year term for the ten World Trade Center counts. The District Court imposed a fine of $4.5 million, constituting the aggregate of the statutory maxima on all 18 counts of conviction, $250 million in restitution, and $900 in special assessments. The Court also imposed a three-year term of supervised release and recommended to the Bureau of Prisons that Yousef be incarcerated at an administrative detention facility and that his visitor list be restricted solely to his attorneys.
 
 
 433
 Ismoil was sentenced to 240 years of imprisonment on the World Trade Center counts: 180 years of imprisonment on Counts One through Six, Count Eight, and Count Eleven, plus thirty years each on Counts Nine and Ten, to be served consecutively. The District Court imposed a fine of $250,000, $10 million in restitution, $500 in special assessments, and five years of supervised release.
 
 
 434
 Yousef and Ismoil jointly and separately raise procedural and substantive objections to their sentences. Each asks that his sentence be vacated and his case remanded for resentencing.
 
 I. Ex Post Facto Claim
 
 435
 Yousef and Ismoil claim that their 180-year sentences violate the Ex Post Facto Clause because the law in effect when they committed their crimes — although not at the time of trial or sentencing — required a jury recommendation before the Court could impose a life term. See 18 U.S.C. § 34 (1993), amended by Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103-322, tit. VI, § 60003(a)(1), 108 Stat. 1796, 1968.[73] Even assuming arguendo the predicate that their sentences are the equivalent of life sentences, we have held in an analogous case concerning 18 U.S.C. § 34 that "a change in law that reduces or eliminates the jury's role in determining the ... punishment of a defendant does not violate the Ex Post Facto Clause because it does not change the substantive definition of the crime, increase the punishment, or eliminate any defense with respect to the offense [charged]." United States v. Joyner, 201 F.3d 61, 80 (2d Cir.2000); see also Salameh II, 261 F.3d at 275-76 (following Joyner); accord Collins v. Youngblood, 497 U.S. 37, 51, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990) (holding that the right to a jury trial is not a concern of the Ex Post Facto Clause). Our prior holdings in Joyner and Salameh II control. Accordingly, we find no Ex Post Facto Clause violation.[74]
 
 II. Length of Sentences
 
 436
 Yousef and Ismoil claim that their 180-year sentences were unlawful "upward departures" from the authorized term of life imprisonment and that the District Court failed to provide notice of its intent to depart upwardly or the reasons for its departures as required by Fed.R.Crim.P. 32, see Burns v. United States, 501 U.S. 129, 138-39, 111 S.Ct. 2182, 115 L.Ed.2d 123 (1991), and 18 U.S.C. § 3553(c)(2). We review these claims for plain error because Yousef and Ismoil failed to object at sentencing to the District Court's alleged failure to give proper notice or reasons for its "departures." See United States v. Diaz, 176 F.3d 52, 117 (2d Cir.1999) ("[I]ssues not raised in the trial court, including sentencing issues, will be deemed waived on appeal in the absence of plain errors or defects affecting substantial rights." (internal quotation marks and citations omitted)). There is no such error here.
 
 
 437
 First, no substantial rights of Yousef or Ismoil have been affected because a resentencing to multiple terms of life imprisonment would not alter the actual circumstances of their sentences. Second, a sentence for a term of years that is within the proper Guidelines range, even if it exceeds a defendant's actuarial life expectancy, should not be regarded as an upward departure from a life sentence, which, save for the death penalty, is deemed a maximum sentence. See U.S.S.G. ch. 5, pt. A; cf. 18 U.S.C. § 34.
 
 
 438
 Yousef also contends that the length of his sentence violates the Eighth Amendment, and that the running of his life sentence consecutively with his 240-year sentence contravenes section 5G1.2(d) of the Sentencing Guidelines. We disagree. Lengthy prison sentences, even those that exceed any conceivable life expectancy of a convicted defendant, do not violate the Eighth Amendment's prohibition against cruel and unusual punishment when based on a proper application of the Sentencing Guidelines or statutorily mandated consecutive terms. See United States v. Martin, 63 F.3d 1422, 1432 (7th Cir.1995); see also United States v. O'Driscoll, 761 F.2d 589, 599 (10th Cir.1985) ("A sentence of imprisonment for a very long term of years, the effect of which is to deny a prisoner eligibility for parole until a time beyond his life expectancy, does not violate the Eighth Amendment prohibition of imposition of cruel and unusual punishment."). The Eighth Amendment "forbids only extreme sentences that are `grossly disproportionate' to the crime," Harmelin v. Michigan, 501 U.S. 957, 1001, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (Kennedy, J., concurring in part and concurring in the judgment) (quoting Solem v. Helm, 463 U.S. 277, 288, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983)), and, with the exception of capital punishment cases, successful Eighth Amendment challenges to the proportionality of a sentence have been "exceedingly rare." Rummel v. Estelle, 445 U.S. 263, 272, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980).
 
 
 439
 Yousef's sentence, even if well beyond his life expectancy, is not disproportionate, much less "grossly disproportionate," to his crimes. We and other courts have universally upheld sentences where the term of years is greater than the defendant's expected natural life for less serious crimes. See, e.g., United States v. Saccoccia, 58 F.3d 754, 786-89 (1st Cir.1995) (upholding 660-year sentence for racketeering, money laundering, and related offenses); United States v. Berryhill, 880 F.2d 275, 277 (10th Cir.1989) (affirming 300-year sentence for kidnapping), overruled in part on other grounds, United States v. Daily, 921 F.2d 994, 1004 (10th Cir.1990); United States v. Salerno, 868 F.2d 524, 543 (2d Cir.1989) (upholding 100-year sentences for RICO violations in face of Eighth Amendment challenges); Rothgeb v. United States, 789 F.2d 647, 651 (8th Cir.1986) (affirming consecutive terms of life imprisonment for first-degree murder and 210 years for second-degree murder).
 
 
 440
 Yousef further contends that the running of his life sentence for the airline bombing plot consecutively to his 240-year sentence for the World Trade Center bombing contravenes the Guidelines' instruction that sentences on all counts should "run concurrently, except as required to achieve the total sentence, or as required by law." U.S.S.G. § 5G1.2 (Nov. 1997), cmt.; see also U.S.S.G. § 5G1.2(c) ("If the sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment, then the sentences on all counts shall run concurrently...."). At sentencing the District Court emphasized that Yousef's sentences for the World Trade Center bombing and the airline bombing plot were to run consecutively rather than concurrently, in a "departure" from the Guidelines, so that he would not benefit from having had his two cases combined under one indictment. See Yousef Sentencing Hr'g Tr., Jan. 8, 1998, at 18. The District Court also noted that the sentence imposed was no greater (or less) "than that which would be imposed if the two cases were indicted separately and the sentencings done separately." Id. at 18-19. Although the District Court failed to give Yousef advance notice of its intention to depart, Yousef did not object at sentencing to this failure to provide notice or to the "departure" itself. We therefore review for plain error. See Diaz, 176 F.3d at 117. As noted above with respect to the imposition of the 180-year sentences, we conclude that no substantial rights of Yousef have been affected because a resentencing of Yousef to concurrent, rather than consecutive, terms of 240 years and life imprisonment would not alter the actual circumstances of his sentence. Nor do we find that an upward departure was unwarranted given the facts of this case.
 
 
 441
 Ismoil separately argues that his thirty-year consecutive sentences for using or carrying a firearm during or in relation to a crime of violence in violation of 18 U.S.C. § 924(c) constitute two sentences for the same criminal act in violation of the Eighth Amendment's protection against cruel and unusual punishment and the Fifth Amendment's protection against double jeopardy. Ismoil's Eighth Amendment argument is without merit. The imposition of consecutive sentences under § 924(c) has been upheld by this Circuit and others. See, e.g., United States v. Santos, 64 F.3d 41, 46-47 (2d Cir.1995), vacated on other grounds, 516 U.S. 1156, 116 S.Ct. 1038, 134 L.Ed.2d 186 (1996); United States v. Martinez, 967 F.2d 1343, 1348 (9th Cir.1992).
 
 
 442
 Ismoil's double jeopardy claim is similarly without merit. We addressed this same claim in Salameh II, a prior appeal stemming from the 1993 World Trade Center bombing involving identical facts and circumstances. In Salameh II, we held that the imposition of two consecutive sentences under § 924(c) was not improperly duplicative "[g]iven the separate, and separately culpable, nature of defendants' use and carriage of the bomb." 261 F.3d at 278-79.
 
 III. Fines and Restitution
 
 443
 Yousef and Ismoil challenge the restitution imposed by the District Court on separate but related grounds, while only Ismoil challenges his fine. Ismoil claims that the District Court failed to consider his financial resources and ability to pay before ordering restitution and imposing a fine, and Yousef contends that the District Court improperly relied upon his potential ability to earn money through selling his story when it set the amount of restitution. Yousef does not challenge his fine. Neither Yousef nor Ismoil objected to the restitution order at sentencing, so we review the District Court's order only for plain error. Diaz, 176 F.3d at 117.
 
 
 444
 In Salameh II, we held that it was not an abuse of discretion for a court to impose $250 million in restitution and a $250,000 fine on each indigent defendant where defendants had failed to present evidence that future income from media contacts was not a substantial possibility. 261 F.3d at 276. We did, however, modify the judgments so that each defendant's fine and restitution obligations would become payable only if he received income from the sale of his account of the World Trade Center bombing or the events leading up to it. Id. at 277.
 
 
 445
 Because the amounts of fines and/or restitution imposed on Yousef and Ismoil are like those addressed in Salameh II — in Ismoil's case, substantially less — the only remaining question is whether they are entitled to have their judgments similarly modified. Although the District Court did not address Ismoil's financial means, his Presentence Report indicates that he was indigent at the time of sentencing. There being no reason to order a remand to establish Ismoil's indigence, we order that his fine and restitution judgments be modified in accordance with our decision in Salameh II.
 
 
 446
 In the case of Yousef, however, we decline to make such a modification. At sentencing, the District Court noted that Yousef had always had funds to travel, purchase bomb ingredients, and flee from authorities. Yousef Sentencing Hr'g Tr., Jan. 8, 1998, at 29. The District Court therefore assumed that Yousef would be able to pay the $4.5 million fine — which he does not challenge on appeal — but said that it did not expect that Yousef could pay the $250 million in restitution absent a windfall from selling his story. Id. (There was evidence that Yousef hoped to write a book on his activities.) Under 18 U.S.C. § 3664(d)(3), a defendant is required to disclose his financial resources to the Probation Department.[75] Yousef has refused to do so and, until he satisfies his burden of establishing his indigence, we will not limit the sources of income, such as prison wages, from which the fines and restitution can be paid.
 
 IV. Special Conditions of Confinement
 
 447
 The District Court recommended to the Bureau of Prisons that Yousef be incarcerated in the administrative detention facility at Florence, Colorado, or at some other administrative detention facility, and that Yousef's visitor list be restricted to his attorneys. On appeal, Yousef contends that the District Court lacked statutory authority to impose these special conditions of confinement and that it failed to provide notice of its intent to make such a recommendation or to afford Yousef an opportunity to argue against it. Yousef also claims that the special conditions of confinement violate the Eighth Amendment's prohibition against cruel and unusual punishment because they amount to a sentence of life imprisonment in solitary confinement.
 
 
 448
 Yousef concedes that the District Court's conditions of confinement were "recommendations" to the Bureau of Prisons, not orders. See Yousef Br. at 284. Because these recommendations are not binding on the Bureau of Prisons, they are neither appealable as "final decisions" under 28 U.S.C. § 1291 nor as a "final sentence" under 18 U.S.C. § 3742. Thus, we lack jurisdiction to consider these claims; Yousef must exhaust his administrative remedies under the Bureau of Prisons Administrative Remedy Program with regard to whatever special administrative measures are imposed upon him. See Yousef v. Reno, 254 F.3d 1214, 1220-22 (10th Cir.2001) (affirming the dismissal for failure to exhaust administrative remedies of Yousef's Bivens action seeking review of Special Administrative Measures and other conditions of his confinement under the First, Fifth, Sixth and Eighth Amendments).
 
 POST JUDGMENT ISSUES
 
 449
 I. "Scarpa Materials"
 
 
 450
 Yousef and Ismoil raise several claims concerning the Government's use of a jailhouse informant, Gregory Scarpa, a member of the Colombo Organized Crime Family who was housed in the Metropolitan Correctional Center ("MCC") with Yousef and Ismoil. For several months in 1996, Scarpa reported to government officials that Yousef and others were engaged in new and ongoing criminal activities from within the MCC. Scarpa also provided the government with "kites" (notes between inmates) that bore Yousef's handwriting and contained information about future terrorist threats. In the course of their investigation of Scarpa's claims, the government erected a "firewall" between the attorneys conducting the Scarpa investigation, which included the monitoring of Yousef's phone calls, and those prosecuting the present action. This firewall was intended to prevent information obtained in the course of the investigation that was privileged or that otherwise concerned Yousef's or Ismoil's trial strategy from being revealed to the trial prosecutors. In late 1996, the government learned from two sources that Scarpa was in fact colluding with Yousef and others to deceive it.
 
 
 451
 In 1997, the Government made an ex parte application to the District Court for two protective orders preventing disclosure of the Scarpa materials to defense counsel. The first application was made on July 9, 1997, pursuant to Fed.R.Crim.P. 16(d)(1), and the second application was made on August 11, 1997, under 18 U.S.C. § 3500(c) and Fed.R.Crim.P. 26.2(c). The applications were granted, but none of the proceedings or orders were docketed and no notice was given to Yousef or Ismoil of their existence.
 
 
 452
 Yousef and Ismoil became aware of Scarpa's involvement in the present matter from newspaper articles reporting Scarpa's testimony at his October 1998 trial for racketeering — eleven months after the verdict in this case and six months into the pendency of the present appeal. In December, 1998, Ismoil sent letters to prosecutors in the Eastern District of New York (where Scarpa was tried) and the Southern District of New York requesting information relating to Scarpa's role as a jailhouse informant. The prosecutors in the Eastern District informed Ismoil's attorney that the Southern District would handle the matter, but no response was forthcoming from that office.
 
 
 453
 On January 19, 1999, Ismoil moved in this Court to compel the Government to furnish information regarding the Scarpa affair in order to support a motion for a new trial based on newly discovered evidence under Fed.R.Crim.P. 33. The Government, in its February 1999 affirmation in opposition, stated that the factual record was insufficiently developed to determine whether Yousef and Ismoil were entitled to disclosure and asked that we send the motion to the District Court for further fact-finding. We agreed, see Amended Order of Mar. 1, 1999, United States v. Yousef, Nos. 98-1041(L), 98-1197, 98-1355 (2d Cir.1999), apparently unaware that the District Court had already issued protective orders pursuant to the Government's ex parte applications. In a June 1999 letter, the Government disclosed that it had sought and received protective orders sealing the Scarpa materials in 1997. In an order entered on September 13, 1999 the District Court denied Yousef's and Ismoil's motions, ruling that the Scarpa materials contained no evidence that the Government had violated their constitutional rights under Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), or Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). See United States v. Yousef, 1999 WL 714103, at *4-*5 (S.D.N.Y. Sept. 13, 1999). The District Court also denied Yousef's and Ismoil's related recusal motions, which we address separately below.
 
 
 454
 Yousef and Ismoil raise a number of issues in connection with both the Government's handling of the Scarpa materials and the District Court's denial of their discovery motions. They challenge whether the granting of the protective orders was valid, and assert that the improprieties in handling the Scarpa materials warrant vacating the protective orders, full disclosure of the materials, and reversals of their convictions. They also claim that the District Court abused its discretion when it failed to conduct a fact-finding hearing on their Massiah and Brady claims and that the District Court erred in refusing to unseal Scarpa's sentencing minutes. Ismoil also claims that the Scarpa materials prejudiced his trial and decisions regarding his subsequent conditions of confinement.
 
 
 455
 We agree that there were procedural defects in the handling of the Scarpa materials. The Advisory Committee Note to Fed.R.Crim.P. 16(d)(1), which governs the first protective order, explicitly states that ex parte protective orders and their supporting documents are to be "preserved in the records of the court to be made available to the appellate court in the event of an appeal." Similarly, Fed.R.Crim.P. 26.2(c), which governs the second protective order,[76] states that any portion of a witness's statement that is withheld from the defendant over the defendant's objection must be preserved "under seal, as part of the record" in case the defendant appeals. The handling of these proceedings was such that the sealed documents and Scarpa's role as a jailhouse informant would not have come to the attention of this Court or Yousef or Ismoil but for fortuitous newspaper reporting. There were, therefore, serious procedural deficiencies.
 
 
 456
 As noted, Rules 16(d)(1) and 26.2(c) require the Government to provide timely notice to defendants and to this Court whenever materials pertaining to the defendants are placed under seal pursuant to a protective order. The proper procedure to be followed in such cases is set out in our decision in In re Herald Co., 734 F.2d 93 (2d Cir.1984), which allows district court proceedings to occur ex parte and in camera based on sustainable findings regarding the need for confidentiality, but requires a public docketing to indicate that sealed proceedings have occurred. See id. at 102-03. In extraordinary circumstances, usually involving physical danger, docketing can be deferred, again with appropriate sustainable findings, until the danger has passed. Id. at 102 n. 7. Should the danger not pass before the case reaches this Court on appeal, an appropriate ex parte application to this Court must be made by the Government with full disclosure to this Court of the proceedings in the District Court. Under no circumstances should either the District Court or the Government handle such proceedings in a way that prevents, or risks preventing, appellate review.[77]
 
 
 457
 The procedural defects do not, however, entitle Yousef or Ismoil to a new trial or even full disclosure of the materials. Such relief is available only if the nondisclosure of these materials was error and was substantially prejudicial. See United States v. Pelton, 578 F.2d 701, 707 (8th Cir.1978) (error in administering discovery rules under Rule 16(d)(1) is reversible only if error was prejudicial to defendant's substantial rights); cf. United States v. Hourihan, 66 F.3d 458, 464 (2d Cir.1995) (discovery violation under Rule 16(a)(1)(A) warrants new trial only if defendant can demonstrate failure to disclose caused "substantial prejudice").
 
 
 458
 The Government, in ex parte affirmations that we have reviewed in camera, has provided various reasons why the Scarpa materials should continue to be sealed, including the protection of confidential informants and the need for secrecy about how it investigates and responds to terrorist threats. After reviewing these affirmations, we conclude that the District Court did not err in issuing the protective orders although a public docketing reflecting the existence of the sealed proceedings should have been ordered at the time of the Government's applications and certainly no later than the date on which the judgments became appealable. Moreover, our review demonstrates that there was no prejudice to Yousef or Ismoil in the nondisclosure of these materials, and that the Government's affirmations are sufficient to justify the continued sealing of the materials.
 
 
 459
 Yousef's and Ismoil's claims that the Scarpa materials must be disclosed in order to determine whether there was a Massiah or Brady violation are without foundation. In Massiah, the Supreme Court held that the government violates a defendant's Sixth Amendment rights when, acting through an undisclosed agent, it deliberately elicits incriminating statements after the defendant has been indicted and his rights to counsel have attached. Massiah, 377 U.S. at 205-07, 84 S.Ct. 1199. Scarpa's information concerned threats that Yousef had made against United States interests that were unrelated to his attack against the World Trade Center or the airline bombing plot. The eliciting of such information cannot violate Yousef's or Ismoil's Sixth Amendment rights under Massiah because these rights attach only to criminal conduct charged in an indictment. Additionally, Yousef and Ismoil have forfeited their rights under Massiah by deliberately colluding with Scarpa to provide the Government with (mis)information they now claim was wrongly elicited. See Jenkins v. Leonardo, 991 F.2d 1033, 1036-37 (2d Cir.1993) (finding no Massiah violation where it was "absolutely clear" defendant knew informant was cooperating with government). Our in camera review of the sealed materials also demonstrates that they do not contain exculpatory information that would support a Brady claim.
 
 
 460
 Because the Scarpa materials contain no information that has any bearing on Yousef's and Ismoil's convictions, the District Court did not abuse its discretion in refusing to hold a fact-finding hearing or unseal the sentencing minutes from Scarpa's trial. We are also satisfied, based on the affirmations submitted in support of the protective orders, that the Government established an effective firewall to prevent disclosures to the Government's trial attorneys of trial strategies or confidential communications between Yousef and Ismoil and their attorneys.[78]
 
 
 461
 Ismoil has separately raised specific claims of prejudice from the Scarpa materials, namely that the Scarpa episode may have affected the District Court's decision to deny severance or separate juries, which, Ismoil alleges, prejudiced his defense and denied him a fair trial. Our review of the Scarpa materials finds no connection between the information in the sealed documents and the District Court's decision to deny severance or separate juries. Ismoil also alleges that the Scarpa materials have been used to justify the imposition of special administrative measures. We lack jurisdiction to address the merits of this claim, because, for the reasons stated above, Ismoil must first pursue administrative remedies against the Bureau of Prisons.
 
 II. Recusal
 
 462
 Yousef and Ismoil claim that they are entitled to have their convictions vacated because Judge Duffy failed to recuse himself when he became aware from the Scarpa proceedings that Yousef and Ismoil had discussed the possibility of kidnapping and harming an unnamed federal judge in order to obtain a mistrial. They also allege that Judge Duffy should have recused himself from ruling on the Scarpa disclosure motion because he had an inherent interest in upholding his prior protective orders.
 
 
 463
 A judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Specific instances where recusal is required include situations in which the judge has "a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1). We have interpreted 28 U.S.C. § 455 as asking whether "an objective, disinterested observer fully informed of the underlying facts, [would] entertain significant doubt that justice would be done absent recusal," or alternatively, whether "a reasonable person, knowing all the facts," would question the judge's impartiality. United States v. Lovaglia, 954 F.2d 811, 815 (2d Cir.1992) (citations omitted). We review a judge's denial of a recusal motion for abuse of discretion. See, e.g., Diamondstone v. Macaluso, 148 F.3d 113, 120 (2d Cir.1998).
 
 
 464
 Yousef and Ismoil disagree with the Government about whether Judge Duffy was aware of the threat prior to the trial and sentencing. Even if we assume that Judge Duffy was aware of the threat and perceived it to be directed against him (the threat did not specify a particular judge) the circumstances of this case still do not warrant recusal.
 
 
 465
 Yousef and Ismoil rely on United States v. Greenspan, 26 F.3d 1001 (10th Cir.1994), in support of their claim. In Greenspan, the Tenth Circuit concluded that a judge's actions in response to a death threat could have contributed to the appearance of prejudice. Id. at 1006. These actions included expediting the sentencing hearing in order to "get [the defendant] into the federal penitentiary system immediately, where he can be monitored more closely," and refusing to continue the sentencing hearing at the request of defendant's newly appointed counsel. Id. at 1005. The Tenth Circuit held, however, that recusal would not have been warranted if there had "been any reason to believe that [the] threats were made only in an attempt to obtain a different judge, to delay the proceedings, to harass, or for other vexatious or frivolous purpose." Id. at 1006.
 
 
 466
 We do not find the circumstances surrounding the threat made in this case sufficiently analogous to the "unique circumstances" of the Greenspan case to warrant recusal. In Greenspan, the conspiracy to kill the judge and his family was alleged to involve a number of persons who had contributed large sums of money for the hiring of a "hit man," and this information was given to the judge just before particular rulings expediting sentencing, thereby contributing to the appearance that the rulings had been influenced by information concerning the plot. Id. at 1005. By contrast, in this case, the seriousness of the threat was immediately called into question by Scarpa's 1996 account that Yousef and Ismoil had abandoned the plan due to their belief that extensive security measures would thwart it. Moreover, based upon the later collusion of Yousef, Ismoil and Scarpa to misinform the government, this threat may well have been nothing more than an attempt to harass the government and divert resources, a fact noted by the District Court in its motion denying recusal. Yousef, 1999 WL 714103, at *3. As the Tenth Circuit stated in Greenspan, where a threat is made simply "to harass," recusal is not warranted. 26 F.3d at 1006; see also United States v. Yu-Leung, 51 F.3d 1116, 1119-20 (2d Cir.1995) (recusal not warranted where government informed judge that it did not take defendant's death threats seriously). Accordingly, we do not find that Judge Duffy abused his discretion when he declined to recuse himself.
 
 
 467
 Yousef and Ismoil also contend that Judge Duffy should have recused himself from ruling on the Scarpa disclosure motion. They claim that the District Court's ex parte communications with the Government gave Judge Duffy "personal knowledge of disputed evidentiary facts" necessitating disqualification under 28 U.S.C. § 455(b)(1), and that Judge Duffy's prior sealing of these materials gave him an inherent interest in not disturbing his prior ruling. We disagree.
 
 
 468
 First, were we to hold that Judge Duffy had an inherent conflict of interest as a result of his prior ruling, we would essentially be requiring district judges to recuse themselves anytime they were asked to revisit a prior decision. We decline to set such a precedent. Second, the Supreme Court has held that judicial rulings and the opinions formed by judges on the basis of facts introduced in the course of proceedings "almost never constitute a valid basis for a bias or partiality motion ... unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." Liteky v. United States, 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994); see also United States v. Conte, 99 F.3d 60, 65 (2d Cir.1996) ("Events occurring in the course of judicial proceedings generally do not constitute a basis for recusal" absent indications that the judge's decision-making was so prejudiced that it called into question the fairness of the proceedings.). Yousef and Ismoil have failed to present any relevant evidence in that regard. The District Court, therefore, did not abuse its discretion by failing to recuse itself from ruling on the motion to compel.
 
 CONCLUSION
 I. Airline Bombing Case
 
 469
 To summarize our conclusions, with respect to the airline bombing trial we hold:
 
 
 470
 1. The District Court had jurisdiction over the defendants' extraterritorial conduct pursuant to federal law.
 
 
 471
 2. The District Court erred in partly basing its finding of jurisdiction over Yousef for the conduct at issue in Count Nineteen on the universality principle of customary international law because it improperly relied on the unsupported statements of commentators instead of the practice and customs of States in determining what crimes may be subject to prosecution under that principle.
 
 
 472
 3. The absence of jurisdiction over "terrorist" acts under the universality principle of customary international law does not preclude Yousef's prosecution under United States laws implementing the United States' obligations under the Montreal Convention.
 
 
 473
 4. Jurisdiction over Counts Twelve through Nineteen is consistent with the United States' obligations under the Montreal Convention and with the objective, protective, and passive personality principles of jurisdiction under customary international law.
 
 
 474
 5. Neither the exercise of jurisdiction over Yousef and Ismoil in the United States nor the conduct of their trials violated their constitutional rights to due process.
 
 
 475
 6. Venue for the airline bombing trial was proper in the Southern District of New York.
 
 
 476
 7. Yousef's argument based on the doctrine of specialty was waived because it was raised for the first time in his appellate reply brief.
 
 
 477
 8. Yousef was properly convicted on Count Fifteen because 18 U.S.C. § 2332 does not unconstitutionally delegate legislative power to the Attorney General and because the District Court did not err in not charging the jury that it had to find intent to retaliate against the United States Government or its citizens in order to find the defendants guilty.
 
 
 478
 9. The District Court did not err in failing to conduct, sua sponte, a mid-trial voir dire of the jury regarding the Pope and the Roman Catholic Church.
 
 
 479
 10. The District Court did not abuse its discretion in admitting the Liberation Army letter or in declining to redact portions of it.
 
 
 480
 11. The District Court did not err in admitting into evidence Murad's April 12, 1995 confession to FBI agents.
 
 
 481
 12. Murad's Sixth Amendment right to present a defense was not violated inasmuch as he received adequate discovery from the Philippines to meet Sixth Amendment requirements and the District Court's jury charge on voluntariness was proper.
 
 
 482
 13. The District Court did not commit reversible error in using the "bully" example to illustrate the concepts of intent and circumstantial evidence.
 
 
 483
 14. There was more than sufficient evidence to sustain Yousef's attempt convictions on Counts Thirteen and Fourteen.
 
 
 484
 15. Defendants' remaining arguments pertaining to the airline bombing trial are without merit.
 
 II. World Trade Center Case
 
 485
 With respect to the World Trade Center bombing trial, we hold:
 
 
 486
 1. The District Court did not err in denying Yousef's motion to dismiss the indictment.
 
 
 487
 2. Yousef's Miranda waiver was not rendered invalid simply because his right to counsel had already attached.
 
 
 488
 3. Because Yousef did not invoke his right to counsel before any United States official, the admission of his post-arrest statements into evidence did not violate his Sixth Amendment right to counsel.
 
 
 489
 4. Yousef's Fifth Amendment right to due process was not violated by the United States Government's failure to provide him with counsel after taking him into custody.
 
 
 490
 5. Yousef waived any argument that his post-arrest statements were involuntary and coerced as a result of his alleged torture by foreign officials.
 
 
 491
 6. The District Court properly denied Ismoil's motions to suppress his post-arrest statements.
 
 
 492
 7. The District Court did not commit reversible error by requiring the defense to produce their experts at the Daubert hearing.
 
 
 493
 8. The District Court did not abuse its discretion in choosing to redact certain references to Yousef from Ismoil's written confession rather than granting Yousef's motion for severance, and neither Yousef nor Ismoil was significantly prejudiced by the joint trial.
 
 
 494
 9. The District Court did not abuse its discretion in denying Yousef's motion for a change of venue.
 
 
 495
 10. The District Court did not abuse its discretion by prohibiting Ismoil from introducing various items of evidence from the first World Trade Center bombing trial into evidence because these items were irrelevant and, therefore, inadmissible under Federal Rule of Evidence 402.
 
 
 496
 11. The District Court did not abuse its discretion by admitting into evidence comparisons made of Ismoil's latent fingerprints found on items at the Pamrapo Apartment with latent fingerprints found on personal documents that Ismoil was known to have handled.
 
 
 497
 12. The District Court properly instructed the jury on the element of knowledge with respect to Ismoil.
 
 
 498
 13. The District Court properly instructed the jury on the issue of "aiding and abetting."
 
 
 499
 14. The District Court did not commit plain error by declining to dismiss the alternate jurors once the jury had retired to deliberate.
 
 
 500
 15. Ismoil was not denied his due process right to a fair trial by the cumulative effect of the District Court's errors during the trial because the District Court committed no trial errors with respect to Ismoil.
 
 III. Sentencing Issues
 
 501
 With respect to Yousef's and Ismoil's arguments regarding their sentencing, we hold:
 
 
 502
 1. The District Court did not violate the Ex Post Facto Clause of the Constitution by sentencing Yousef and Ismoil without a jury recommendation.
 
 
 503
 2. Yousef's and Ismoil's 180-year sentences do not constitute unlawful "upward departures" from the statutory maximum sentence of life imprisonment.
 
 
 504
 3. Yousef's sentence does not violate the Cruel and Unusual Punishment Clause of the Eighth Amendment to the Constitution.
 
 
 505
 4. The imposition of consecutive sentences on Yousef does not plainly contravene U.S.S.G. § 5G1.2.
 
 
 506
 5. The District Court did not violate the Eight Amendment's prohibition of cruel and unusual punishment or the Double Jeopardy Clause of the Constitution by sentencing Ismoil to two consecutive thirty-year sentences for violating 18 U.S.C. § 924(c).
 
 
 507
 6. The fine and restitution requirements of the judgment of conviction against Ismoil are hereby modified so that they only become payable if Ismoil receives income from the sale of his account of the World Trade Center bombing or the events leading up to it.
 
 
 508
 7. Because Yousef refused to disclose his financial resources to the United States Probation Office, as required by 18 U.S.C. § 3664(d)(3), the District Court did not plainly err by ordering Yousef to pay $250 million in restitution.
 
 
 509
 8. We lack jurisdiction to consider Yousef's arguments challenging the conditions of confinement recommended by the District Court to the Bureau of Prisons because the District Court's non-binding recommendations are not appealable.
 
 IV. Post-Judgment Issues
 
 510
 With respect to Yousef's and Ismoil's post-judgment motions, we hold:
 
 
 511
 1. There were procedural defects in the handling of the "Scarpa materials," but Yousef and Ismoil are not entitled either to a new trial or to full disclosure of these materials because the nondisclosure did not substantially prejudice their case.
 
 
 512
 2. The District Court did not abuse its discretion in declining to hold a fact-finding hearing on the Massiah and Brady claims raised by Yousef and Ismoil because the Scarpa materials contain no information bearing on their convictions.
 
 
 513
 3. Because none of the information in the Scarpa materials bears on the District Court's decision to deny Ismoil's motion for severance, the nondisclosure of this information did not prejudice Ismoil's defense or deny him a fair trial.
 
 
 514
 4. We lack jurisdiction to consider Ismoil's claim that the Scarpa materials have been used to justify the Bureau of Prisons' imposition of special administrative measures against him because he has not yet exhausted his administrative remedies against the Bureau of Prisons.
 
 
 515
 5. Judge Duffy did not abuse his discretion by declining to recuse himself.
 
 
 516
 * * *
 
 
 517
 We have considered all of the defendants' remaining arguments and conclude that they are without merit.
 
 
 518
 Judge Duffy carefully, impartially, and commendably conducted the two lengthy and extraordinarily complex trials from which these appeals were taken. The fairness of the proceedings over which he presided is beyond doubt.
 
 
 519
 The judgments of the District Court are affirmed except to the extent that Ismoil's restitution requirements are hereby modified in the manner described above.
 
 
 
 Notes:
 
 
 [1]
 We assume familiarity with the factual background describing the 1993 World Trade Center bombing and the attendant investigation that is set forth inUnited States v. Salameh, 261 F.3d 271, 274-75 (2d Cir.2001), cert. denied sub. nom. Abouhalima v. United States, 536 U.S. 967, 122 S.Ct. 2681, 153 L.Ed.2d 852 (2002), and cert. denied, ___ U.S. ___, 123 S.Ct. 187, 154 L.Ed.2d 76 (2002) ("Salameh II"), United States v. Rahman, 189 F.3d 88, 103-11 (2d Cir.1999), and United States v. Salameh, 152 F.3d 88, 107-08 (2d Cir.1998) ("Salameh I") and the factual background detailing the conspiracy to bomb United States commercial airliners in Southeast Asia described by the District Court in United States v. Yousef, 925 F.Supp. 1063, 1065-73 (S.D.N.Y.1996).
 This case is the most recent of a series of appeals pertaining to the World Trade Center bombing of 1993. In Salameh I, 152 F.3d at 89, we affirmed the judgments of conviction of defendants Mohammed A. Salameh, Nidal Ayyad, Mahmud Abouhalima, and Ahmad Mohammad Ajaj.
 
 
 [2]
 Yousef told the INS that he was traveling alone and presented INS officials with a passport from Iraq in the name of Ramzi Yousef. To explain his lack of the required visa, Yousef stated that a contact from Iraq's consulate in Pakistan helped him to get on the plane to New York without a visa. Yousef requested political asylum in the United States, claiming that he was in danger from Iraq because its Government believed that he was aligned with the Kuwaiti Government. Yousef filled out the applicable asylum application forms and made a sworn statement to support his claim. He was then released into the United States with an asylum hearing appointment
 
 
 [3]
 A redacted indictment was prepared for the airline bombing trial which deleted the counts relating to the World Trade Center bombing (Counts One through Eleven) and renumbered Counts Twelve through Twenty as Counts One through Nine
 
 
 [4]
 18 U.S.C. § 924(c)(1) provides in relevant part:
 (A) ... [A]ny person who, during and in relation to any crime of violence ... uses or carries a firearm ... shall, in addition to the punishment provided for such crime of violence ...
 (i) be sentenced to a term of imprisonment of not less than 5 years;
 ...
 (B) If the firearm possessed by a person convicted of a violation of this subsection —
 ...
 (ii) is a ... destructive device ... the person shall be sentenced to a term of imprisonment of not less than 30 years.
 
 
 [5]
 Lieutenant José Cruz, Jr. of the explosive ordnance disposal unit of the Manila police department was involved in the apartment search. In support of the search warrant request, he submitted an affidavit to the Philippine court in which he falsely claimed that local police had presented him with incriminating items. Cruz later testified that, in fact, he had collected the items himself from within the defendants apartment and placed them in an attache case to present to the Philippine court
 
 
 [6]
 Yousef told the agents on the plane that he spoke, read, and understood English. He then signed the advice of rights form, waiving his Fifth and Sixth Amendment rights
 
 
 [7]
 18 U.S.C. § 371 provides in relevant part:
 If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.
 
 
 [8]
 18 U.S.C. § 32 provides in relevant part:
 (a) Whoever willfully —
 (1) sets fire to, damages, destroys, disables, or wrecks any aircraft in the special aircraft jurisdiction of the United States or any civil aircraft used, operated, or employed in interstate, overseas, or foreign air commerce;
 (2) places or causes to be placed a destructive device or substance in, upon, or in proximity to, or otherwise makes or causes to be made unworkable or unusable or hazardous to work or use, any such aircraft, or any part or other materials used or intended to be used in connection with the operation of such aircraft, if such placing or causing to be placed or such making or causing to be made is likely to endanger the safety of any such aircraft;
 ...
 shall be fined under this title or imprisoned not more than twenty years or both.
 
 
 [9]
 18 U.S.C. § 32(a)(7) provides that whoever wilfully "attempts or conspires to do anything prohibited under paragraphs (1) through (6) of this subsection ... shall be fined under this title or imprisoned not more than twenty years or both."
 
 
 [10]
 18 U.S.C. § 2332 provides in relevant part:
 (b) Attempt or conspiracy with respect to homicide. — Whoever outside the United States attempts to kill, or engages in a conspiracy to kill, a national of the United States shall —
 (1) in the case of an attempt to commit a killing that is a murder as defined in this chapter [U.S.C. § 2331 et seq.], be fined under this title or imprisoned not more than 20 years, or both; and
 (2) in the case of a conspiracy by two or more persons to commit a killing that is a murder as defined in section 1111(a) of this title, if one or more of such persons do any overt act to effect the object of the conspiracy, be fined under this title or imprisoned for any term of years or for life, or both so fined and so imprisoned.
 ...
 (d) Limitation on prosecution. — No prosecution for any offense described in this section shall be undertaken by the United States except on written certification of the Attorney General or the highest ranking subordinate of the Attorney General with responsibility for criminal prosecutions that, in the judgment of the certifying official, such offense was intended to coerce, intimidate, or retaliate against a government or a civilian population.
 
 
 [11]
 18 U.S.C. § 2332a provides in relevant part:
 (a) Offense against a national of the United States or within the United States. — A person who, without lawful authority, uses, threatens, or attempts or conspires to use, a weapon of mass destruction (other than a chemical weapon as that term is defined in section 229F) ...
 (1) against a national of the United States while such national is outside of the United States;
 (2) against any person within the United States, and the results of such use affect interstate or foreign commerce or, in the case of a threat, attempt, or conspiracy, would have affected interstate or foreign commerce; or
 (3) against any property that is owned, leased or used by the United States or by any department or agency of the United States, whether the property is within or outside of the United States,
 shall be imprisoned for any term of years or for life, and if death results, shall be punished by death or imprisoned for any term of years or for life.
 
 
 [12]
 See note 4, ante.
 
 
 [13]
 Under 18 U.S.C. § 32(b), whoever willfully —
 (3) places or causes to be placed on a civil aircraft registered in a country other than the United States while such aircraft is in service, a device or substance which is likely to destroy that aircraft, or to cause damage to that aircraft which renders that aircraft incapable of flight or which is likely to endanger that aircraft's safety in flight;
 ...
 shall be fined under this title or imprisoned not more than twenty years, or both. There is jurisdiction over an offense under this subsection if a national of the United States was on board, or would have been on board, the aircraft; an offender is a national of the United States; or an offender is afterwards found in the United States.
 
 
 [14]
 At the time of Shah's arrest, 18 U.S.C. § 751(a) provided in relevant part:
 Whoever escapes or attempts to escape from the custody of the Attorney General or his authorized representative, or from any institution or facility in which he is confined by direction of the Attorney General, or from any custody under or by virtue of any process issued under the laws of the United States by any court, judge, or commissioner, or from the custody of an officer or employee of the United States pursuant to lawful arrest, shall, if the custody or confinement is by virtue of an arrest on a charge of felony, or conviction of any offense, be fined under this title or imprisoned not more than five years, or both ....
 
 
 [15]
 Although some issues are only expressly raised by one defendant, both Yousef and Murad joined in all relevant and consistent arguments raised by one another with respect to their convictions in the airline bombing case
 
 
 [16]
 By "extraterritorial jurisdiction" we mean subject matter jurisdiction of a United States court to adjudicate conduct committed outside of the United States
 
 
 [17]
 The Fifth Amendment to the United States Constitution provides in relevant part that "[n]o person shall be ... deprived of life, liberty, or property, without due process of law."
 
 
 [18]
 As the District Court pointed out, federal law provides United States-flag aircraft with the same protection that historically was extended to United States-flag vessels at seaSee United States v. Yousef, 927 F.Supp. 673, 679 (S.D.N.Y.1996) (citing Restatement (Third) of the Foreign Relations Law of the United States ("Restatement (Third)") § 402, Reporters' Note 4).
 
 
 [19]
 The twelfth aircraft was a United Airlines flight from Korea to Manila
 
 
 [20]
 The statute previously codified at 49 U.S.C.App. § 1472(n) has been transferred to 49 U.S.C. § 46502(b), which provides in relevant part:
 (1) An individual committing or conspiring to commit an offense (as defined in the Convention for the Suppression of Unlawful Seizure of Aircraft) on an aircraft in flight outside the special aircraft jurisdiction of the United States —
 (A) shall be imprisoned for at least 20 years; or
 (B) notwithstanding section 3559(b) of title 18, if the death of another individual results from the commission or attempt, shall be put to death or imprisoned for life.
 (2) There is jurisdiction over the offense in paragraph (1) if —
 (A) a national of the United States was aboard the aircraft;
 (B) an offender is a national of the United States; or
 (C) an offender is afterwards found in the United States.
 
 
 [21]
 The Court found support for its conclusion in the legislative history of the Antihijacking Act of 1974. That statute fulfilled the United States' obligations under the Convention for the Suppression of Unlawful Seizure of Aircraft, Dec. 16, 1970, 22 U.S.T. 1641, T.I.A.S. No. 7192,reprinted in 1974 U.S.C.C.A.N. 3975 (the "Hague Convention"), of which the United States is a contracting party. The Hague Convention requires contracting nations to establish jurisdiction over crimes committed by hijackers when the hijacker is "present in" their country and they do not extradite him. See 22 U.S.T. at 1641, art. 4. The Court found that the "found in" provision from the Antihijacking Act was parallel to the "present in" language in the Hague Convention, and observed that the latter did not impose a voluntariness requirement — as urged by Yunis, and as Yousef urges us to discern in 18 U.S.C. § 32(b).
 
 
 [22]
 Yousef was first named in an indictment for charges relating to the World Trade Center attack on March 31, 1993, in the first superseding indictment. The original indictment, filed on March 17, 1993, did not identify Yousef by name
 
 
 [23]
 Yousef had been in United States custody since February 8, 1995. The first indictment to include charges related to the airline bombings was the eighth superseding indictment, filed March 22, 1995
 
 
 [24]
 Customary international law is comprised of those practices and customs that States view as obligatory and that are engaged in or otherwise acceded to by a preponderance of States in a uniform and consistent fashion. Ian Brownlie,Principles of Public International Law 5-7 (5th ed. 1999). See also Restatement (Third) § 102(2) (stating that customary international law "results from ... [the] consistent practice of states followed by them from a sense of legal obligation"). Customary international law recognizes five bases on which a State may exercise criminal jurisdiction over a citizen or non-citizen for acts committed outside of the prosecuting State. These five well-recognized bases of criminal jurisdiction are: (1) the "objective territorial principle," which provides for jurisdiction over conduct committed outside a State's borders that has, or is intended to have, a substantial effect within its territory; (2) the "nationality principle," which provides for jurisdiction over extraterritorial acts committed by a State's own citizen; (3) the "protective principle," which provides for jurisdiction over acts committed outside the State that harm the State's interests; (4) the "passive personality principle," which provides for jurisdiction over acts that harm a State's citizens abroad; and (5) the "universality principle," which provides for jurisdiction over extraterritorial acts by a citizen or non-citizen that are so heinous as to be universally condemned by all civilized nations. See generally In re Marc Rich & Co., 707 F.2d 663, 666 (2d Cir.1983) (citing Introductory Comment to Research on International Law, Part II, Draft Convention on Jurisdiction with Respect to Crime, 29 Am. J. Int'l L. 435, 445 (Supp. 1935)); United States v. Pizzarusso, 388 F.2d 8, 10-11 (2d Cir.1968); see also Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 781 n. 7 (D.C.Cir.1984) (Edwards, J., concurring); United States v. Marino-Garcia, 679 F.2d 1373, 1380-83 & nn. 13-16 (11th Cir.1982).
 
 
 [25]
 While it is not possible to claim that the practice or policies of any one country, including the United States, has such authority that the contours of customary international law may be determined by reference only to that country, it is highly unlikely that a purported principle of customary international law in direct conflict with the recognized practices and customs of the United States and/or other prominent players in the community of States could be deemed to qualify as abona fide customary international law principle.
 
 
 [26]
 As explained further below, the interpretive canon established byCharming Betsy does not impinge upon our analysis of jurisdiction over Yousef for Counts Twelve through Nineteen because such exercise of jurisdiction is consistent with principles of customary international law.
 
 
 [27]
 On the use of the synonymous terms "jurist," "scholar," and "publicist," see note 33,post.
 
 
 [28]
 The United States has signed but not ratified the Vienna Convention on the Law of Treaties, meaning that the Convention is not binding on the United States,see, e.g., Congressional Research Service of the Library of Congress, Treaties and Other International Agreements: The Role of the United States Senate, a Study Prepared for the Committee of Foreign Relations of the United States Senate, S. Prt. No. 106-71, 106th Cong, 2d Sess. at 43 (2001) (stating that the United States "is not legally bound by its provisions"). Signing a treaty serves to "authenticat[e]" its text but "does not establish [the signing party's] consent to be bound." Ian Brownlie, Principles of Public International Law 610-11 (5th ed. 1999). Only "ratification" of the treaty causes the treaty to become binding on the signing party. Id. at 611. In the United States, ratification occurs when two thirds of the members of the Senate present vote in favor of ratifying a signed treaty presented by the Executive. U.S. Const. Art II, § 2 cl. 2.
 Although the United States has not ratified the Vienna Convention, we look to it here as one source of guidance because the United States "played a leading role in negotiating the Vienna Convention," id. at 20, and the U.S. Department of State long has taken the position that "the Convention is ... the authoritative guide to current treaty law and practice," Id. at 44 (quoting statement of Secretary of State William P. Rogers, S. Exec. Doc. L. at 1); see also, e.g., Sean D. Murphy, Blocking of Iceland's Effort to Join Whaling Convention, 96 Am. J. Int'l L. 712, 713 n. (2002) (citing U.S. Dep't of State, Iceland's Adherence to the IWC Convention: U.S. Legal Views 2 (2002) (position paper distributed to delegations attending the 2002 annual meeting of the International Whaling Commission) (stating that the Department of State considers the Vienna Convention to be "the authoritative guide to current treaty law and practice.") (document on file at George Washington University)). At least one United States court has relied on the Vienna Convention as a source of guidance on the construction of international law terms and obligations. See Comm. of U.S. Citizens Living in Nicaragua, 859 F.2d at 940 (using Vienna Convention for guidance on the meaning of the term "jus cogens" and the extent to which the jus cogens may or may not impinge on a State's domestic law practice).
 
 
 [29]
 While the purpose of such treaties is to assure "universal punishment of the offenses in question ... [by denying] perpetrators ... refuge in all States,"see Case Concerning the Arrest Warrant of 11 Apr. 2000 (Democratic Republic of the Congo v. Belgium), 41 I.L.M. 536, 560 (2002) (separate opinion of ICJ President Guillaume ¶ 9, at 560), Judge Rosalyn Higgins of the International Court of Justice notes that it is incorrect to speak of these treaties as creating "universal jurisdiction," or even "treaty-based universal jurisdiction," because the treaties create obligations only in States parties to them, not universally in all states, Rosalyn Higgins, Problems and Process: International Law and How We Use It 64 (1994) (stating that jurisdiction created by treaty is never "universal jurisdiction stricto sensu" because only States parties are vested with jurisdiction by the treaty). Thus, treaties such as those mentioned above oblige contracting States to enact domestic (or "municipal") laws that proscribe certain conduct. See, e.g., New York Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons, Including Diplomatic Agents, Dec. 28, 1973, art. 2(2), 28 U.S.T. 1975, 1978, T.I.A.S. No. 8532, 1035 U.N.T.S. 167 ("Each State Party shall make these crimes punishable by appropriate penalties which take into account their grave nature."); United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, Dec. 20, 1988, art. 3(1), 28 I.L.M. 493, 500 (1989) ("Each Party shall adopt such measures as may be necessary to establish as criminal offences under its domestic law, when [certain offenses are] committed intentionally."). Nevertheless, confusion on this point is common among commentators and advocacy groups, who regularly speak of a State's jurisdictional obligations that arise pursuant to a treaty as investing the State with "universal jurisdiction." See, e.g., Amnesty International, Universal Jurisdiction: The Duty of States to Enact and Implement Legislation ch. 13, 1 (2001) (stating that "[t]here are a number of crimes other than war crimes, crimes against humanity, [and] genocide ... over which states may exercise universal jurisdiction, usually pursuant to treaties imposing a prosecute or extradite obligation on the states parties." (emphasis added)).
 
 
 [30]
 We take no position on whether the acts charged in Count Nineteen constitute "terrorist acts" or "terrorism."
 
 
 [31]
 For a discussion of the departures of the Restatement (Third) of the Foreign Relations Law of the United States from the content of the Restatement (Second), see Stephen C. McCaffrey,The Restatement's Treatment of Sources and Evidence of International Law, 25 Int'l Lawyer 311 (1991).
 The American Law Institute ("ALI") began its project of preparing comprehensive "restatements" of the laws of the United States in order "`to promote the clarification and simplification of the law and its better adaptation to social needs.'" The American Law Institute, Capturing the Voice of the American Law Institute: A Handbook for ALI Reporters 1 (2001) (quoting the ALI's 1923 Certificate of Incorporation); see also Harvey S. Perlman, The Restatement Process, 10 Kan. J.L. & Pub. Pol'y 2, 2-3 (2000). Accordingly, the Restatements do not merely (or necessarily) "restate" the law as it is; the ALI handbook for reporters instructs that reporters are "not compelled to adhere to ... a preponderating balance of authority but [are] instead expected to propose the better rule and provide the rationale for choosing it." Id. at 6 (internal quotation marks omitted) (emphasis added).
 The ALI published its first Restatement of the Foreign Relations Law of the United States in 1965 — although this volume was entitled the Restatement (Second) because it comprised part of the second series of restatements issued by the ALI. Id.; see also Restatement (Second) of the Foreign Relations Law of the United States (1965) ("Restatement (Second)"), The Restatement (Third) is a "comprehensive revision" of the Restatement (Second). Restatement (Third) at 3. The Director of the ALI notes in the foreword to the Restatement (Third) that it is "in no sense an official document of the United States," and that "[i]n a number of particulars the formulations in this Restatement are at variance with positions that have been taken by the United States Government." Id. at IX. These variations presumably are intentional because, although the ALI extended the Restatement (Third) project by a year to consider "communications received ... from the Department of State and from the Justice Department," it did not fully conform the Restatement to the positions expressed in those communications. American Law Institute, Proceedings, 63d Annual Meeting, 1986, at 90 (1987). The Restatement (Third) addresses for the first time the central subject of the sources of international law, which the Restatement (Second) had relegated to the comments of section 1. McCaffrey, ante, at 312.
 The Restatement (Third)'s innovations on the subject of customary international law have been controversial. For example, the Restatement (Third) suggests that customary international law might trump prior inconsistent statutory law, binding the executive branch. See Restatement (Third) § 115(2) & cmt. d & Reporters' Note 4. This proposition is without foundation or merit. Indeed, other commentators have called the Restatement (Third)'s view that customary international law could supersede federal statutory law "pure bootstrapping," noting that the only authority cited for that proposition in the Restatement (Third) is a single article by the Restatement (Third)'s own Reporter — that is, the citation is without external authority. Curtis A. Bradley & Jack L. Goldsmith, Customary International Law as Federal Common Law: A Critique of the Modem Position, 110 Harv. L. Rev. 815, 835-36 & nn. 142-43 (1997). Even the current President of the ALI notes that this rule was "much debated when the Restatement (Third) was under discussion in the Institute ... [and is] not completely free from controversy now." Michael Traynor, That's Debatable: The ALI as a Public Policy Forum, Part II, 25 The ALI Reporter 1, 2 (2002).
 Inasmuch as the Restatement (Third) notes that certain of its positions are "at variance" with the practice and customs followed by the United States in its international relations, and incorrectly asserts that customary international law may trump United States statutory law, courts must be vigilant and careful in adopting the statements of the Restatement (Third) as evidence of the customs, practices, or laws of the United States and/or evidence of customary international law.
 
 
 [32]
 Article 59 provides in full: "The decision of the Court has no binding force except between the parties and in respect of that particular case."
 
 
 [33]
 "Publicists" is an antique word used in the parlance of international law as a synonym for writers who, in other areas of scholarship, are called "scholars" or "jurists." "Jurist," for its part, means "[a] legal scholar," though its use may introduce ambiguity because a secondary meaning of this term is "judge."Black's Law Dictionary 767 (5th ed. 1979); see note 36, post. "Publicis" is a term used for the writings of "publicists."
 
 
 [34]
 According to the Charter of the United Nations, "[a]ll Members of the United Nations areipso facto parties to the Statute of the International Court of Justice." Charter of the United Nations, June 26, 1945, 59 Stat. 1031, T.S. No. 993 (1945), Art. 93. The United States Senate ratified the Charter of the United Nations on July 28, 1945. 91 Cong. Rec. 8185, 8190 (1945).
 
 
 [35]
 Some scholars promulgate the view that the opinions of scholars should bepreferred as a source of authority over the output of States' lawmaking bodies and States' practices, based on the argument that scholars are more independent of narrowly national concerns than elected lawmakers and therefore better embody the disinterested "conscience juridique." See, e.g., Oscar Schachter, The Invisible College of International Lawyers, 72 Nw. U. L. Rev. 217, 225 (1977). This seemingly idealistic position has been rejected by other scholars, who note that it is "obvious" that "subjective factors" and "national and other prejudices" freely may enter into the writings of publicists, particularly those who "see themselves to be propagating new and better views." Ian Brownlie, Principles of Public International Law 24 (5th ed. 1999). The claim of scholars to speak for "the international community," loosely so called, however commonplace in our time, should be regarded with skepticism. See note 36, post.
 Not all international law scholars adopt the position that scholars' views are more constitutive of customary international law than States' practices. See, e.g., Ernest A. Young, Sorting Out the Debate Over Customary International Law, 42 Va. J. Int'l L. 365, 391 (2002) (stating, "It is hard not to see delusions of grandeur in statements like [Sohn's] .... Law professors defending the modern position are, at least to some extent, asserting their own power.").
 
 
 [36]
 See, e.g., Statement Amicus Curiae of International Law Professors, Republic of Paraguay v. Gilmore, 523 U.S. 371, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998) (stating, more subtly than Professor Sohn, that the "views of jurists on points of international law [should be] taken into account when such questions arise in U.S. courts"; further stating that amici, "through scholarship[,] ... have contributed to the development of jurisprudence on various questions related to the pending matter,") (no record exists on Supreme Court docket sheet of any action on the motion to file this amicus brief). On the term "jurist" generally, and the possibilities for confusion in the use of this term, see note 33, ante.
 For a survey of statements by international law scholars attributing to themselves lawmaking authority in the area of customary international law, see Daniel W. Drezner, On the Balance Between International Law and Democratic Sovereignty, 2 Chi. J. Int'l L. 321, 324-25 & nn. 12-14 (2001) (stating that "[r]evisionist scholars of international law claim that unelected, unrepresentative groups advocate the use of customary international law as a means of bypassing democratic sovereignty," and citing extensively to relevant examples). See also Curtis A. Bradley, The Costs of International Human Rights Litigation, 2 Chi. J. Int'l L. 457, 468 (2001) (discussing the "substantial pride" of some "international law scholars" who believe they "are engaged in a form of law creation").
 
 
 [37]
 Our view of the matter is entirely consistent with the understanding of the customary international law set forth in two notable cases,Kadic v. Karadzic, 70 F.3d 232 (2d Cir.1995), and Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir.1980), arising under the Alien Tort Claims Act of 1789, 28 U.S.C. § 1350. In those cases, we considered the character and sources of customary international law, see, e.g., Kadic, 70 F.3d at 238-39; Filartiga, 630 F.2d at 880 n. 7, and we nowhere suggested that the views of international scholars, standing alone and unconnected to accurate descriptions of past state practice, could be a basis for the determination of the applicable law. These cases did not address jurisdiction under the universality principle because jurisdiction in both cases arose under the Alien Tort Claims Act.
 
 
 [38]
 The phrases "international law" and the "law of nations" frequently are used interchangeably,see, e.g., Restatement (Third) at 41 (stating, in the introductory note to Chapter 2, that "the law of nations later [was] referred to as international law"), but these terms are not entirely synonymous. "International law" is of a far more recent vintage than "law of nations." "Law of nations" derives from the Latin jus gentium, meaning literally "law of nations" (the root of gentium being gens, meaning a race, clan or people), and was used to refer to the law applied by Roman magistrates in foreign lands. The jus gentium is closely related to the concepts of natural law and natural reason, jus naturale and naturale ratio. By contrast, Jeremy Bentham first coined the phrase "international law" in 1789. Jeremy Bentham, An Introduction to the Principles of Morals and Legislation 326 n. 1 (Hafner Publ'g Co. 1948) (1789) (stating that "[t]he word international, it must be acknowledged, is a new one ... calculated to express, in a more significant way, the branch of law which goes commonly under the name of the law of nations." (emphasis in original)). Bentham's writings on "international law," however, significantly expanded the scope of what previously had been known as the "law of nations" to sweep within it any area of lawmaking in which States might join for their mutual advancement. Jeremy Bentham, Principles of International Law, in 2 The Works of Jeremy Bentham 535-40 (John Bowring, ed., New York, Russell & Russell, Inc. 1962) (1786-89); id. at 540 (stating that "international laws [should] be made upon all points which remain unascertained" among nations, particularly areas in which nations "are capable of collusion" in the furtherance of aligned interests). Thus while Benthamite "international law" and its progeny are concerned with lawmaking in any area that could improve the condition of, and relations between, States, the "law of nations" historically consisted of a finite set of principles believed by commentators (primarily Grotius, Vattel, Pufendorf, and Burlamaqui) to be derived from the divine order, or from abstract reason and natural law. Stewart Jay, The Status of the Law of Nations in Early American Law, 42 Vand. L. Rev. 819, 823 (1989). According to William Blackstone, the eighteenth-century British legal scholar and judge, the "law of nations is a system of rules, deducible by natural reason, and established by universal consent among the civilized inhabitants of the world"; it is founded on the principle "that different nations ought in time of peace do to one another all the good they can; and, in time of war, as little harm as possible, without prejudice to their own real interests." 4 William Blackstone, Commentaries *66.
 In a notable opinion by Judge Henry J. Friendly, himself a practitioner of international law for many years before his appointment to our Court, we held that "a violation of the law of nations arises only when there has been a violation by one or more individuals of those standards, rules or customs (a) affecting the relationship between states or between an individual and a foreign state, and (b) used by those states for their common good and/or dealings inter se." IIT v. Vencap, Ltd., 519 F.2d 1001, 1015 (2d Cir.1975) (internal citation and quotation marks omitted).
 
 
 [39]
 The Charter of the International Military Tribunal, which tried war criminals of the Second World War, defined "war crimes" as:
 violations of the laws or customs of war ... includ[ing], but not ... limited to, murder, ill-treatment or deportation to slave labor or for any other purpose of civilian population of or in occupied territory, murder or ill-treatment of prisoners of war or persons on the seas, killing of hostages, plunder of public or private property, wanton destruction of cities, towns, or villages, or devastation not justified by military necessity[.]
 The Charter of the International Military Tribunal, Art. 6(b), in 1 Trial of the Major War Criminals before the International Military Tribunal 11 (1947).
 
 
 [40]
 The Charter describes "crimes against humanity" as:
 murder, extermination, enslavement, deportation, and other inhumane acts committed against any civilian population, before or during the war, or persecutions on political, racial, or religious grounds in execution of or in connection with any crime within the jurisdiction of the Tribunal, whether or not in violation of domestic law of the country where perpetrated.
 The Charter of the International Military Tribunal, Art. 6(c), in 1 Trial of the Major War Criminals before the International Military Tribunal 11 (1947).
 
 
 [41]
 For example, each side of the Israeli-Palestinian conflict charges the other with "terrorism," sentiments echoed by their alliesSee, e.g., Todd S. Purdum, What Do You Mean, "Terrorist"?, N.Y. Times, Apr. 7, 2002, Week in Review, at 1 ("If Israel sees its military campaign in the West Bank as a justifiable echo of Mr. Bush's assault on Al Qaeda, Palestinians claim affinity with the American colonists' revolt against an occupying power."). The Organization of the Islamic Conference met in Kuala Lumpur, Malaysia, in April 2002, to define terrorism; the host of the conference, Malaysian Prime Minister Mahathir Mohamad, proposed a definition of terrorism as "all attacks on civilians"; the conference's final declaration, however, stated that terrorism consists only of attacks on civilians perpetrated by non-Palestinians, stating that the Conference "`rejects any attempt to link terrorism to the struggle of the Palestinian people in the exercise of their inalienable right to establish their independent state.'" Id. (quoting statements by Mohamad and contained in the conference's final declaration). Sentiments at the conference were far from uniform, however: The deputy foreign minister of Bosnia-Herzegovina stated that "if a person kills or harms a civilian ... he is a terrorist" irrespective of the "race or religion" of the perpetrator and the victims. Terrorism Issue Splits Muslim Conferees, Chi. Trib., April 2, 2002, at 10 (quoting statements of Bosnian-Herzegovinian delegate to conference).
 
 
 [42]
 Confusion on the definition of "terrorism" aboundsSee, e.g., Craig S. Smith, Debate Over Iraq Raises Fears of a Shrinking Role for NATO, N.Y. Times, Jan. 26, 2003, at L 26 (quoting Celeste A. Wallander, senior fellow at the Center for Strategic and International Studies, as stating that even among members of the North Atlantic Treaty Alliance ("NATO") there is no consensus "on how to define transnational terrorism").
 Terrorism is defined variously by the perpetrators' motives, methods, targets, and victims. Motive-based definitions suffer from confusion because of the attempt to carve out an exception for assertedly legitimate armed struggle in pursuit of self-determination. For example, under one of the various United Nations resolutions addressing terrorism, armed and violent acts do not constitute "terrorism" if committed by peoples seeking self-determination in opposition to a violently enforced occupation. See, e.g., Declaration on Principles of International Law Concerning Friendly Relations Among Co-operating States in Accordance with the Charter of the United Nations, Oct. 24, 1970, G.A. Res. 2625, 25 U.N. GAOR Supp. (No. 28) at 21, U.N. Doc. A/8028 (1971), reprinted in 9 I.L.M. 1292 (1970). This attempt to distinguish "terrorists" from "freedom fighters" potentially could legitimate as non-terrorist certain groups nearly universally recognized as terrorist, including the Irish Republican Army, Hezbollah, and Hamas. See Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief & Dev., 291 F.3d 1000, 1002 (7th Cir.2002) (describing Hamas); Stanford v. Kuwait Airways Corp., 89 F.3d 117, 120 (2d Cir.1996) (describing Hezbollah); Matter of Requested Extradition of Smyth, 863 F.Supp. 1137, 1139-40 (N.D.Cal.1994) (describing the Irish Republican Army).
 By contrast, the European Convention on the Suppression of Terrorism defines terrorism solely based on the methods of violence the perpetrator employs, and explicitly removes political judgment of the acts by defining most violent acts as "non-political" (regardless of the perpetrator's claimed motive). European Convention on the Suppression of Terrorism, Nov. 10, 1976, Europ. T.S. No. 90. Thus, in Article I, the Convention defines as terrorism any offenses, inter alia, "involving the use of a bomb, grenade, rocket, automatic firearm, or letter or parcel bomb if this use endangers persons," a definition that may fail to circumscribe the offense adequately.
 The Arab Convention on the Suppression of Terrorism (Cairo, Apr. 22, 1998), reprinted in International Instruments Related to the Prevention and Suppression of International Terrorism, 152-73 (United Nations 2001), while condemning terrorism, takes a uniquely restrictive approach to defining it, stating that offenses committed against the interests of Arab states are "terrorist offenses," while offenses committed elsewhere or against other peoples or interests are not. Id. at Art. I.3 (defining "terrorist offence" as any of several defined violent actions that occur "in any of the Contracting States, or against their nationals, property or interests"). The Convention further defines as legitimate (non-terrorist) "[a]ll cases of struggle by whatever means, including armed struggle," unless such struggles "prejudic[e] the territorial integrity of any Arab State." Id. at Art. II(a).
 United States legislation has adopted several approaches to defining terrorism, demonstrating that, even within nations, no single definition of "terrorism" or "terrorist act" prevails. There are numerous statutes defining "terrorism" or "acts of terrorism." see, e.g., 18 U.S.C. § 2331 (defining terrorism by motive, stating that "international terrorism" is comprised of certain acts that "appear to be intended (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination or kidnapping"); 50 U.S.C. § 1801(c)(2) (substantially the same); 6 U.S.C. § 444(2)(B) (defining terrorism by its effect on United States interests, stating that "acts of terrorism" are any acts that are "unlawful" and that cause damage to any "person, property, or entity" in the United States, or to any United States-flag craft or air carrier); 8 U.S.C. § 1182(a)(3)(B)(ii) (in the context of what acts cause an alien to be excludable based on participation in "terrorist activity," defining "terrorist activity" apart from any nexus to United States interests, as "any activity which is unlawful under the laws of the place where it is committed (or which, if committed in the United States, would be unlawful under the laws of the United States or any State)" and that involves, inter alia, attacks on third parties to influence the policy of any government, attacks on aircraft and other vessels, or the use of chemical, biological or nuclear weapons).
 Still other definitions of "terrorism" may focus on the victims of the attacks or the relationship between the perpetrators and the victims. See, e.g., Alex P. Schmid & Albert J. Jongman, Political Terrorism 1-2 (1988) ("Terrorism is a method of combat in which... symbolic victims serve as an instrumental target of violence. These instrumental victims share group or class characteristics which form the basis for their selection for victimization. Through previous use of violence or the credible threat of violence other members of that group or class are put in a state of chronic fear (terror).").
 
 
 [43]
 Other States colorably could have asserted jurisdiction over Yousef or requested his extradition from Pakistan, where he was arrested. These States include the Philippines, because the attack was on a Philippine-flag aircraft and also because the aircraft was flying between two points in the Philippines when Yousef placed the bomb under his seat; Japan, because the aircraft was en route from the Philippines to Japan when the bomb exploded and because one Japanese national was injured and another was murdered in the attack; and Pakistan, because Yousef is believed to be a Pakistani national. Each of these States had jurisdiction to prosecute under customary international law, and, as parties to the Montreal Convention, under the Convention. The Philippines ratified the Convention on March 26, 1973; Japan on June 12, 1974; and Pakistan on January 24, 1974
 
 
 [44]
 InUnited States v. Javino, 960 F.2d 1137, 1143 (2d Cir.1992), we noted that Congress may be constrained by a "reasonableness" standard in enacting legislation that asserts jurisdiction over extraterritorial criminal conduct, stating that "[t]he reasonableness of an attempt to exercise extraterritorial control depends on such factors as the extent to which the conduct `has substantial, direct, and foreseeable effect' in the legislating country, and the extent to which other states `may have an interest in regulating the activity.'" Id. (quoting Restatement (Third) of the Foreign Relations Law of the United States § 403(2)(a), (g) (1987)).
 This statement could be read to imply that United States lawmaking with respect to extraterritorial acts is constrained by an international law principle of "reasonableness" — and, by extrapolation, by sometimes elusive, and generally malleable and evolving, customary international law standards. But the statute at issue in Javino did not expressly apply to extraterritorial conduct. Id. at 1142. Accordingly, to the extent that Javino could be read to state that customary international law imposes limits on the ability of Congress, acting under its constitutional power, to extend the jurisdiction of our courts to extraterritorial conduct, such statements constituted mere dicta.
 Moreover, any such reading of Javino's assertion in dicta that Congress may be constrained by principles of customary international law in its ability to legislate in respect of extraterritorial conduct is flatly contradicted by a long-settled Supreme Court precedent. Chief Justice Marshall, writing for the Court, held in The Nereide, 13 U.S. (9 Cranch) 388, 3 L.Ed. 769 (1815), that Congress may "manifest [its] will" to apply a rule different from that of customary international law "by passing an act for the purpose." Id. at 423. The Court reaffirmed this principle in McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963), stating that Congress may enact laws superseding "the law of nations," id. at 21-22, 83 S.Ct. 671, and we summarized this principle succinctly in United States v. Pinto-Mejia, 720 F.2d 248 (2d Cir.1983), in which we stated, "Congress is not bound by international law." Id. at 259.
 
 
 [45]
 Two commentators observed a decade ago that "few cases seriously discuss the constitutional question, and none invalidate application of federal law on these grounds." Lea Brilmayer & Charles Norchi,Federal Extraterritoriality and Fifth Amendment Due Process, 105 Harv. L. Rev. 1217, 1263 n. 12 (1992).
 
 
 [46]
 Among other things, Yousef could have asked the District Court to issue letters rogatory to obtain documentary evidence in a foreign country pursuant to 28 U.S.C. § 1781. Section 1781(b) permits
 (1) the transmittal of a letter rogatory or request directly from a foreign or international tribunal to the tribunal, officer, or agency in the United States to whom it is addressed and its return in the same manner; or
 (2) the transmittal of a letter rogatory or request directly from a tribunal in the United States to the foreign or international tribunal, officer, or agency to whom it is addressed and its return in the same manner.
 
 
 [47]
 Although Shah's counsel requested access to the officer who wrote the report, he did not do so until near the end of the trial, more than two months after the Government produced the report, and he then did so merely by sending a letter to the Philippine National Police
 
 
 [48]
 This is not a situation where the defendants are claiming that the District Court failed to subpoena a witness within the Court's subpoena power. Even if the defendants had made such a claim, we would find it to be without merit. InUnited States v. Greco, 298 F.2d 247, 251 (2d Cir.1962), the defendant challenged his conviction on Sixth Amendment grounds because he did not have the right to compel testimony from witnesses in Canada. We pointed out that "the Sixth Amendment can give the right to compulsory process only where it is within the power of the federal government to provide it. Otherwise any defendant could forestall trial simply by specifying that a certain person living where he could not be forced to come to this country was required as a witness in his favor." Id. Accordingly, we concluded that "[t]he fact that appellant could not compel the attendance of an unnamed witness for whom he never asked did not deprive him of any constitutional right." Id. Likewise, in the case at hand, the District Court's inability to subpoena witnesses from the Philippines deprived the defendants of no constitutional right.
 
 
 [49]
 Pakistan became a successor in interest to the United Kingdom under the treaty when it gained its independence in 1947
 
 
 [50]
 Article 7 of the treaty provides:
 A person surrendered can in no case be kept in custody or be brought to trial in the territories of the High Contracting Party to whom the surrender has been made for any other crime or offence, or on account of any other matters, than those for which the extradition shall have taken place, until he has been restored, or has had an opportunity of returning, to the territories of the High Contracting Party by whom he has been surrendered.
 1931 U.S.T. LEXIS 60, at *6.
 
 
 [51]
 18 U.S.C. § 2332 provides:
 (a) Homicide. — Whoever kills a national of the United States, while such national is outside the United States, shall —
 (1) if the killing is murder (as defined in section 1111(a)), be fined under this title, punished by death or imprisonment for any term of years or for life, or both;
 (2) if the killing is a voluntary manslaughter as defined in section 1112(a) of this title, be fined under this title or imprisoned not more than ten years, or both; and
 (3) if the killing is an involuntary manslaughter as defined in section 1112(a) of this title, be fined under this title or imprisoned not more than three years, or both.
 (b) Attempt or conspiracy with respect to homicide. — Whoever outside the United States attempts to kill, or engages in a conspiracy to kill, a national of the United States shall —
 (1) in the case of an attempt to commit a killing that is a murder as defined in this chapter [18 U.S.C. §§ 2331 et seq.], be fined under this title or imprisoned not more than 20 years, or both; and
 (2) in the case of a conspiracy by two or more persons to commit a killing that is a murder as defined in section 1111(a) of this title, if one or more of such persons do any overt act to effect the object of the conspiracy, be fined under this title or imprisoned for any term of years or for life, or both so fined and so imprisoned.
 (c) Other conduct. — Whoever outside the United States engages in physical violence —
 (1) with intent to cause serious bodily injury to a national of the United States; or
 (2) with the result that serious bodily injury is caused to a national of the United States;
 shall be fined under this title or imprisoned not more that ten years, or both.
 (d) Limitation on prosecution. — No prosecution for any offense described in this section shall be undertaken by the United States except on written certification of the Attorney General or the highest ranking subordinate of the Attorney General with responsibility for criminal prosecutions that, in the judgment of the certifying official, such offense was intended to coerce, intimidate, or retaliate against a government or a civilian population.
 
 
 [52]
 Although the words "tactics" and "strategy" obviously possess somewhat different meanings, they are generally used interchangeably in this contextSee, e.g., Yu-Leung, 51 F.3d at 1122-23.
 
 
 [53]
 On May 30, 1996, Yousef told the Court that he wanted to make his own opening statement and proceedpro se. ATr. 79-84. After he was advised by the Court several times of the dangers of representing himself, ATr. 79-85, Yousef stated that he still wanted to represent himself, ATr. 84. The District Court concluded that Yousef "knowingly and voluntarily ... waived his right to counsel" and allowed Yousef to continue pro se. Id. The Court appointed Roy Kulcsar, Yousef's attorney up to that point, to remain as standby counsel, and to act "solely as an advisor." Id. As Yousef's attorney-advisor, Kulcsar was actively involved in the case, making numerous objections and motions on Yousef's behalf. See, e.g., ATr. 4147, 5098.
 
 
 [54]
 Furthermore, the evidence strongly indicated that Yousef had written the letter. The letter was culled from a laptop computer registered to one of Yousef's aliases and located in Yousef's Manila apartment, and the file containing the letter was dated November 19, 1994, which was around the time evidence showed Yousef was buying chemicals and preparing to test his bombs. ATr. 2664-65. The same computer also contained files listing the chemicals necessary to carry out the bombing plan as well as an outline of the bombing plan itself
 
 
 [55]
 Following a 2002 amendment to Federal Rule of Criminal Procedure 12, the relevant text is now designated as Rule 12(e) rather than Rule 12(f). In order to remain consistent with the parties' papers, however, we will continue to refer to the relevant provision as "Rule 12(f)."
 
 
 [56]
 Murad's affidavit was dated March 28, 1996
 
 
 [57]
 See Tr. of Suppression H'rg. at 332-447.
 
 
 [58]
 Although Murad's attorney tried to question Major Albert Ferro of the Philippine National Police about these Amnesty International and State Department reports, the District Court sustained the Government's objection to this line of questioning. Murad does not appear to have otherwise elicited testimony about the reports
 
 
 [59]
 Whatever significance these reports might have in other contexts, their probative value in this context is highly questionable
 
 
 [60]
 The Government explained at trial that Philippine officials told them that certain reports were "classified." The Government understood this to mean that they were "for the eyes of the President of the Philippines only" and that the Philippine government would not turn them over. ATr. 3217, 3292
 
 
 [61]
 Yousef's attorney-advisor objected in open court to other portions of the proposed jury instructions and offered written objections on behalf of Yousef. ATr. 5098
 
 
 [62]
 We decidedSalameh I on August 4, 1998, two years after Judge Duffy's jury instruction in the airline bombing case.
 
 
 [63]
 The District Court in the instant case illustrated the difference between direct and circumstantial evidence with the following example from Robinson Crusoe:
 At the beginning of the trial I started to tell you about circumstantial evidence and I gave you an example. Do you remember the story about Robinson Crusoe who was shipwrecked on this desert island? He thinks that it is uninhabited. One day he is out there, he is looking around the island, and he spots some footsteps on the sand in between where the tide was up to last and where the water is now. He measures the footprints and he is sure they are not his. That's circumstantial evidence. Of what? Of the fact that there is somebody else on the island.
 If the issue was is the island totally uninhabited except for Robinson Crusoe, do you think he would have any difficulty in figuring out that there was somebody else there? Do you think he did? No. From the circumstantial evidence, he drew the inference that somebody else was on the island.
 Circumstantial evidence, ladies and gentleman, if believed, is of no less value than direct evidence, for in either case, particularly here in a criminal case, you must be convinced beyond a reasonable doubt that the government has sustained its burden of proof.
 ATr. 5578-79.
 
 
 [64]
 Specifically, it stated that "it is for you and you alone, ladies and gentleman, to decide what inferences you will draw." ATr. 5580
 
 
 [65]
 We note that the Sixth Amendment right to counsel is "offense specific," such that it attaches only to the specific charges as to which adversary proceedings have been initiatedSee McNeil v. Wisconsin, 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). Accordingly, to the extent Yousef seeks to assert the same claim of error with respect to the introduction of his post-arrest statements at the Philippine Airlines bombing trial, this claim fails because Yousef was not indicted for any charges relating to the airline bombing trial until he was returned to the United States, well after he made the statements. See Airline Bombing Case, Background, section III, ante.
 
 
 [66]
 Because extradition proceedings are not themselves criminal proceedings, but rather are civil proceedings related to a criminal proceeding in another jurisdiction, they also do not independently trigger any Sixth Amendment protectionsSee Caltagirone v. Grant, 629 F.2d 739, 748 n. 19 (2d Cir.1980); Jhirad v. Ferrandina, 536 F.2d 478, 485 n. 9 (2d Cir.1976); see also DeSilva v. DiLeonardi, 181 F.3d 865, 868-69 (7th Cir.1999).
 
 
 [67]
 The translated version of Ismoil's statement, which was written in Arabic, uses two different spellings: "Abdel-Basset" and "Abdel-Bassit." The Government's indictment uses a third spelling, "Abdul-Basit." We use the spelling set forth in the indictment
 
 
 [68]
 Fed.R.Evid. 801(d)(2)(A) states, in relevant part, as follows: "A statement is not hearsay if ... [t]he statement is offered against a party and is ... the party's own statement, in either an individual or a representative capacity...."
 
 
 [69]
 Fed.R.Evid. 106 provides:
 When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.
 The Advisory Committee Notes accompanying the 1972 Proposed Rules state that "[t]he rule is an expression of the rule of completeness."
 
 
 [70]
 Fed.R.Evid. 402 states as follows: "All relevant evidence is admissible, except as otherwise provided.... Evidence which is not relevant is not admissible."
 
 
 [71]
 Fed.R.Evid. 1006 states, in relevant part, that "[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation."
 
 
 [72]
 At the time of trial, Rule 24(c) provided, in relevant part: "An alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict." Fed.R.Crim.P. 24(c) (1996). Rule 24(c) was amended in 1999 expressly to allow a district court, in its discretion, to retain alternates, and the current version of Rule 24(c), which also reflects a 2002 amendment, reads, in relevant part:
 The court may retain alternate jurors after the jury retires to deliberate. The court must ensure that a retained alternate does not discuss the case with anyone until that alternate replaces a juror or is discharged. If an alternate replaces a juror after deliberations have begun, the court must instruct the jury to begin its deliberations anew.
 Fed.R.Crim.P. 24(c)(3) (2003).
 
 
 [73]
 The jury recommendation requirement was eliminated by the 1994 amendment
 
 
 [74]
 Nor is this a case where the judge's sentencing determination violated Yousef's and Ismoil's Sixth Amendment jury trial guarantee. In a series of recent decisions, the Supreme Court has held that any fact (other than a prior conviction) that increases the maximum penalty for a crime must be found by a jury beyond a reasonable doubtSee Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 2439-40, 153 L.Ed.2d 556 (2002); Apprendi v. New Jersey, 530 U.S. 466, 482-85, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); Jones v. United States, 526 U.S. 227, 242-43 & n. 6, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999). The fact that Yousef's and Ismoil's sentences were imposed by a judge, rather than a jury, does not implicate these precedents because there was no judicial fact-finding that exposed Yousef or Ismoil to greater punishment than that authorized by the jury's verdict.
 
 
 [75]
 18 U.S.C. § 3664(d)(3) provides:
 Each defendant shall prepare and file with the probation officer an affidavit fully describing the financial resources of the defendant, including a complete listing of all assets owned or controlled by the defendant as of the date on which the defendant was arrested, the financial needs and earning ability of the defendant and the defendant's dependents, and such other information that the court requires relating to such other factors as the court deems appropriate.
 
 
 [76]
 The second protective order was issued under Federal Rule of Criminal Procedure 26.2(c) (incorporating 18 U.S.C. § 3500(c)), in order to seal telephone conversations between one of the appellants and a witness (not Scarpa) whom the Government planned on calling at trial
 
 
 [77]
 We act on the assumption that there have been no other sealed proceedings in this case. If there have been, they should be brought to the attention of this Court by counsel for the Government, in advance of the scheduled issuance of the mandate in this appeal, as a matter of professional responsibility
 
 
 [78]
 Ismoil also contends that the nondisclosure of the Scarpa materials violated the Classified Information Procedures Act, 18 U.S.C. App. 3 ("CIPA"). Notice was not required under CIPA because the Scarpa materials were not classified pursuant to § 1(a) of CIPA